**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **ESTATE OF RENARDO GREEN, et al.** | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Case No. 1:24-CV-01351-MJM** |
| **CITY OF ANNAPOLIS, et al.** | * | |
| **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR HEARING**</u>

## TABLE OF CONTENTS

I.      BACKGROUND ................................................................................................. 1

II.     LEGAL STANDARD ........................................................................................ 10

III.    ARGUMENT ..................................................................................................... 12

   A.   **The Body Worn Camera Footage can be Considered in Resolving the Motion to Dismiss without Converting it to one for Summary Judgment.** ................................. 12

   B.   **Plaintiffs have Failed to State a Claim Upon Which Relief can be Granted, Warranting Dismissal of the Complaint.** .................................................................. 14

     1.   Plaintiffs have again failed to satisfy the applicable pleading standards for their claims against any of the Individual Defendants. .............................................................. 14

     2.   The Facts Alleged in the Complaint either Contradict what is clear from the Body Worn Camera Footage or are Insufficient to Support the Claims Presented. ............................ 17

       i.    *Counts I and II – Excessive Force and Violation of Right to Due Process under 42 U.S.C. §1983* ......................................................................................................... 17

       ii.   *Counts III and IV – Monell Claim under 42 U.S.C. §1983* ........................................ 26

       iii.  *Counts V and VI – Conspiracy and/or Bystander Liability under 42 U.S.C. §1985 and 42 U.S.C. §1983* ....................................................................................................... 29

       iv.   *Counts VII and VIII – Deliberate Indifference to Serious Medical Needs under 42 U.S.C. §1983* ......................................................................................................... 32

       v.    *Counts IX and X – Article 24 of the Maryland Declaration of Rights* ...................... 38

       vi.   *Counts XI and XII – Battery* ..................................................................................... 39

       vii.  *Counts XIII and XIV – Negligence and Negligence Per Se* ................................... 40

       viii. *Counts XV and XVI – Gross Negligence* ................................................................. 41

       ix.   *Count XVII – Wrongful Death* ................................................................................. 44

       i.    *Count XVIII – Survival Action* ................................................................................ 45

   C.   **Even if Plaintiffs have Plausibly Stated a Claim for Relief, the Individual Defendants are Immune From Suit.** ................................................................................................ 45

     1.   Qualified Immunity ...................................................................................................... 46

     2.   Public Official Immunity .............................................................................................. 51

     3.   Good Samaritan Act and Fire & Rescue Companies Act ............................................. 52

IV.     CONCLUSION ................................................................................................. 53

# TABLE OF AUTHORITIES

## Cases

*A Soc'y Without a Name v. Va.*, 655 F.3d 342 (4th Cir. 2011) ...................................... 29

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ............................................................... 46

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L. Ed.2d 868 (2009) .............. 10, 11, 15, 16

*Barbre v. Pope*, 402 Md. 157 (2007) .................................................................... 41

*Barnes v. Maryland Nat. Capital Park and Planning Comm'n*, 932 F.Supp. 691 (D. Md. 1996) 29

*Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) .......... 10

*Bost v. Wexford Health Sources, Inc.,* 2018 WL 3539819 (D. Md. July 23, 2018) ............ 15

*Buckley v. Hennepin County*, 9 F.4th 757 (8th Cir. 2021) ....................................... 49, 50

*California v. Hodari D.*, 499 U.S. 621 (1991) .......................................................... 18

*Campbell v. Hewitt, Coleman & Assocs., Inc.,* 21 F.3d 52 (4th Cir. 1994) ...................... 11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................. 11, 12

*City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600 (2015) ............................................. 46

*City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ............................................ 27, 29

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) .................................................. 28

*City of Tahlequah v. Bond*, 595 U.S. 9 (2021) ....................................................... 47

*Coney v. Davis*, 809 F. App'x 158 (4th Cir. 2020) ................................................... 20

*Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, L.Ed.2d 80 (1957) .................................. 10

*Connick v. Thompson*, 563 U.S. 51 (2011) ............................................................ 32

*Cottman v. Balt. Police Dep't*, 2022 WL 137735 (D. Md. Jan. 13, 2022) ....................... 28

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) .............................................. 19

*Cruzan v. Dir., Miss. Dep't of Health*, 497 U.S. 261 (1990) ...................................... 26

*Dale v. Mayor*, 2015 WL 5521815 (D. Md. Sept. 15, 2015) ...................................... 14

*Davis v. DiPino*, 99 Md. App. 282 (1994) .............................................................. 52

*Davis v. Scherer*, 468 U.S. 183 (1984) ................................................................ 23

*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ................................................ 47

*Dodson v. Prince George's Cty.*, 2016 WL 67255 (D. Md. Jan. 6, 2016) ...................... 31

*Doe v. Dep't of Pub. Safety and Corr. Servs.*, 185 Md. App. 625, 971 A.2d 975 (2009) ........... 38

*Doe v. Rosa*, 795 F.3d 429 (4th Cir. 2015) ........................................................... 32

*Estate of Green v. City of Annapolis*, 2023 U.S. Dist. LEXIS 176157 (D. Md. Sept. 30, 2023)
.................................................................................................................. passim

*Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997) .......................... 24

*Estelle v. Gamble*, 429 U.S. 97 (1976) ................................................................ 33

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................................. 33

*Felty v. Graves-Humphreys Co.*, 818 F.2d 1126 (4th Cir. 1987) ................................. 12

*Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146 (4th Cir. 2020) ................................ 10

*Fijalkowski v. Wheeler*, 361 F. Supp. 3d 577 (E.D. Va. 2019) ................................... 12

*Foor v. Juvenile Services*, 78 Md. App. 151 (1989) ................................................. 43

*Fried v. Archer*, 139 Md. App. 229 (2001) ............................................................ 41

*Garrett v. Clarke*, 74 F.4th 579 (4th Cir. 2023) ..................................................... 47

*Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159 (4th Cir. 2016) ............................ 21, 35

*Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500 (4th Cir. 2015) ................................... 11

*Grayson v. Peed*, 195 F.3d 692 (4th Cir. 1999) ............................................................................ 26, 37

*Hairfield-Ulsch v. Montgomery County, Md.*, 2015 WL 1405421 (D. Md. Mar. 25, 2015) ........ 42

*Hall v. Fabrizio*, 2012 WL 2905293 (D. Md. July 13, 2012) ............................................................. 29

*Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011) ................................................................................ 19

*Heyer v. United States Bureau of Prisons*, 849 F.3d 202 (4th Cir. 2017) ................................... 33

*Hicks v. Ferreyra*, 64 F.4th 156 (4th Cir. 2023) ............................................................................... 46

*Hines v. French*, 157 Md. App. 536 (2004) ........................................................................................ 39

*Hinkle v. City of Clarksburg*, 81 F.3d 416 (4th Cir. 1996) ............................................................. 31

*Horridge v. St. Mary's County Dep't of Soc. Servs.*, 382 Md. 170 (2004) ................................... 40

*Ibarra v. United States*, 120 F.3d 472 (4th Cir. 1997) .................................................................... 10

*Jackson v. Lightsey*, 775 F.3d 170 (4th Cir. 2014) ......................................................................... 33

*Jackson v. Pena*, 28 F.Supp.3d 423 (D. Md. June 19, 2014) ........................................................ 17

*James v. Prince George's County*, 288 Md. 315 (1980) ................................................................ 51

*Jien v. Perdue Farms, Inc.*, 2020 WL 5544183 (D. Md. Sept. 16, 2020) ....................................... 30

*Johnson v. Dore*, 2013 WL 5335626 (D. Md. Sept. 20, 2013) ....................................................... 14

*Johnson v. Valu Food, Inc.*, 132 Md. App. 118 (2000) .................................................................... 39

*Jones v. Chapman*, 2017 WL 2472220 (D. Md. July 24, 2015) ...................................................... 30

*Khawaja v. MCC, City of Rockville*, 89 Md. App. 314 (1991) ........................................................ 42

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) ......................................................................... 20, 25

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018) ........................................................................................ 47

*Lahwon v. Edwards*, 2021 U.S. App. LEXIS 33823 (4th Cir. 2021) ............................................. 24

*Langford v. Joyner*, 62 F.4th 122 (4th Cir. 2023) ........................................................................... 16

*Lawhon v. Mayes,* 2021 WL 5294931 (4th Cir. Nov. 15, 2021) ..................................................... 13

*Lewis v. Simms*, 2012 WL 254024 (D. Md. Jan. 26, 2012) ............................................................ 28

*Lovelace v. Anderson*, 366 Md. 690 (2001) ..................................................................................... 51

*Love-Lane v. Martin*, 355 F.3d 766 (4th Cir. 2004) ........................................................................ 15

*Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003) .................................................................................... 27

*Mang v. City of Greenbelt*, 2012 WL 115454 (D. Md. 2012) ......................................................... 45

*Martin v. St. Mary's Dep't of Social Servs.*, 346 F.3d 502 (4th Cir. 2003) ................................. 19

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 475 (1986) ......................... 11

*McCoy v. Hatmaker*, 135 Md. App. 693 (2000) ................................................................... 42, 43, 44

*McKenna v. Edgell*, 617 F.3d 432 (6th Cir. 2010) ........................................................................... 49

*McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir. 1994) ...................................................................... 23

*Medina v. Meilhammer*, 62 Md. App. 239 (1985) ........................................................................... 42

*Militier v. Beorn*, 896 F.2d 848 (4th Cir. 1990) ................................................................. 23, 31, 36

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ......................................................................................... 46

*Muthukumarana v. Montgomery County*, 370 Md. 447 (2002) .................................................... 40

*Nalls v. Balt. Cnty.*, 2024 U.S. Dist. LEXIS 45771 (D. Md. Mar. 15, 2024) ....................... 12, 16

*Nat'l Union Fire Ins. Co. v. Allfirst Bank*, 282 F.Supp.2d 339 (D. Md. 2003) .......................... 30

*Nelson v. Carroll*, 355 Md. 593 (1999) ............................................................................................. 39

*Nicholson v. Baltimore City Police Dep't*, 2021 U.S. Dist. LEXIS 75798 (D. Md. Apr. 20, 2021)
.......................................................................................................................................................... 29

*Orem v. Rephann*, 523 F.3d 442 (4th Cir. 2008) ........................................................ 19

*Peete v. Metro Gov't of Nashville & Davidson County*, 486 F.3d 217 (6th Cir. 2007)............... 49

*Perez v. City of Fresno*, 98 F.4th 919 (9th Cir. 2024) ................................................ passim

*Peters v. City of Mount Rainier*, 2014 WL 4855032 (D. Md. Sept. 29, 2014) ........................... 28

*Philips v. Pitt Cnty., Mem'l Hosp.*, 572 F.3d 176 (4th Cir. 2009) ................................... 13

*Proctor v. Metro. Money Store Corp.*, 579 F.Supp.2d 724 (D. Md. 2008) ............................... 16

*Queen v. Prince George's County*, 188 F.Supp.3d 535 (D. Md. 2016)................................... 46

*Randall v. Prince George's County*, 302 F. 3d 188 (4th Cir. 2002)............................... 27, 30, 32

*Reichle v. Howards*, 566 U.S. 658, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012) ....................... 47

*Respess v. Travelers Casualty & Surety Company of America*, 770 F.Supp.2d 751 (D. Md. 2011) ........................................................................................................ 42

*Revene v. Charles Cty. Comm'rs*, 882 F.3d 870 (4th Cir. 1989) ..................................... 10

*Riley v. Dorton*, 115 F.3d 1159 (4th Cir. 1997) ..................................................... 19

*Robles v. Prince George's Cty., Md.*, 302 F.3d 262 (4th Cir. 2002)................................... 19

*Schultz v. Braga*, 455 F.3d 470 (4th Cir. 2006) ..................................................... 19

*Scott v. Harris*, 550 U.S. 372 (2007) ............................................................ 12, 21

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015) ............................... 30

*Shakka v. Smith*, 71 F.3d 162 (4th Cir. 1995) ....................................................... 23

*Sharpe v. S. Carolina Dep't or Corr.*, 621 F. App'x 732 (4th Cir. 2015) ............................. 33

*Shoemaker v. Smith*, 353 Md. 143 (1999).............................................................. 42

*Simmons v. Poe*, 47 F.3d 1370 (4th Cir. 1995) ....................................................... 29

*Smith-Hosch v. Bramble*, 2019 WL 4060017 (D. Md. Aug. 28, 2019) .................................... 14

*Solis v. Prince George's County*, 153 F.Supp.2d 793 (2001) ......................................... 41

*Sposato v. First Mariner Bank*, 2013 WL 1308582 (D. Md. Mar. 28, 2013)........................... 11, 12

*Stanton v. Sims*, 571 U.S. 3 (2013) ................................................................. 46

*State v. Albrecht*, 336 Md. 475 (1994)............................................................... 42

*Tatum v. Gigliotti*, 321 Md. 623 (1991)............................................................. 42

*Tatum v. Gigliotti*, 80 Md. App. 559 (1989)..................................................... 42, 43, 44

*Thompson v. Badgujar*, 2021 U.S. Dist. LEXIS 147923 (D. Md. Aug. 6, 2021)......................... 12

*Thompson v. Virginia*, 878 F.3d 89 (4th Cir. 2017)................................................... 47

*Trimper v. Porter-Hayden*, 305 Md. 31 (1985) ....................................................... 45

*Trulock v. Freeh*, 275 F.3d 391 (4th Cir. 2001)..................................................... 15

*U.S. v. Garcia*, 855 F.3d 615 (4th Cir. 2017) ....................................................... 13

*United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844 (4th Cir. 1979)........................ 10

*Vinnedge v. Gibbs*, 550 F.2d 296 (4th Cir. 1977) ................................................... 15

*Wag More Dogs, LLC v. Cozart*, 680 F.3d 359 (4th Cir. 2012) ........................................ 10

*Washington v. Harper*, 494 U.S. 210 (1990) ......................................................... 26

*Weeden v. Prince George's Cty.*, 2018 WL 2694441 (D. Md. June 4, 2018).............................. 30

*Wilcox v. Brown*, 877 F.3d 161 (4th Cir. 2017)...................................................... 15

*Willey v. Bd. of Educ.*, 557 F. Supp. 3d 645 (D. Md. Aug. 30, 2021) ................................ 14

*Williams v. Prince George's County*, 112 Md. App. 526 (1996) ....................................... 39

iv

**Statutes**

Md. Code Ann., Cts. & Jud. Proc. Art., §3-901 ........................................................... 45

Md. Code Ann., Cts. & Jud. Proc. Art., §3-902 ........................................................... 45

Md. Code Ann., Cts. & Jud. Proc. Art., §5-303 ........................................................... 41

Md. Code Ann., Cts. & Jud. Proc. Art., §5-507 ........................................................... 51

Md. Code Ann., Cts. & Jud. Proc. Art., §5-603 ........................................................... 53

Md. Code Ann., Cts. & Jud. Proc. Art., §5-604 ........................................................... 53

Md. Code Ann., Cts. & Jud. Proc. Art., §6-401 ........................................................... 45

U.S. Const. Amend. IV ................................................................................................. 18

U.S. Const. Amend. XIV .............................................................................................. 19

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 10

Fed. R. Civ. P. 12(d) .................................................................................................... 11

Fed. R. Civ. P. 56 ......................................................................................................... 11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ESTATE OF RENARDO GREEN, et al.** | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Case No. 1:24-CV-01351-MJM** |
| **CITY OF ANNAPOLIS, et al.** | * | |
| **Defendants.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR HEARING</u>

Defendants, Mark Cochran, Matthew Bodmer, Anna Woytko, Ivan Siminyuk, ("Officer Defendants"), Thomas Frankhouser, Glenn Makovsky, Bridget Weiss, Caleb Ward, Ryan Norris, ("AFD Defendants") (all collectively the "Individual Defendants"), and the City of Annapolis ("City"), by and through undersigned counsel, pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56(a) move to dismiss Plaintiffs' Complaint with prejudice or, alternatively, for summary judgment in the above-captioned matter and submit this Memorandum of Law in Support thereof, respectfully stating to this Honorable Court for cause:

## I.    BACKGROUND

This is the second lawsuit arising out of an encounter between the decedent, Renardo Green, and the Individual Defendants on June 1, 2021. In December 2022, Plaintiffs filed suit against the City and the Individual Defendants, seeking $75 million dollars in compensatory damages and an undetermined claim for punitive damages, attorneys' fees, and other costs. After

Defendants moved to dismiss, Judge Rubin dismissed Plaintiffs' Complaint without prejudice. *See Estate of Green v. City of Annapolis*, 2023 U.S. Dist. LEXIS 176157 (D. Md. Sept. 30, 2023) (hereinafter "First Lawsuit"). Notably, Judge Rubin considered the police reports and the body worn camera footage in resolving the motion due to Plaintiffs' reference to them in their complaint. *Id.*, 2023 U.S. Dist. LEXIS 176157, at *15-20.

Plaintiffs have now filed the instant lawsuit, with minor adjustments to the factual allegations and causes of action, and have purposely excluded any explicit references to the body worn camera footage and police reports in an attempt to avoid the same outcome as the First Lawsuit. That being said, the body worn camera footage[1] was publicly posted on the City's website on March 9, 2023, and depicts details of the incident different from, and in addition to, those described in the instant Complaint. For the reasons stated, *infra*, this Court is permitted to consider the body worn camera footage without converting this Motion to one for summary judgment.

At approximately 2:00 AM on June 1, 2021, Plaintiff Tracy Naylor called 911 after her husband, Mr. Green, ingested PCP and injured himself to the point of bleeding profusely. ECF No. 1, at ¶ 41. Officers from the Annapolis Police Department ("APD"), Anna Woytko[2] and Matthew Bodmer[3], were the first to arrive on scene at approximately 2:20 AM. *See* fns. 2 and 3, at 2:20 a.m. The officers could hear Mr. Green yelling from outside the apartment building as they approached. *See* fn. 2, at 2:20:32 a.m. Upon their arrival inside the apartment, Mr. Green was laying on his back in the kitchen being held down by Ms. Naylor's brother. *See* fns. 2 and 3,

---

[1] See https://www.annapolis.gov/CivicAlerts.aspx?AID=1582
[2] Officer Woytko's body worn camera footage can viewed here: https://www.youtube.com/watch?v=D0zf2JSu54o&rco=1
[3] Officer Bodmer's body worn camera footage can be viewed here: https://www.youtube.com/watch?v=BGsSW5AJ_mk&rco=1

at 2:20:50 a.m. Mr. Green was observed to be "in a delirious state, flailing his legs, yelling 'yeah bitch' repeatedly, and otherwise behaving erratically" and blood was observed throughout the kitchen area. *Id.*; *see also* ECF No. 1, at ¶ 42. Officers Woytko and Bodmer repeatedly attempted to communicate with Mr. Green, but his only response was to continue to scream obscenities and thrash around. *See* fns. 2 and 3, at 2:20:50 a.m. – 2:23:50 a.m. Ms. Naylor informed the officers that Mr. Green was on PCP and that he had busted his hand by slamming it through ceramic plates. *See* fn. 2, at 2:20:53 a.m. – 2:21:12 a.m. During this time, Ms. Naylor's brother was stepping on Mr. Green's chest in an effort to control Mr. Green, who was hitting and kicking around, including at Ms. Naylor's brother. *See* fn. 2, at 2:21 a.m.; *see also* fn. 4, at 2:25:12 a.m. – 2:25:38 a.m. Mr. Green was still screaming and kicking his legs while being held down by Ms. Naylor's brother upon Officer Ivan Siminyuk's[4] arrival at 2:23 a.m. *See* fn. 4, at 2:23:04 a.m. For the first three minutes that the officers are on scene, the officers ask Mr. Green at least three times to stop "flailing around" and ask Mr. Green to relax no less than twenty-five times. *See* fns. 2 and 3, at 2:20:50 a.m. – 2:23:50 a.m. Mr. Green does not comply and instead continues to constantly scream mostly obscenities and flail around for almost the entire duration of the Individual Defendants' encounter with him. *See* generally fns. 2, 3, 4, and 5, at 2:20:32 a.m. – 2:40:45 a.m.

At 2:24 a.m., Officer Siminyuk tells Mr. Green that he is going to handcuff him. After Officer Siminyuk linked two pairs of handcuffs together, both he and Officer Bodmer struggled to put the handcuffs on Mr. Green due to his inability or unwillingness to comply by stiffening his arms. *See* fns. 4 and 3, at 2:24:31 a.m. – 2:25:55 a.m. Ms. Naylor's brother stopped holding

---

[4] Officer Siminyuk's body camera footage can be viewed here:
https://www.youtube.com/watch?v=qaUOMdTrXuE&rco=1

Mr. Green down during this time, and the Officers repeatedly reminded Mr. Green that he was

not in trouble. *Id.* At this point, Mr. Green was in protective custody to be petitioned for an

emergency evaluation. ECF No. 1, at ¶ 43. After applying the handcuffs, the officers then rolled

Mr. Green onto his side at 2:26:34 AM. ECF No. 1, at ¶ 44. While awaiting the arrival of the

AFD Defendants, Mr. Green continuously screamed and moved his body around. *See* fns. 4 and

3, at 2:26:35 a.m. – 2:29:10 a.m. Officers Bodmer and Siminyuk had to repeatedly reposition Mr.

Green on his side and physically hold him there because he kept moving onto his stomach. *Id.*

Officer Siminyuk at one point told Mr. Green to "stay on your side." *See* fn. 4, at 2:27:45 a.m. At

approximately 2:29 a.m., AFD Defendants arrived on scene and began to render aid to Mr.

Green's injured hand, who continued to scream obscenities and move around on the floor. *See* fn.

4, at 2:29:11 a.m. In the time it took for Officer Siminyuk to greet the AFD Defendants, Mr.

Green rolled himself onto his stomach and Officer Siminyuk had to again reposition him on his

side and hold him there, while Officer Bodmer continued to hold his legs so that he would not

continue to kick his legs around. *See* fns. 4 and 3, at 2:29:24 a.m. – 2:29:58 a.m. Sergeant Mark

Cochran[5] arrived shortly after and provided Officer Bodmer with shackles, who then placed them

around Mr. Green's ankles so that he would not kick anyone while AFD Defendants continued to

render aid.  *See* fns. 3 and 4, at 2:30 a.m. Despite the application of the shackles to Mr. Green's

ankles, he continued to thrash around on the kitchen floor. *See* fns. 3, 4, and 5, at 2:31:00 a.m. –

2:34:00 a.m. At this point, Officers Bodmer, Siminyuk, and Sgt. Cochran were all physically

keeping Mr. Green on his side due to his inability to stay still. *Id.*

---

[5] Sergeant Cochran's body worn camera footage can be viewed here:
https://www.youtube.com/watch?v=Oay0aVA6jXU&rco=1

During this time, Officer Woytko went to speak with Ms. Naylor[6]. *See* fn. 2, at 2:32:16 a.m. Ms. Naylor informed Officer Woytko that Mr. Green came in from taking out the trash "yelling and carrying on and then he just started going off beating on everything," and explained how he injured his hand. *Id.*, at 2:32:25 a.m. – 2:32:55 a.m. Ms. Naylor further stated that Mr. Green was high on PCP and that she did not know how he gained entry into their residence, as she would take his key whenever he got high. *Id.*

While Officer Siminyuk and Sgt. Cochran held Mr. Green's right shoulder upward to keep him positioned on his side, one of the AFD Defendants, Firefighter First Class Bridget Weiss ("FF 1/C Weiss"), is heard suggesting they get a sheet to move Mr. Green out of the small kitchen area. *See* fns. 3, 4, and 5, at 2:31:26 a.m. While the officers continued to keep Mr. Green on his side, Sgt. Cochran asked one of the AFD Defendants "what's the plan?" *See* fn. 5, at 2:33:35 a.m. – 2:33:52 a.m. An AFD Defendant responded, but due to Mr. Green's continued screaming Sgt. Cochran says "I can't hear you." *Id.* The AFD Defendant repeated himself and referenced using the Reeves Sleeve, to which Sgt. Cochran stated "I don't know what that is." *Id.* The AFD Defendant then directed Sgt. Cochran's attention to the portable[7] stretcher behind him. *Id.* Sgt. Cochran then asked if the AFD Defendants needed the Officer Defendants to lift Mr. Green, and an AFD Defendant is heard saying "no, I think…" though it is difficult to hear how the AFD Defendant finishes his sentence due to Mr. Green's screaming. *Id.*

FF 1/C Weiss then placed a sheet under Mr. Green so that he could be moved out of the small kitchen area and transported to the portable stretcher. *See* fns. 4 and 5, at 2:33:58 a.m. Mr. Green was then repositioned a few times so that the white sheet was under him, including being

---

[6] The audio of the body worn camera footage belonging to all four officers is muted during parts of this conversation to protect Ms. Naylor's sociological information.

[7] Plaintiffs refer to this as a "soft stretcher" or "scoop stretcher" in the Complaint. ECF No. 1, at ¶ 55.

positioned on his stomach momentarily so that FF 1/C Weiss could cut his shirt off. *See* fns. 4 and 5, at 2:33:58 a.m. – 2:35:53 a.m. Mr. Green was still screaming and uncontrollable throughout this whole process, just as he had been when officers first arrived on scene. *Id*. Sgt. Cochran again asked the AFD Defendants what the plan was. *See* fn. 5, at 2:35:53 a.m. FF 1/C Weiss, along with another AFD Defendant, demonstrated that, using the white sheet, Mr. Green would be lifted and brought out from the kitchen to the left of the apartment, then they would walk backwards to lower and place Mr. Green on the portable stretcher. *See* fns. 4 and 5, at 2:35 a.m. Officer Bodmer assisted by lifting the white sheet by Mr. Green's feet. *See* fn. 3, at 2:36:15 a.m. – 2:36:26 a.m. Sgt. Cochran assisted by lifting the white sheet near Mr. Green's right shoulder. *See* fn. 5, at 2:36:15 a.m. – 2:36:26 a.m. Officer Siminyuk assisted by lifting the white sheet near Mr. Green's left shoulder. *See* fn. 4, at 2:36:15 a.m. – 2:36:26 a.m. Mr. Green was then lowered onto the portable stretcher and secured to it by three of the AFD Defendants, who secured one strap by his ankles, one strap below his buttocks, and one strap on his lower back. *See* fns. 3, 4, and 5, at 2:36:48 a.m. – 2:37:19 a.m. Mr. Green's erratic behavior never ceased during this time. *Id*.

Once secured, the AFD Defendants (and not any of the Officer Defendants) lifted the portable stretcher and began transporting Mr. Green out of the apartment. Though initially on his side, Sgt. Cochran and Officer Woytko's body cameras capture the moment where Mr. Green's left arm and elbow drop and he becomes prone after he has been lifted up from the floor on the portable stretcher. *See* fns. 2 and 5, at 2:37:32 a.m. Mr. Green continued yelling as he had been for the previous seventeen minutes.

Officer Woytko remained in the apartment to take pictures of the scene, only exiting briefly to speak with Officer Bodmer at a point after Mr. Green had already been loaded into the back of the medic unit. *See* fn. 2, at 2:38 a.m. – 2:41:05 a.m.

Officer Siminyuk left to move Officer Bodmer's car as Mr. Green was placed on the rolling stretcher[8]. *See* fn. 4, at 2:38:35 a.m., and did not return to the scene.

While walking out of the apartment after the AFD Defendants, Sgt. Cochran stated "I gotta call CID in reference to something else going on," and proceeded to walk outside away from the scene as Mr. Green was placed on the rolling stretcher. Between 2:38:32 a.m. and 2:41:18 a.m., Sgt. Cochran was standing off to the side of the apartment building, sometimes with his back to Mr. Green, making phone calls or speaking with bystanders. *See* fn. 5, at 2:38:32 a.m. – 2:41:18 a.m. During this time, Sgt. Cochran's body worn camera picked up Mr. Green's continued screaming and each time Sgt. Cochran's body worn camera is facing toward Mr. Green, he can be seen moving around on the rolling stretcher. *Id*, at 2:39:38 a.m. – 2:39:48 a.m.

Officer Bodmer followed the AFD Defendants and grabbed a yellow strap connected to the rolling stretcher before handing it to an AFD Defendant, while Mr. Green continued to scream and move around on the rolling stretcher. *See* fn. 3, at 2:38:00 a.m. – 2:38:48 a.m. FF 1/C Weiss and another AFD Defendant secured Mr. Green for his safety to the rolling stretcher using straps across his knees and across his lower back just above his buttocks. *Id.*, at 2:38:44 a.m. – 2:39:23 a.m. One of the AFD Defendants remarked, "he is, uh, trying to get up" as Mr. Green was being secured to the rolling stretcher. *Id.*, at 2:38:45 a.m. Mr. Green continued to yell and move around on the rolling stretcher after he was secured, including lifting his chest up and off the stretcher. *Id.*, at 2:38:42 a.m.; at 2:39:08 a.m.; and at 2:39:13 a.m. These actions continued as

---

[8] Plaintiffs refer to this as a "hard stretcher" in the Complaint. ECF No. 1, at ¶ 59.

the AFD Defendants began transporting Mr. Green to the medic unit. *Id.*, at 2:39:35 a.m. –
2:40:03 a.m. After the AFD Defendants started wheeling Mr. Green towards the medic unit, he
continued to lift his upper body off the stretcher up until the moment he was loaded into the back
of the medic unit. *Id.*, at 2:40:03 a.m. – 2:40:45 a.m.

FF 1/C Weiss can be heard on Officer Bodmer's body worn camera saying "he's calmer
now" as Mr. Green was loaded into the back of the medic unit. *Id.*, at 2:40:53 a.m. Once Mr.
Green was secured inside the medic unit, FF 1/C Weiss began talking to Mr. Green, telling him
she was going to take his blood pressure. *Id.*, at 2:41:19 a.m.  She then said "Rena[r]do honey go
ahead and turn your head to the side." *Id.*, at 2:41:32 a.m. Once Mr. Green did not respond, FF
1/C Weiss told him "Rena[r]do I'm gonna turn your head honey." *Id.*, at 2:41:47 a.m. FF 1/C
Weiss then said "Rena[r]do honey" and appeared to reposition his head[9], to which one of the
AFD Defendants stated "he won't like it." *Id.*, at 2:42:04 a.m. – 2:42:17 a.m. FF 1/C Weiss
responded saying, "I know he won't, but I can't have him sleep like that, do you understand?"
and then directed her attention back to Mr. Green and said "Rena[r]do honey." *Id.*

At 2:42:21 a.m., FF 1/C Weiss asked someone to put Mr. Green on a heart monitor,
giving the first indication that at least one of the AFD Defendants started to consider that Mr.
Green's condition may have been more serious than just having fallen asleep. *Id.*, at 2:42:21 a.m.
FF 1/C Weiss then indicated that Mr. Green's nose is clear and his airway is open. *Id.*, at 2:42:37
a.m. FF 1/C Weiss continued to monitor Mr. Green's airway while Sgt. Cochran checked on
Officer Bodmer. *Id.*, 2:42:54 a.m. – 2:44 a.m. Sgt. Cochran told Officer Bodmer "it sounds like
he's calmed down a little bit?" to which Officer Bodmer responded in the affirmative and stated
"I think they gave him something." *Id.* One of the AFD Defendants then asked the officers for

---

[9] Officer Bodmer's body worn camera footage depicting Mr. Green and the medical care administered to him is
blurred due to the public release of the footage.

another set of handcuffs. *Id.*, 2:44:09 a.m. – 2:44:23 a.m. Because Officers Bodmer and

Siminyuk had used their sets of handcuffs to link together earlier in the encounter, Officer

Bodmer retrieved a third set of handcuffs so that each of Mr. Green's hands could be handcuffed

to each side of the stretcher. *Id.*, at 2:44:40 a.m. Mr. Green was then repositioned to his back, *Id.*,

at 2:44:27 a.m. – 2:45:20 a.m.[10], and Officer Bodmer handcuffed Mr. Green's left hand to one

side of the stretcher while one of the AFD Defendants handcuffed Mr. Green's right hand to the

other side of the stretcher. *Id.*, at 2:45:34 a.m. – 2:46:15 a.m. AFD Defendants then continued to

treat Mr. Green, including the administration of CPR while en route to the hospital, until their

arrival to the hospital where he was turned over to hospital personnel. ECF No. 1, at ¶¶ 69 and

70.

      Unfortunately, Mr. Green passed away at the hospital three days later while under the

hospital's care. ECF No. 1, at ¶ 73. Plaintiffs reference a Baltimore Sun article that reports that

the Maryland Office of the Chief Medical Examiner ruled Mr. Green's manner of death was

"prone restraint cardiac arrest." *See* ECF 1, at ¶ 81, fn. 9. That same article states that the autopsy

report indicated that Mr. Green's drug intoxication - specifically, PCP, TCP, methadone,

fentanyl, and cocaine - contributed to Mr. Green's death. *Id.*

      Plaintiffs have filed this second lawsuit against the City and the Individual Defendants,

with nearly identical factual allegations and causes of action, seeking the same relief as their

complaint in the First Lawsuit. Defendants now move to dismiss this second Complaint with

prejudice or, alternative, for summary judgment in their favor.

---

[10] *See also* ECF 1, at ¶ 68.

## II.    LEGAL STANDARD

The legal sufficiency of a complaint may be tested by way of a motion to dismiss for the failure to state a claim under Federal Rule of Procedure ("FRCP") 12(b)(6). *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020). A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FRCP 8(a)(2). Additionally, "[e]ach allegation must be simple, concise, and direct." FRCP 8(d)(1). The purpose of FRCP 8 is to ensure a defendant is given "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47-48 (1957).

When evaluating a motion to dismiss filed pursuant to FRCP 12(b)(6), the Court is required to accept as true all well-pled allegations and construe the facts and reasonable inferences in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). However, in order to proceed beyond dismissal, the complaint must be both legally and factually sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and that entitlement to relief is likely rather than merely conceivable. *Iqbal*, 556 U.S. at 678-79 (citing *Twombly*, 550 U.S. at 556). The court should not accept unsupported legal allegations, *Revene v. Charles Cty. Comm'rs*, 882 F.3d 870, 873 (4th Cir. 1989), "legal conclusions couched as facts," *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal* 556 U.S. at 678. Thus, "[d]etermining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Under limited circumstances, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). "The court may consider documents attached to the complaint, as well as documents attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed." *Sposato v. First Mariner Bank*, 2013 WL 1308582, at *2 (D. Md. Mar. 28, 2013).

Additionally, "courts may take judicial notice of publicly available records without converting a motion to dismiss to a motion for summary judgment." *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 502-03 (D. Md. 2019).

However, to the extent the Court determines any of the exhibits fall outside the pleadings, FRCP 12(d) permits the conversion of a motion to dismiss to one for summary judgment. Summary judgment is appropriate when the Court finds no genuine dispute of material fact, entitling the movant to judgment as a matter of law. FRCP 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining if the movant is entitled to summary judgment, the court must view the evidence in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 475, 587-88 (1986).

Even though summary judgment is generally deferred until the conclusion of the discovery period, courts are permitted to grant summary judgment if the "record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." *Campbell v. Hewitt, Coleman & Assocs., Inc.,* 21 F.3d 52, 55 (4th Cir. 1994) (internal quotes omitted). Indeed, one of the primary

purposes of FRCP 56 "is to isolate and dispose of factually unsupported claims or defenses …" *Celotex*, 477 U.S. at 323-24.  It is well-settled that trial courts have an "affirmative obligation … to prevent factually unsupported claims and defenses from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

Unique circumstances are presented here. The allegations are insufficiently pled and the publicly available body worn camera footage contradicts the bald allegations in the Complaint. The Supreme Court has held that, when "opposing parties tell two different stories" at summary judgment, "one of which is blatantly contradicted" by video evidence, a court should "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). Thus, Plaintiffs' version of the facts are not worthy to be construed as fact and given the benefit of reasonable inferences when they are so clearly contradicted by the body worn camera footage. *Id*, at 381.

## III. ARGUMENT

### A. The Body Worn Camera Footage can be Considered in Resolving the Motion to Dismiss without Converting it to one for Summary Judgment.

The Court is permitted to consider the body worn camera footage attached to this Motion, so long as it is integral to Plaintiffs' Complaint. *See Sposato*, 2013 WL 1308582, at *2. "Courts have concluded that, in some circumstances, video recordings of the subject matter of a complaint may be considered when evaluating a motion to dismiss." *Nalls v. Balt. Cnty.*, 2024 U.S. Dist. LEXIS 45771, at *20 (D. Md. Mar. 15, 2024) (citing to *Estate of Green*, 2023 U.S. Dist. LEXIS 176157, at *20; *see also Thompson v. Badgujar*, PWG-20-1272, 2021 U.S. Dist. LEXIS 147923, 2021 WL 3472130, at *4 (D. Md. Aug. 6, 2021); and *Fijalkowski v. Wheeler*, 361 F. Supp. 3d 577, 582 n.3 (E.D. Va. 2019)). The Fourth Circuit has held that "[i]n addition to

the facts as stated in the complaint, [a] district court correctly consider[s] … body camera footage in deciding whether to grant the motions to dismiss." *Lawhon v. Mayes*, 2021 WL 5294931, at *1 (4th Cir. 2021).

The Plaintiffs have removed explicit reference to the words "body worn camera footage" originally contained in their complaint in the First Lawsuit. However, the body worn camera footage not only depicts the incident at the core of the Complaint, but it is indirectly referenced in the "Factual Claims" section of their new Complaint. *See* ECF No. 1, at pgs. 11-19. Indeed, of the twenty-nine factual allegations specific to the conduct of any of the Individual Defendants on June 1, 2021, twenty-two of them contain specific timestamps. *See* ECF No. 1, at ¶¶ 42-44, 46-51, 55-60, 65-71. One allegation even includes a specific reference to the second at which the actions are alleged to have occurred. *Id.*, at ¶ 43. There is no way for Plaintiffs to rely upon such a specific timeline – down to the seconds – other than via the body worn camera footage. Thus, Plaintiffs' allegations demonstrate the integral nature of the body worn camera footage to the Complaint.

Additionally, a court "may properly take judicial notice of matters of public record" on a FRCP 12(b)(6) motion. *Philips v. Pitt Cnty., Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). It is well-settled that courts may take judicial notice of publicly available information on government websites. *See U.S. v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017). Here, the body worn camera footage belonging to each Officer Defendant has been publicly posted on the City's website since March 9, 2023[11]. Accordingly, this Court is permitted to consider the body worn camera footage in assessing this Motion (without converting it to one for summary judgment),

---

[11] *See* https://www.annapolis.gov/CivicAlerts.aspx?AID=1582.

because the footage is not only integral to Plaintiff's Complaint, but also because the footage is considered public records posted to and available on the City's website.

If the Court were to consider converting this Motion to one for summary judgment, there would be no legitimate need for discovery because the Plaintiffs are already in possession of the body worn camera footage depicting the encounter between Mr. Green and the Individual Defendants[12]. The Plaintiffs – and the public – have had access to this footage of the encounter for well over a year, including having such access for over six months before Judge Rubin issued her opinion in the First Lawsuit[13].

**B.** **Plaintiffs have Failed to State a Claim Upon Which Relief can be Granted, Warranting Dismissal of the Complaint.**

    1.  Plaintiffs have again failed to satisfy the applicable pleading standards for their claims against any of the Individual Defendants.

Regardless of whether a claim is brought under federal or state laws, a plaintiff "must do more than make conclusory claims of individual member conduct; specific allegations of individual conduct are required." *Willey v. Bd. of Educ.*, 557 F. Supp. 3d 645, 664 (D. Md. Aug. 30, 2021)(citing *Smith-Hosch v. Bramble*, 2019 WL 4060017 (D. Md. Aug. 28, 2019)). *See also Johnson v. Dore*, 2013 WL 5335626, at *4 (D. Md. Sept. 20, 2013) (granting Rule 12(b)(6) motion to dismiss claims as to two defendants because the "Complaint d[id] not include any allegations concerning [those defendants] to support a plausible claim against them" but rather "repeatedly refer generally to 'Defendants,' without identifying specific Defendants or conduct."); *and Dale v. Mayor*, 2015 WL 5521815, at *9 (D. Md. Sept. 15, 2015) (dismissing

---

[12] *See* https://www.annapolis.gov/CivicAlerts.aspx?AID=1582. Though the footage contained redactions, such redactions are limited to the faces of Plaintiff Naylor, her brother, medical care administered by AFD Defendants in the medic unit, and the face of a hospital staff member.
[13] Plaintiffs made no attempt to amend their complaint in the First Lawsuit after the body worn camera footage was publicly released.

battery claims because "complaint does not identify which of the many police officers in the complaint committed these alleged batteries, when they occurred, or how they occurred.").

Specific claims under 42 U.S.C. §1983 "require[] a showing of personal fault based upon a defendant's own conduct." *Bost v. Wexford Health Sources, Inc.,* 2018 WL 3539819, at *20 (D. Md. July 23, 2018) (citing *Vinnedge v. Gibbs*, 550 F.2d 296, 928 (4th Cir. 1977)). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. *See also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Plaintiffs' Complaint contains factual allegations that are too vague and generalized to support any plausible claims against any Individual Defendant. Plaintiffs largely present all of their allegations in a vacuum, without meaningful factual detail necessary to explain what physical contact each Individual Defendant had with Mr. Green[14], how each Individual Defendant engaged in unconstitutional conduct, or otherwise what actions each Individual Defendant took that provides a basis for each claim asserted. Instead, the Individual Defendants are implicated collectively in all claims arising out of June 1, 2021. This undifferentiated allegation style is insufficient and must be discounted as a valid claim against any Individual Defendant.

---

[14] The only unconstitutional physical contact alleged that is specifically attributable to one specific Individual Defendant (as opposed to collectively attributed to all Individual Defendants) is that "[f]rom 2:36-2:37 [a.m.], [Sgt.] Cochran forcibly held Mr. Green face down…" ECF 1, at ¶ 56.

Additionally, despite having access to the body worn camera footage for the past 14 months, Plaintiffs utterly fail to make a single allegation against any individual AFD Defendant, instead pleading all factual allegations collectively against the AFD Defendants. "Courts are rightfully 'critical of complaints that fail to isolate the allegedly unconstitutional acts of each defendant' or 'make only categorical references to Defendants.'" *Nalls*, 2024 U.S. Dist. LEXIS 45771, at *93-94 (citing to *Langford v. Joyner*, 62 F.4th 122, 125 (4th Cir. 2023)).

The issue with this type of pleading, referred to as group pleading, was explained by Judge Titus in *Proctor v. Metro. Money Store Corp.,* 579 F.Supp.2d 724, 744 (D. Md. 2008):

> At best, such pleading amounts to a conclusory allegation that … [each Defendant] [was] somehow responsible for the wrongful conduct[.] At worst, the repeated refrain that all three individuals committed each and every act must be read as an allegation that *one of the three* did each act, an assertion that amounts to speculation and which is deficient under *Twombly*.

(emphasis added).

Moreover, it is impossible to determine which allegations of fact are intended to support which claims for relief, as each and every single count in the Complaint specifically incorporates the allegations contained in Paragraphs 1-90 and goes on to set forth "[t]hreadbare recitals of the elements of each claim," which should be disregarded[15]. *Iqbal*, 556 U.S. at 678.

As a result of this failure, Plaintiffs' Complaint is ambiguous in that it lacks the details needed to draw a plausible connection between Plaintiffs' alleged injuries and the actions of any particular Individual Defendant despite being in possession of the body worn camera footage for

---

[15] The only exception to this lack of specific factual basis is in Counts VII and VIII where Plaintiffs make specific factual allegations attributable to the Officer Defendants, which is addressed in detail below.

approximately fourteen months. Such generalized and conclusory allegations warrant dismissal with prejudice.

      2.   <u>The Facts Alleged in the Complaint either Contradict what is clear from the Body Worn Camera Footage or are Insufficient to Support the Claims Presented.</u>

      i.   *Counts I and II – Excessive Force and Violation of Right to Due Process under 42 U.S.C. §1983*

To prevail on a §1983 claim, a plaintiff must prove a deprivation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under the color of state law. *Jackson v. Pena*, 28 F.Supp.3d 423, 429 (D. Md. June 19, 2014). Plaintiffs allege that the Individual Defendants deprived Mr. Green of his Fourth and Fourteenth Amendment rights to be free from the excessive use of force and his Fourteenth Amendment right to bodily integrity "when, beginning at 2:34 AM, they, *inter alia*, exerted force upon Mr. Green during the seizure of his person…by forcibly restraining Mr. Green in a face-down position to two stretchers simultaneously, by manual means and by tight straps that compromised his respiration and circulation, in contravention of clear and longstanding minimal constitutional standards reflected in the M[aryland] I[nstitute] E[mergency] M[edical] S[ervices] S[ystems] Protocols." ECF 1, at ¶ 96. Paragraph 104 of the Complaint factually alleges that Mr. Green was restrained in a face-down position from 2:34-2:45 AM. ECF 1, at ¶ 104. The remaining Paragraphs in Counts I and II set forth legal conclusions without any specific factual allegations in support thereof. *Id.*, at ¶¶ 92-113.

As an initial matter, Plaintiffs do not, and cannot, adequately plead that the *Officer* Defendants are subject to the Maryland Institute for Emergency Medical Services Systems ("MIEMSS") protocols. To the contrary, Plaintiffs' Complaint alleges MIEMSS protocols

"direct[] … EMS responders" and that it is the Annapolis Fire Department ("AFD"), not the Annapolis Police Department ("APD"), that "include[s] an [EMS] Division." ECF 1, at ¶¶ 5 and 32.

Moreover, Plaintiffs fail to state a plausible claim under Counts I and II against the Officer Defendants. The Complaint specifically alleges that the time Officers Bodmer and Siminyuk spent placing handcuffs on Mr. Green and rolling him to his side are *not* alleged to be a constitutional violation. ECF 1, at ¶ 45. The only factual allegations regarding alleged physical contact by any of the Officer Defendants after 2:34 a.m. are: 1) "…the Officer Defendants (except for Woytko) forcibly rolled Mr. Green into a prone (face-down) position on the sheet and held him in that position," ECF 1, ¶ 50; 2) Officers Bodmer, Siminyuk, and Sgt. Cochran transported Mr. Green to the portable stretcher "and placed him face-down on that stretcher" at 2:36 a.m., ECF 1, at ¶ 55; 3) Sgt. Cochran "forcibly held Mr. Green face down while the AFD Defendants strapped him face-down to two stretchers simultaneously[16]" from 2:36 a.m. to 2:37 a.m., ECF 1, at ¶ 56; 4) Sgt. Cochran assisted the AFD Defendants in "forcibly plac[ing] and tighten[ing] straps over Mr. Green's legs and back while he was face down" from 2:36-2:37 a.m., ECF 1, at ¶ 57; and 5) Officer Bodmer assisted the AFD Defendants in placing Mr. Green onto the rolling stretcher and "forcibly placed and tightened straps over his legs and upper back" from 2:38 to 2:39 a.m., ECF 1, at ¶ 59.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See* U.S. Const. Amend. IV. A "seizure" for Fourth Amendment purposes includes taking a citizen into police custody, *see California v. Hodari D.*, 499 U.S. 621, 624, (1991), and a seizure is "unreasonable" if

---

[16] The body worn camera footage clearly shows Mr. Green is only on one stretcher, the portable stretcher, from 2:36 a.m. to 2:37 a.m. *See* fns. 2, 3, 4, and 5, at 2:36 a.m. to 2:37 a.m.

"effectuated by excessive force," *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)

(quoting *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006)). The Fourteenth Amendment

provides that no state "shall deprive any person of life, liberty, or property, without due process

of law." *See* U.S. Const. Amend. XIV. The due process clause of the Fourteenth Amendment

"guarantees more than fair process" and "includes a substantive component that provides

heightened protection against government interference with certain fundamental rights." *Martin

v. St. Mary's Dep't of Social Servs.*, 346 F.3d 502, 511 (4th Cir. 2003). The core of substantive

due process is to protect the individual against "arbitrary action of government." *County of

Sacramento v. Lewis*, 523 U.S. 833, 845 (1998).

The Fourth Circuit has held that people who are involuntarily taken into protective

custody by the police are considered pretrial detainees. *See Young v. City of Mount Rainier*, 238

F.3d 567, 576 n. 5 (4th Cir. 2001) (classifying the decedent as a pretrial detainee, even though

"there [was] no indication that he was under arrest or would later have been arrested" because he

had been involuntarily taken into police custody).

"The point at which Fourth Amendment protections end and Fourteenth Amendment

protections begin is often murky." *Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008). The

Fourth Circuit has "rejected any concept of a continuing seizure rule," holding that "the Fourth

Amendment applies to the initial decision to detain an accused, [but] not to the conditions of

confinement after that decision has been made." *Robles v. Prince George's Cty., Md.*, 302 F.3d

262, 268 (4th Cir. 2002) (citing *Riley v. Dorton*, 115 F.3d 1159, 1163 (4th Cir. 1997)). Thus,

"[o]nce the single act of detaining an individual has been accomplished, the [Fourth]

Amendment ceases to apply." *Id.* In other words, Plaintiffs allege that Mr. Green was in

protective custody upon Officers Bodmer and Siminyuk's application of handcuffs and rolling

Mr. Green to his side, ECF 1, at ¶ 43, so the Fourteenth Amendment's Due Process Clause therefore governs any claims regarding excessive force beginning at 2:34 a.m.

That being said, the Supreme Court has extended the Fourth Amendment's objective reasonableness standard to the Fourteenth Amendment excessive force cases. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). To succeed on an excessive force claim brought under the Fourteenth Amendment, a plaintiff "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 397; *see also Coney v. Davis*, 809 F. App'x 158, 159 (4th Cir. 2020). The Supreme Court has instructed:

> [c]onsiderations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397. A pretrial detainee can also prevail by showing that a defendant's actions were taken with an intent to punish. *Id.*, at 398.

It is unclear why Counts I and II have been lodged against Officer Woytko. Plaintiffs, using only the body worn camera footage as a basis, specifically allege that she did not participate in "forcibly roll[ing]" Mr. Green onto the white sheet. ECF 1, at ¶ 50. Plaintiffs actually make no allegation of physical contact between Mr. Green and Officer Woytko after 2:34 a.m. *See* ECF 1, at ¶¶ 50, 55, 56, 57, and 59. Indeed, Officer Woytko was speaking to Ms. Naylor while Mr. Green was moved to the portable stretcher and only briefly observed Mr. Green being transported out of the apartment. *See* fn. 2, at 2:32:16 a.m – 2:38 a.m. Additionally, Officer Woytko was not outside when Mr. Green was placed on the rolling stretcher and subsequently loaded into the back of the medic unit. *Id.*, at 2:38 a.m. – 2:41:05 a.m. Counts I and II against Officer Woytko must be dismissed with prejudice for these reasons.

As for Officer Bodmer, the only allegation of actual physical contact between himself and Mr. Green is totally contrived as it alleges that he (along with Officer Siminyuk and Sgt. Cochran) "forcibly rolled" Mr. Green into a prone position on the white sheet and "held him there." ECF 1, at ¶ 50. However, the body worn camera footage clearly contradicts and refutes this allegation completely. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)("[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached… the exhibit prevails."); *see also Harris*, 550 U.S. at 381. (On summary judgment, a court should "view[] the facts in the light depicted by the videotape" rather than crediting a "visible fiction" propounded by the party whose account is contradicted by the video evidence.). As depicted in the body camera footage, the officers are observed repeatedly trying to keep Mr. Green on his side, who continuously moves around and places himself on his stomach prior to being placed on the white sheet.  *See* fns. 4 and 5, at 2:29 a.m. – 2:36 a.m. Even prior to the AFD Defendants' arrival, Officer Siminyuk is heard asking Mr. Green to "stay on [his] side" and seen forcibly moving him back to his side. *See* fn. 5, at 2:27:46 a.m.

The Complaint makes no other factual allegation that Officer Bodmer "forcibly restrain[ed] Mr. Green in a face-down position to two stretchers simultaneously, by manual means and by tight straps." ECF 1, at ¶ 96. Instead, the Complaint alleges that he "transported" Mr. Green to the portable stretcher, ECF 1, at ¶ 55, assisted the AFD Defendants with placing Mr. Green on the rolling stretcher[17], ECF 1, at ¶ 59, and provided AFD Defendants a strap used to restrain Mr. Green. ECF 1, at ¶ 171. As such, the allegations of Plaintiffs' Complaint specific to Officer Bodmer, in addition to the body worn camera footage, contradict the allegation that he "forcibly restrained" Mr. Green in Counts I and II. Dismissal with prejudice is warranted.

---

[17] The body worn camera footage clearly shows Officer Bodmer had no involvement in the physical placement of Mr. Green onto the rolling stretcher. *See* fn. 3, at 2:38:04 – 2:38:30 a.m.

The same goes for Officer Siminyuk and Sgt. Cochran. For the same reasons as those stated for Officer Bodmer, the body worn camera footage depicting Officer Siminyuk and Sgt. Cochran's repeated repositioning of Mr. Green onto his side contradicts the allegation that he "forcibly rolled" Mr. Green into the prone position on the white sheet and "held him there." ECF 1, at ¶ 50. The remaining allegation regarding physical contact by Officer Siminyuk is that he helped "transport" Mr. Green to the portable stretcher at 2:36 a.m., ECF 1, at ¶ 55, which cannot plausibly be considered an equivalent to "restraining," much less "forcibly restraining" an individual. Thus, Plaintiffs have not adequately plead that Officer Siminyuk participated in the alleged restraining of Mr. Green on either stretcher.

Next, the Complaint alleges that, from 2:36-2:37 a.m., Sgt. Cochran "forcibly held Mr. Green face down while the AFD Defendants strapped him face-down to two stretchers simultaneously." ECF 1, at ¶ 56. Body worn camera footage shows that Mr. Green was moved to the portable stretcher at 2:36:26 a.m. and placed upon that stretcher only, not two stretchers as alleged. Between 2:36:36 a.m. and 2:36:53 a.m., Sgt. Cochran can be seen with his fingertips on Mr. Green's left shoulder area without appearing to be "forcibly holding" Mr. Green down. *See* fns. 3 and 5, at 2:36:36 a.m. – 2:36:53 a.m. To the contrary, Mr. Green continued to roll and flail about and lift himself off the portable stretcher during this time. *See* fn. 5, at 2:36:46 a.m. – 2:36:53 a.m. Sgt. Cochran subsequently tried to push Mr. Green's left shoulder upward to keep him on his side. *Id.*, at 2:36:53 a.m. – 2:37:00 a.m. By 2:37:07 a.m., Sgt. Cochran removed his hand from Mr. Green's shoulder area. *See* fns. 3 and 5 at 2:37:07 a.m. In sum, Sgt. Cochran's fingertips were in contact with Mr. Green for approximately thirty seconds, and did little to stop Mr. Green from continuing to flail about and lift his chest off the portable stretcher. No

reasonable inference of "forcibly holding" can be made here in light of Mr. Green's intoxication, constant yelling, and constant flailing.

To the extent that Plaintiffs are alleging Officers Bodmer, Siminyuk, or Sgt. Cochran engaged in excessive force by merely lifting the white sheet Mr. Green was on and assisting the AFD Defendants in transporting him to the portable stretcher, it is important to note that such actions were taken at the direction of the AFD Defendants. This is evident by Sgt. Cochran asking the AFD Defendants what their plan was two separate times. *See* fn. 5, at 2:33:35 am and 2:35:53 a.m. In response, FF 1/C Weiss, along with another AFD Defendant demonstrated their plan to lift Mr. Green, using the white sheet, and place him on the portable stretcher. *See* fns. 4 and 5, at 2:35:53 a.m. All the three officers did was lift the white sheet underneath Mr. Green and follow the directions of the AFD Defendants. *See* fns. 2, 3, 4, and 5, at 2:35:53 a.m. – 2:36:26 a.m. It is well-settled that non-medical officials are entitled to rely on the professional judgment and expertise of trained medical personnel without fear of liability. *See Militier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990); *see also Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995). Accordingly, the Complaint fails to adequately plead excessive force, under either the Fourth Amendment or the Fourteenth Amendment, on the parts of the Officer Defendants.

Assuming, *arguendo,* that this Court permits group pleading then even taking the facts alleged as true, the AFD Defendants' apparent failure to adhere to local policies, rules (such as the MIEMSS protocols) or even state laws still does not violate Section 1983. *See Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision"); *McLenagan v. Karnes*, 27 F.3d 1002, 1008 (4th Cir. 1994) ("[A]n asserted violation of state law is almost always insufficient to sustain a federal claim under §1983."). Moreover,

that there exists "longstanding minimal constitutional standards reflected in the [MIEMSS] Protocols" as alleged by Plaintiffs, ECF ¶ 96, is at odds with federal legal authority. As recently as April 15, 2024, "there are few cases applying Fourth and Fourteenth Amendment standards to paramedics responding to medical emergencies." *Perez v. City of Fresno*, 98 F.4th 919, 928 (9th Cir. 2024).

In any event, "courts have found that being placed in the prone position, alone, does not constitute deadly force." *Lahwon v. Edwards*, 477 F. Supp. 3d 428, 446 (E.D. Va. Aug. 10, 2020), *aff'd* 2021 U.S. App. LEXIS 33823 (4th Cir. 2021) (quoting *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593-94 (7th Cir. 1997)). But the Complaint does not allege Mr. Green was merely in the prone position; rather, it is alleged that he was "forcibly" restrained "by manual means and by tight straps" between 2:34 a.m. and 2:45 a.m. ECF 1, at ¶¶ 96 and 104.

Plaintiffs' Complaint further alleges that Mr. Green was high on PCP, in a "disturbed and impaired mental state," and had injured himself on broken glass and ceramics. ECF 1, at ¶ 41. He was flailing his legs, repeatedly screaming obscenities, and "otherwise behaving erratically." *Id*, at ¶ 42. Once taken into protective custody for his own safety, Officers Bodmer and Woytko had to hold his legs to prevent him from continuing to flail his legs, and Officer Siminyuk and Sgt. Cochran had to hold Mr. Green on his side because he kept moving around and putting himself in the prone position. *See* fns. 4 and 3, at 2:26:35 a.m. – 2:29:58 a.m.; and at 2:31 a.m. – 2:34 a.m. After Mr. Green was secured into the portable stretcher, he continued moving around and it can be seen that Mr. Green drops his left elbow and shoulder, becoming prone at that point. *See* fns. 2 and 5, at 2:37:22 a.m. – 2:37:35 a.m.

Once he was secured to the rolling stretcher, Mr. Green continued to move around with ease – to the point of lifting his chest completely off the stretcher several times. *See* fn. 3 and 5,

24

at 2:38:42 a.m. – 2:40:45 a.m. In the approximate two minutes between Mr. Green being placed onto the rolling stretcher and being loaded into the back of the medic unit, he lifted his chest up and off the stretcher or otherwise moving his body around at least fifteen times. *See* fn. 3, at 2:38:42 a.m.; at 2:38:48 a.m.; at 2:39:17 a.m.; at 2:39:35 a.m.; at 2:39:39 a.m.; at 2:39:46 a.m.; at 2:39:53 a.m.; at 2:40:00 a.m.; at 2:40:05 a.m.; at 2:40:14 a.m.; at 2:40:17 a.m.; at 2:40:22 a.m.; and at 2:40:33 a.m. until 2:40:41 a.m.; *see also* fn. 5. At 2:39:08 a.m.; and at 2:39:13 a.m.

This Court can infer as reasonable that securing a patient using the straps on the stretcher is a safety measure. Indeed, the MIEMSS protocols that Plaintiffs cite to in their Complaint actually recommends that, if a patient is handcuffed, EMS Providers "[s]ecure the patient onto the stretcher for transport, using additional straps if necessary[18]."

Moreover, Mr. Green physically resisted the continued seizure by being generally uncooperative, yelling, and flailing of his extremities. Securing Mr. Green for his safety was necessary and reasonable because he continuously moved around and otherwise behaved erratically throughout the entire encounter with the Individual Defendants, and thus posed a continued danger to himself and potentially others. This is so noted by one of the AFD Defendants when he mentioned that "[Mr. Green] is trying to get up" while he was being secured to the rolling stretcher. *See* fn. 3 generally, at 2:38:43 a.m. – 2:38:48 a.m.

Further, Plaintiffs are unable to demonstrate that any action taken by the Individual Defendants were taken "with an intent to punish." *See Kingsley*, 576 U.S. at 398. Not only does the Complaint lack any factual allegations of the sort, the body worn camera footage clearly demonstrates that the Individual Defendants, especially the Officer Defendants and FF 1/C

---

[18] *See* https://www.miemss.org/home/Portals/0/Docs/Guidelines_Protocols/MD-Medical-Protocols-2020-20200610.pdf?ver=2020-06-12-120333-457, at pg. 322.

Weiss, treated Mr. Green with compassion and tried to assure him that he was not in trouble. *See* fn. 3, at 2:20 a.m. – 2:42 a.m.

In sum, Mr. Green was still able to move his body around enough to lift his chest up and off the stretcher several times while being wheeled to the medic unit. Using straps to secure Mr. Green to the portable and rolling stretchers, so as to prevent him from falling, hardly constitute an application of "forcible" restraints upon Mr. Green. Accordingly, the aforementioned actions do not rise to excessive force under the Fourth or Fourteenth Amendments to the U.S. Constitution. Even if they did, the Individual Defendants are entitled to qualified immunity as described in Section III(C)(1) below.

Lastly, Plaintiffs have not adequately pled a constitutional interest in bodily integrity pursuant to the Fourteenth Amendment. The Supreme Court has recognized a liberty interest in bodily integrity in very limited circumstances: in instances where individuals are subject to invasive procedures. *See Cruzan v. Dir., Miss. Dep't of Health*, 497 U.S. 261, 278-79 (1990) (noting principles of bodily integrity gives rise to constitutionally protected liberty interest in refusing unwanted medical treatment); *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (recognizing bodily integrity liberty interest in avoiding unwanted administration of anti-psychotic drugs while in custody). The Complaint makes no allegation that Mr. Green was subject to an invasive procedure – to the contrary, the Complaint actually alleges the "AFD Defendants did not administer a chemical restraint." ECF 1, at ¶ 54.

For the above stated reasons, dismissal of Counts I and II in their entirety is appropriate.

      ii.      *Counts III and IV – Monell Claim under 42 U.S.C. §1983*

It is well-settled that the existence of a constitutional violation must be properly pled in order for Counts III and IV to be maintained. *See Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999) ("As there are no underlying constitutional violations by any individual, there can be no

municipal liability."). Accordingly, Counts III and IV must be dismissed if the Court finds Plaintiffs' have not sufficiently pled a constitutional violation.

Even if they did sufficiently plead a constitutional violation, Plaintiffs have failed to state a claim under *Monell v. N.Y. City Dept. of Social Servs.,* 436 U.S. 658 (1978). In order to properly plead a municipal liability claim, Plaintiffs must allege that "(1) the municipality [had] actual or constructive knowledge of the custom and usage by its responsible policymakers, and (2) there [was] a failure by those policymakers, as a matter of specific intent or deliberate indifference, to correct or terminate the improper custom and usage." *Randall v. Prince George's County*, 302 F. 3d 188, 210 (4th Cir. 2002). Plaintiff must also allege that there was a direct causal link "between the policy or custom and the deprivation of rights." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). The Fourth Circuit has previously held what may be considered policy or custom:

> (1) Through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) a practice that is so persistent and widespread as to constitute a custom or usage with the force of law."

> *Lytle v. Doyle*, 326 F.3d 463, 471 (4ᵗʰ Cir. 2003).

Plaintiffs first allege that the City "had one or more unconstitutional policies or customs that authorized or permitted face-down restraint of individuals in custody under the same or similar circumstances as Mr. Green." ECF 1, at ¶118. The factual allegations in support of this claim are that, on June 1, 2021, the APD and the AFD did not have a policy prohibiting face-down restraints. ECF 1, at ¶¶ 120 and 129. To the extent that Plaintiffs are alleging a facial

challenge to APD's use of force policy or any AFD policies[19], *see* ECF 1, at ¶¶ 112-114; and

117, courts are required to consider "only applications of the [law] in which it actually authorizes

or prohibits conduct." *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015). Plaintiffs do not

allege the existence of a policy that authorizes the complained of conduct (face-down restraint or

transport in a temporary face-down position) and a policy's silence on such topic is not an

authorization to engage in unconstitutional conduct. *See Cottman v. Balt. Police Dep't*, 2022 WL

137735, at *13 (D. Md. Jan. 13, 2022). Thus, Plaintiffs' allegations are insufficient to adequately

plead an unconstitutional policy or custom.

      Plaintiffs have also alleged the custom and policy at issue is the City's alleged failure to

train its employees. ECF 1, at ¶119. To state a claim for the failure to train, Plaintiff must allege:

"(1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the

City, and (3) that the [employee's] conduct resulted from said training." *Lewis v. Simms*, 2012

WL 254024, at *3 (D. Md. Jan. 26, 2012). Plaintiffs have not alleged any facts with respect to

these three elements, including, most notably, the nature of the City's training or any specific

deficiency in the training. It is insufficient to state, as Plaintiffs have here, "in broad, conclusory

terms in a variety of different ways" that the City "failed to train and supervise its [employees]."

*Peters v. City of Mount Rainier*, 2014 WL 4855032, at *5 (D. Md. Sept. 29, 2014) (dismissal of a

failure to train claim when the complaint failed to allege facts concerning the "nature of the

training" or "that the officer's conduct resulted from said training."). Facts about the sort of

training that City police and fire personnel actually receive helps to state a failure to train claim,

---

[19] It should be noted that Plaintiffs' references to departmental policies that were revised or generated after June 1, 2021, is not only prejudicial to Defendants but irrelevant as Plaintiffs' allegations in this regard focus on positional asphyxia, and Mr. Green's cause of death was cardiac arrest.

*Hall v. Fabrizio*, 2012 WL 2905293, at *2 (D. Md. July 13, 2012), but Plaintiffs have failed to allege any facts detailing the sort of training these City employees receive.

In any event, a failure to train can only form a basis for liability if "it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations." *Harris*, 489 U.S. at 397. "Sporadic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will." *Nicholson v. Baltimore City Police Dep't*, 2021 U.S. Dist. LEXIS 75798, at *21 (D. Md. Apr. 20, 2021). As Plaintiffs fail to allege any misconduct outside of Mr. Green's experience, they have failed to state a claim for the failure to train. Counts III and IV warrant dismissal.

      iii.     *Counts V and VI – Conspiracy and/or Bystander Liability under 42 U.S.C. §1985 and 42 U.S.C. §1983*

Under 42 U.S.C. §1985(3), "if two or more persons conspire to deprive any person or class of persons of their constitutional rights and another is injured or deprived of having or exercising any right or privilege as a citizen of the United States, the injured party has a cause of action against the conspirators." *Barnes v. Maryland Nat. Capital Park and Planning Comm'n*, 932 F.Supp. 691, 696 (D. Md. 1996).

To survive dismissal, a plaintiff claiming conspiracy under § 1985(3) must allege: "(1) a conspiracy of two or more persons, (2) who are motivated by a specific class[]based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *A Soc'y Without a Name v. Va.*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995)). In *A Soc'y Without a Name,* the Fourth Circuit upheld dismissal of a §1985 conspiracy claim where the plaintiff failed "to allege with any specificity the persons who agreed to the alleged

conspiracy, the specific communications amongst the conspirators, or the manner in which any such communications were made." *Id.* at 347. Here, Plaintiffs have failed to allege any discriminatory animus or any agreement among conspirators, including the requisite specific communications, to support a conspiracy action. For this reason, Judge Rubin dismissed the same exact cause of action in Plaintiffs' complaint in the First Lawsuit. *See Estate of Green, et al.*, 2023 U.S. Dist. LEXIS 176157, at *53-54. Though this Court is not bound by Judge Rubin's ruling, the opinions of other district judges are "persuasive authority entitled to substantial deference." *Nat'l Union Fire Ins. Co. v. Allfirst Bank*, 282 F.Supp.2d 339, 351 (D. Md. 2003).

The Complaint similarly fails to sufficiently state a failure to intervene claim. To state a claim for bystander liability, Plaintiff must allege each Individual Defendant: 1) was confronted with an official's illegal act; 2) possessed the power to prevent it; and 3) chose not to act. *See Randall v. Prince George's County, Md.*, 302 F.3d 188, 203 (2002).

A claim "cannot rely on 'indeterminate assertions against all defendants,'" as Plaintiffs have done here. *Jien v. Perdue Farms, Inc.,* 2020 WL 5544183, at *4 (D. Md. Sept. 16, 2020) (quoting *SD3, LLC v. Black & Decker (U.S.) Inc.,* 801 F.3d 412, 423 (4th Cir. 2015)). "Importantly, if the officers participate[d] in the fray . . . , as plaintiffs claim, then they were not acting as bystanders." *Jones v. Chapman*, 2017 WL 2472220, at *35 (D. Md. July 24, 2015) (internal quotations omitted); *see also Weeden v. Prince George's Cty.*, 2018 WL 2694441, at *5 (D. Md. June 4, 2018) ("Defendant Police Officers cannot be held liable for both participating in the injury and failing to prevent the injury."). Defendants raised this argument before Judge Rubin in the First Lawsuit and she agreed with Defendants' position. *See Estate of Green, et al.*, 2023 U.S. Dist. LEXIS 176157, at *55. Thus, Counts V and VI should be dismissed for this reason alone.

Additionally, given that each claim requires an underlying constitutional violation, Plaintiffs' conspiracy and bystander liability claims are, by nature, concomitant with the other § 1983 claims. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996) (observing that bystander liability claim was "derivative" of excessive force claim and holding that claim failed "[i]n the absence of any underlying use of excessive force"); *Dodson v. Prince George's Cty.*, 2016 WL 67255, *3 (D. Md. Jan. 6, 2016) ("Because the excessive force claim fails, the failure to intervene claim also fails."). If the Court finds that Plaintiffs have not properly pled a Constitutional violation against any of the Individual Defendants, then Counts V and VI must be dismissed as well.

It should be noted that the Complaint contains averments in Counts VII and VIII that allege the Officer Defendants did not intervene after observing Mr. Green "strapped down onto two stretchers simultaneously in a face-down position." *See* ECF 1, at ¶¶ 174-177. First, as stated above, Officer Bodmer is the only Officer Defendant who was present throughout the entirety of the complained-of conduct. Second, to the extent these allegations properly satisfy the first element of a bystander liability claim and are considered under an analysis of Counts V and VI (despite being pled in different counts), police officers are entitled to rely on the professional judgment and expertise of trained medical personnel. *Militier*, 896 F.2d at 854. Any allegation that the Officer Defendants were aware of an illegal act is contradicted by what is clearly shown on the body camera footage. Sgt. Cochran, the only supervisor among the Officer Defendants, is heard asking one of the AFD Defendants what their plan was and, when the AFD Defendant mentioned the Reeves sleeve, Sgt. Cochran responded with "I don't know what that means." *See* fn.5, at 2:33:35 a.m. – 2:33:50 a.m. Sgt. Cochran's unfamiliarity with a common piece of medical equipment, in addition to Plaintiffs' allegation that the MIEMSS protocols apply to the

AFD Defendants only[20], demonstrates the Officer Defendants did not have specific knowledge of what would constitute the appropriate administration of medical care to Mr. Green. "[A] bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer. **If the bystander lacks such specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible**." *Randall v. Prince George's County*, 302 F.3d 188, 203 n.24 (4th Cir. 2002) (emphasis added). It would be unprecedented to charge the Officer Defendants with ensuring that their colleagues employed proper medical procedures - procedures learned during years of medical schooling and training that law enforcement officers are not required to undergo as a function of their jobs.

For these reasons, Counts V and VI should be dismissed.

  iv. *Counts VII and VIII – Deliberate Indifference to Serious Medical Needs under 42 U.S.C. §1983*

Counts VII and VIII are improperly lodged against the City because the principles of *respondeat superior* do not apply in imposing liability under §1983. *See Doe v. Rosa*, 795 F.3d 429 (4th Cir. 2015); *See also Monell*, 436 U.S. at 691 (concluding that a municipality cannot be held liable in a § 1983 under a theory of *respondeat superior* because "a municipality cannot be held liable solely because it employs a tortfeasor[.]"); *Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("[Municipalities] are not vicariously liable under § 1983 for their employees' actions."). Judge Rubin dismissed an identical cause of action in Plaintiffs' complaint in the First Lawsuit for this exact reason. *See Estate of Green, et al.*, 2023 U.S. Dist. LEXIS 176157, at *56.

"[C]onduct that amounts to 'deliberate indifference' [] is viewed as sufficiently shocking to the conscience that it can support a Fourteenth Amendment claim." *Young*, 238 F.3d at 575 (citations omitted). "[O]fficials evince deliberate indifference by acting intentionally to delay or

---

[20] *See* ECF 1, at ¶¶ 5, 32, and 33.

deny the [individual] access to adequate medical care or by ignoring an [individual's] known serious medical needs." *Sharpe v. S. Carolina Dep't or Corr.*, 621 F. App'x 732, 733 (4th Cir. 2015) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)).

The deliberate indifference standard has two prongs: "[t]he plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017). Plaintiffs allege that Mr. Green "suffered at all relevant times from a serious medical condition known to all Defendants." *See* ECF 1, at ¶ 168. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 210. Plaintiffs, however, do not identify what serious medical condition Mr. Green is alleged to have suffered.

Under the second component of the deliberate indifference standard, a defendant must "subjectively know of and disregard an excessive risk to the [individual]'s health or safety - that is, the official must have 'actual subjective knowledge of both the [individual]'s serious medical condition and the excessive risk posed by the official's action or inaction.'" *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (citing *Farmer v. Brennan*, 511 U.S. 825, 837-39, (1994)).

Regarding the Officer Defendants, Plaintiffs have failed to adequately allege liability on the deliberate indifference claim. As a preliminary matter, Plaintiffs' allege the following in their Complaint:

> Officer Defendants treated Mr. Green as a combative criminal suspect instead of treating him as a person requiring medical care. Officer Defendants immobilized Mr. Green on the ground, face-down, and placed his arms behind his back with two sets of handcuffs and restrained his legs with shackles.

ECF 1, at ¶ 171. This allegation clearly contradicts the body worn camera footage, as the Officer Defendants repeatedly tell Mr. Green that he is not in trouble and they are only trying to help him. *See* fns. 2 and 3, at 2:22:26 a.m.; and at 2:25:50 a.m. – 2:26:16 a.m. Further, this allegation of deliberate indifference, which focuses on the point when the Officer Defendants took Mr. Green into protective custody, also conflicts with Plaintiff's previous allegation that such actions did not rise to the level of a constitutional violation occurred. ECF 1, at ¶ 45.

As for Mr. Green's later cardiac arrest, neither prong of the deliberate indifference claim has been adequately pled. No physician diagnosed Mr. Green's medical condition as one mandating treatment, so his need for a doctor's attention must have been so obvious that a layperson would easily recognize it.

While the allegation that Mr. Green was prone on a stretcher for eleven minutes[21] must be taken as true for purposes of a motion to dismiss, Plaintiffs' allegations that Officer Defendants "caused Mr. Green to be restrained on a face-down position" and "were on scene the entirety of the eleven [] minutes that Mr. Green was immobilized in a face-down position," ECF 1, at ¶¶ 172 and 173, is contradicted by other allegations of the Complaint and the body worn camera footage, as described in Section III(B)(2)(i) above. Officer Siminyuk left the scene at 2:38 a.m., fn. 4, at 2:38:35 a.m., Officer Woytko remained in the apartment, fn. 2, at 2:38 a.m. – 2:40:50 a.m., and though Sgt. Cochran is alleged to have been present nearby while Mr. Green was being wheeled toward and loaded into the medic unit, ECF 1, at ¶ 65, he was actually on the phone with another subordinate handling an unrelated work matter. *See* fn. 5, at 2:38:32 a.m. – 2:41:18 a.m.

---

[21] The body worn camera footage contradicts this allegation. *See* fns. 2, 3, 4, and 5, at 2:34:00 a.m. – 2:37:32 a.m.

Further, any allegation, or inference, on the part of the Plaintiffs that Mr. Green was "immobilized" or otherwise so tightly strapped in a face-down position where it may have been obvious he was going into cardiac arrest must be disregarded as it is evident from the body worn camera footage that Mr. Green, who had been *continuously* moving around and screaming, continued to do so even after his placement on the rolling stretcher and up until he was placed in the medic unit at 2:40:45 a.m. *See* fn. 3, at 2:38:42 a.m.; at 2:38:48 a.m.; at 2:39:17 a.m.; at 2:39:35 a.m.; at 2:39:39 a.m.; at 2:39:46 a.m.; at 2:39:53 a.m.; at 2:40:00 a.m.; at 2:40:05 a.m.; at 2:40:14 a.m.; at 2:40:17 a.m.; at 2:40:22 a.m.; and at 2:40:33 a.m. until 2:40:41 a.m.; *see also* fn. 5, at 2:39:08 a.m.; and at 2:39:13 a.m.; *see also Goines*, 822 F.3d at 166 ("[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached… the exhibit prevails.").

A serious medical need "so obvious that even a lay person would easily recognize the necessity for a doctor's attention" was not apparent until 2:42:21 a.m. when FF 1/C Weiss asked an AFD Defendant to put Mr. Green on a monitor – over thirteen minutes after AFD Defendants arrived on scene and began treating Mr. Green's injuries. Mr. Green was screaming, kicking, and otherwise flailing around from the officers' arrival at approximately 2:20 a.m. until he became unresponsive at 2:41 a.m. At that point, FF 1/C Weiss believed Mr. Green had fallen asleep. *See* fn. 3, at 2:41:19 a.m.; at 2:41:32 a.m.; at 2:41:56 a.m.; and at 2:42:04 a.m. – 2:42:17 a.m. Moreover, Mr. Green did not make any complaints about what the Individual Defendants were doing or otherwise indicate he was in distress due to their actions. The allegations and the body worn camera footage do not suggest any of the Officer Defendants had reason to understand that Mr. Green experienced any serious medical condition which necessitated treatment measures other than those provided by their medically trained colleagues.

Further, Plaintiffs have failed to plead any facts that each Officer Defendant was aware of any alleged inadequate response to a substantial risk of harm. Plaintiffs have attempted to sufficiently meet this factual requirement by alleging that each of the Officer Defendants: 1) observed Mr. Green "strapped down to two stretchers" from 2:34 a.m. to 2:45 a.m.; and 2) did not intervene to either prevent Mr. Green from getting "strapped down" or to prevent him from remaining in a "strapped down" position. ECF 1, at ¶¶ 174 through 177. Accordingly, these allegations are insufficient to make a claim of deliberate indifference because as stated, *supra*, police officers are entitled to rely on the judgment of medical professionals in the provision of medical care. *Militer*, 896 F.2d at 854. Plaintiffs have failed to allege that any of the Officer Defendants recognized that it was appropriate for them to act to prevent AFD Defendants from strapping Mr. Green to a stretcher in order to protect him from falling – he was strapped in a manner that enabled him to continue to move around, including moving enough to lift his chest off of the stretcher several times.

The sole factual allegations against the AFD Defendants in support of Counts VII and VIII are that all five of them endangered Mr. Green "by leaving him handcuffed and shackled in a face-down position while they strapped him face down onto two stretchers simultaneously, placed additional handcuffs on him, and kept him in a face-down position for eleven (11) minutes." *See* ECF 1, at ¶ 180. Once again, Plaintiffs do not allege any impropriety with Mr. Green being handcuffed and shackled, which were necessary due to being placed in protective custody, for his own safety, and because he kept kicking his legs around while the Individual Defendants were attempting to help him. Moreover, the body worn camera footage contradicts the allegation in the Complaint that Mr. Green was in a prone position for eleven minutes. *See* fns. 2, 3, 4, and 5, at 2:34:00 a.m. – 2:34:32 a.m.

Regardless, Mr. Green spent ten of the alleged eleven minutes in a prone position yelling and moving around in the same manner as he had been upon the AFD Defendants' arrival at 2:29 a.m., showing no signs of distress as a result of the action of any Individual Defendant. In other words, Mr. Green's behavior at 2:40 a.m. did not markedly differ from his behavior at 2:29 a.m. When Mr. Green stopped yelling and moving about at 2:41 a.m., AFD Defendants continued to render medical attention, including checking his airway at approximately 2:42 a.m., repositioning Mr. Green at approximately 2:45 a.m., and administering CPR at approximately 2:48 a.m. ECF 1, at ¶¶ 68, 69, and 70. Plaintiffs have similarly failed to adequately plead factual support to the contention that each AFD Defendant recognized that his or her response to Mr. Green's eventually becoming unresponsive was inappropriate.

Deliberate indifference "is a very high standard - a showing of mere negligence will not meet it … [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences" *Grayson*, 195 F.3d at 695-96. The Fourth Circuit has upheld dismissal for failure to state a claim for deliberate indifference upon which relief can be granted in circumstances where officers were alleged to have placed a restrained individual face down in a patrol car. *See Young v. City of Mt. Rainier*, 238 F.3d 567 (4th Cir. 2001). In *Young*, officers encountered the decedent, who had PCP in his system, acting strangely in the street. Officers ultimately were alleged to have pepper sprayed Young, placed him face down in restraints in the back of a police car, and transported him to the emergency room where he later died. Young's parents sued, alleging in part that the officers involved were deliberately indifferent to Young's medical needs because they "knew or should have known" of the risks inherent to Young in that situation. The Fourth Circuit determined that

mere allegations of deliberate indifference, without more, could not support Young's parents' claim:

> [T]he complaint simply establishes that Young struggled with law enforcement officers, was sprayed with pepper spray, restrained, transported to a hospital in a prone position, and died sometime thereafter. While the complaint alleges that the officers knew or should have known about the potential problems with the use of pepper spray and restraints on PCP users, these allegations, particularly absent any suggestion that Young exhibited any distress during the time he was in custody of the officers, at most support an inference that the defendants were negligent in some unidentified way. Negligence, however, is insufficient to support a claim of a Fourteenth Amendment violation.

*Young,* 238 F.3d at 577. The Court further held that the officers' action in turning Young over to healthcare providers was reasonable under the circumstances: "[w]e fail to see how such conduct could be considered abandonment, much less deliberate indifference to Young's serious medical needs." *Id.* at 578.

Here, while Plaintiffs' allegations that Mr. Green was on PCP and restrained in the prone position are similar to those in *Young*, the prone positioning occurred while Mr. Green was already receiving medical care. If the Fourth Circuit has held that a plaintiff failed to state a claim under the circumstances of *Young*, then it strains reason and logic to see how a deliberate indifference claim could proceed beyond dismissal here. Without more, Plaintiffs have failed to adequately allege that the Individual Defendants deliberately ignored a serious medical condition that was obvious or known to each of them.

     v.     *Counts IX and X – Article 24 of the Maryland Declaration of Rights*

Article 24 is construed *in pari materia* with the Fourteenth Amendment. *Doe v. Dep't of Pub. Safety and Corr. Servs.*, 185 Md. App. 625, 636, 971 A.2d 975, 982 (2009). Accordingly, Plaintiffs' claim under the Maryland Declaration of Rights fails for the same reasons as the Fourteenth Amendment claims in Counts I and II.

vi.    *Counts XI and XII – Battery*

On a preliminary note, Plaintiffs advised during the First Lawsuit that "it is not the intention of Plaintiffs to sue the City of Annapolis directly for a claim of battery," which resulted in the dismissal of such a claim. *See Estate of Green, et al.*, 2023 U.S. Dist. LEXIS 176157, at *67. However, Plaintiffs failed to remove language pertaining to the City's alleged vicarious liability, originally in their complaint from the First Lawsuit, from the new Complaint. *See* ECF 1, at ¶ 220. The same applies to the references to and elements of an assault cause of action, as Plaintiffs acknowledged during the First Lawsuit that the statute of limitations had passed, but again failed to remove such language from their new Complaint. *See Estate of Green, et al.*, 2023 U.S. Dist. LEXIS 176157, at *67; *see also* ECF 1, at ¶¶ 216, 217, 219, and 224.  Accordingly, all references to assault and the elements of assault against the Individual Defendants, as well as vicarious liability against the City, should be struck from the Complaint.

Moreover, Plaintiffs have not sufficiently alleged battery on the part of any of the Officer Defendants. A battery "occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 355 Md. 593, 601 (1999); *accord Johnson v. Valu Food, Inc.*, 132 Md. App. 118, 123 (2000). Plaintiffs must allege "there is no legal authority or justification" for the employee's actions to survive dismissal. *Hines v. French*, 157 Md. App. 536, 551 (2004) (quoting *Williams v. Prince George's County*, 112 Md. App. 526, 554 (1996)).

The Complaint avers that the battery occurred when the Individual Defendants "unlawfully restrained Mr. Green in a face-down position and unlawfully strapped him in a face-down position to two stretchers simultaneously." ECF 1, at ¶ 216. These allegations fail for the same reason Counts I and II fail. As stated in Section III(B)(2)(i), *supra*, the body worn camera footage shows that least two of AFD Defendants - not any of the Officer Defendants - physically

strapped Mr. Green into both the portable stretcher and the rolling stretcher. *See* fns. 2, 3, 4, and 5, at 2:36:25 a.m. – 2:39:39 a.m.

In sum, dismissal of Counts XI and XII is warranted in their entirety, with the exception of the battery claim against the AFD Defendants, which will be addressed further, *infra*.

### vii.    *Counts XIII and XIV – Negligence and Negligence Per Se*

Counts XIII and XIV have been lodged against the Officer Defendants only[22]. In order to state a claim for negligence, a plaintiff must allege facts demonstrating the following: 1) the defendant owed a duty to the plaintiff; 2) the defendant breached that duty; 3) the plaintiff suffered actual injury; and 4) the injury proximately resulted from the defendant's breach. *Horridge v. St. Mary's County Dep't of Soc. Servs.*, 382 Md. 170, 182 (2004).

Plaintiffs' negligence claim fails at the outset, because they have not sufficiently pled a specific duty owed to Mr. Green, as police officers generally owe a duty to the public at large and not individual citizens. Known as the public duty doctrine, "when a statute or common law imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort." *Muthukumarana v. Montgomery County*, 370 Md. 447, 486 (2002).

Plaintiffs' are only able to overcome the parameters of the public duty doctrine by pleading the existence of a special relationship. In order "for a special relationship between police officer and victim to be found, [a plaintiff] must [show] that the local government or the police officer affirmatively acted to protect the *specific* victim or a *specific* group of individuals like the victim, thereby inducing the victim's *specific* reliance upon the [] protection." *Fried v.*

---

[22] Despite this, Plaintiffs yet again failed to remove language from their original complaint in the First Lawsuit pertaining to allegations against the City. ECF 1, at ¶ 232. For the same reasons as stated in Section III(B)(2)(vi) above, this Paragraph should be struck from the Complaint.

*Archer*, 139 Md.App. 229, 250-51 (2001) (*emphasis added*) (citations omitted). Because Plaintiffs have failed to allege action taken specifically to protect Mr. Green and his specific reliance on that protection, Counts XIII and XIV should not proceed beyond dismissal. Indeed, Judge Rubin held dismissal was warranted in the First Lawsuit for this reason. *See Estate of Green, et al.*, 2023 U.S. Dist. LEXIS 176157, at *76-77.

Plaintiffs also allege that the Officer Defendants were negligent per se "in that they violated the aforementioned prohibition against prone restraint in the MIEMSS Protocols." ECF 1, at ¶ 233. As Plaintiffs are well aware by now, police officers are not subject to the MIEMSS protocols. In fact, the Complaint does not even allege that the MIEMSS protocols apply to anyone other than EMS providers – who are all employed by the AFD, not the APD. *See* ECF 1, at ¶¶ 4, 32, and 33. Count XIII and Count XIV should be dismissed with prejudice.

   viii. *Counts XV and XVI – Gross Negligence*

Plaintiffs conceded during the First Lawsuit that Counts XV and XVI were improperly brought against the City because Maryland's Local Government Tort Claims Act does not authorize a lawsuit directly against the City. *See Estate of Green, et al.*, 2023 U.S. Dist. LEXIS 176157, at *79; *see also* Md. Code Ann., Cts. & Jud. Proc. Art., ("CJP") §5-303; and *Solis v. Prince George's County*, 153 F.Supp.2d 793 (2001). Once again, Plaintiffs have failed to remove the City as a defendant to this cause of action. Counts XV and XVI against the City should be dismissed and Paragraph 244, as well as the reference to the City in Paragraph 245, of the Complaint should be struck.

With regard to the Individual Defendants, gross negligence is defined as "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property or another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Barbre v. Pope*, 402 Md. 157, 187 (2007).

A plaintiff must plead facts that demonstrate conduct that is of an extraordinary or outrageous character in order to survive dismissal. *Khawaja v. MCC, City of Rockville*, 89 Md. App. 314, 319 (1991). "Maryland courts have been loath to find gross negligence on anything less than the most egregious [] conduct." *Hairfield-Ulsch v. Montgomery County, Md.*, 2015 WL 1405421, at *6 (D. Md. Mar. 25, 2015). *See also State v. Albrecht*, 336 Md. 475, 500 (1994) (defining gross negligence as conduct "so heedless and incautious as necessarily to be deemed unlawful and wanton, manifesting such a gross departure from what would be the conduct of an ordinary careful and prudent person under the same circumstances so as to furnish evidence of an indifference to consequences." (internal citations omitted)). In other words, gross negligence is akin to "reckless or wanton conduct." *Shoemaker v. Smith*, 353 Md. 143, 164, 725 A.2d 549 (1999).

In order for the Individual Defendants to reach the level of reckless disregard, their conduct must "take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Medina v. Meilhammer*, 62 Md. App. 239, 250 (1985) (internal quotations omitted). Under Maryland law, "gross negligence implies malice and evil intention." *Respess v. Travelers Casualty & Surety Company of America*, 770 F.Supp.2d 751, 764 (D. Md. 2011). Thus, in order to adequately plead a claim for gross negligence, Plaintiffs must allege facts that any Individual Defendant made a deliberate choice not to give Mr. Green a chance to survive, as "it is deliberateness that lies at the core of the *Tatum*[23] standard of willfulness and wantonness." *McCoy v. Hatmaker,* 135 Md. App. 693, 714 (2000).

---

[23] *Tatum v. Gigliotti*, 80 Md. App. 559 (1989), *aff'd* 321 Md. 623 (1991)

When dealing with such a heightened standard, bald and conclusory allegations will not suffice; specificity is required. *Foor v. Juvenile Services*, 78 Md. App. 151, 170, *cert. denied*, 316 Md. 364 (1989). Here, the Complaint lacks the requisite specificity and instead provides a few conclusory terms, such as "Defendants engaged in intentional, willful, and wanton misconduct with reckless disregard for the consequences to Mr. Green." *See* ECF 1, at ¶ 241. This allegation is, of course, a conclusory one, even under FRCP 8's standards. In fact, the Complaint is completely devoid of any factual support for the allegation of "willful and wanton misconduct."

The rulings in *Tatum v. Gigliotti*, 80 Md. App. 559 (1989), *aff'd* 321 Md. 623, (1991) and *McCoy v. Hatmaker*, 135 Md. App. 693 (2000) provide instruction on the gross negligence standard in the context of medical services provided by paramedics and emergency medical technicians in Maryland. In *Tatum*, paramedics from Prince George's County Fire Department responded to a call regarding a man suffering from an asthma attack, and upon their arrival, attempted to provide the decedent treatment used for hyperventilation - not asthma. When the decedent resisted the treatment, the paramedics administered oxygen and required him to walk to the ambulance instead of being placed on a stretcher. While en route to the hospital, the decedent refused to lie on the stretcher and subsequently fell to the floor after the ambulance took a sharp turn. *Tatum*, 80 Md. App. at 562-63. The paramedics subsequently wrote in the ambulance report that the decedent arrived to the hospital in stable condition. *Id.* However, hospital personnel testified that the patient was "in complete respiratory and cardiac arrest" when he arrived at the hospital. *Id*.

Despite egregious facts demonstrating a misdiagnosis of the patient, borderline cruel treatment, and falsification of official records, the Appellate Court of Maryland determined that

"although the actions of Gigliotti may have amounted to negligence, they do not satisfy the threshold of gross negligence." *Id*. at 569.

In *McCoy,* the widow of a man who died suddenly in his car sued a Baltimore City paramedic and a Baltimore City police officer (who was a trained emergency medical technician), alleging both men were grossly negligent when they allegedly failed to comply with the relevant standard of care when each assessed the decedent as beyond resuscitative help. As with here, the widow alleged that the paramedic's failure to follow MIEMSS and other treatment protocols equated to gross negligence. *McCoy*, 135 Md. App. at 710. The Appellate Court of Maryland disagreed, holding that a paramedic's failure to follow medical protocol and subsequent erroneous medical judgment was not sufficient to establish gross negligence. *Id*. at 707-08. "[W]e cannot equate a well-intended error in medical judgment — even if it costs the patient's life — with wanton and reckless disregard for the life of that patient. Medical protocols seek to establish best practices for successfully treating certain conditions. Failure to follow such protocols might sometimes be deliberate, but more often than not, we believe, such failure to heed them during an emergency would be purely accidental and, therefore, at most simple negligence." *Id.* at 713. Aside from the alleged violation of MIEMSS protocols (which do not even apply to the Officer Defendants), the Complaint fails to assert the factual predicate necessary to proceed on a gross negligence claim. The bald allegations that the Individual Defendants' collective conduct was "willful" or "wanton" are simply too extreme to be plausible under *Twombly* and *Iqbal*. Accordingly, Counts XV and XVI must be dismissed, with prejudice, for the failure to state a claim for gross negligence.

### ix.     *Count XVII – Wrongful Death*

Maryland's wrongful death statute is set forth under CJP §§ 3-901, *et seq*. "An action may be maintained against a person whose wrongful act causes the death of another." CJP §3-

902(a). "Wrongful act" is defined as "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." CJP §3-901. Because Plaintiffs have failed to state a claim for all of the aforementioned Counts, they have similarly failed to state a claim for any "wrongful act," and Count XVII should be dismissed.

        i.     *Count XVIII – Survival Action*

Maryland's survival statute provides "a cause of action at law, whether real, personal, or mixed, survives the death of either party." CJP, §6-401. It "**does not create a new cause of action unknown to common law**. Rather it changes the rule at common law under which certain actions by or against decedents abated with death." *Trimper v. Porter-Hayden*, 305 Md. 31, 38 (1985) (emphasis added).

The Supreme Court of Maryland has explained that "to be precise a 'survival action' is merely the *mechanism* by which an estate brings a claim that the decedent could have asserted had he survived. It is not a 'claim' in the sense that, for example, one might assert a battery or negligence claim." *Mang v. City of Greenbelt*, 2012 WL 115454, at *22 (D. Md. 2012)(emphasis in original). Here, every substantive claim alleged throughout the Complaint has already been plead in the eight other survival action claims. It should be noted that this issue was briefed during the First Lawsuit and Judge Rubin found dismissal was warranted. *See Estate of Green, et al.*, 2023 U.S. Dist. LEXIS 176157, at *84-85. Therefore, Count XVIII should be dismissed with prejudice as duplicative.

**C.**   **<u>Even if Plaintiffs have Plausibly Stated a Claim for Relief, the Individual Defendants are Immune From Suit.</u>**

To the extent Plaintiffs have sufficiently alleged any of the Individual Defendants violated Mr. Green's constitutional rights in their response to a medical emergency, they are

nevertheless shielded by qualified immunity, public official immunity, immunity under the Good Samaritan Act, and/or immunity under the Fire and Rescue Companies Act.

    1.  <u>Qualified Immunity</u>

Qualified immunity protects government officials "from federal claims when they act in objectively reasonable reliance on existing law." *Queen v. Prince George's County*, 188 F.Supp.3d 535, 541 (D. Md. 2016). It gives "government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (internal citations omitted). Qualified immunity is an affirmative defense that does not merely provide a defense to liability – it provides "*immunity from* suit …" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). It is intended to free officials from litigation concerns and disruptive discovery. *Iqbal*, 556 U.S. at 685. The protection applies "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

As stated above, Individual Defendants have committed no constitutional violation and therefore are entitled to qualified immunity. Even if Plaintiffs have sufficiently alleged a constitutional violation, the Individual Defendants are still entitled to qualified immunity because on June 1, 2021, it was not clearly established that mere placement of a patient in a prone position and securing him with straps to a portable stretcher and a rolling stretcher violates the Constitution.

Whether a constitutional right is clearly established "requires defining the right at issue." *Hicks v. Ferreyra*, 64 F.4th 156, 170 (4th Cir. 2023). That right must not be defined "at a high level of generality," but with precision. *City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600 (2015).

The Supreme Court in *Kisela v. Hughes* determined that defining the right in question as the "right to be free of excessive force" was too general where, as here, the officials' conduct did not constitute an "obvious case." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153-54 (2018) (internal citation omitted).

Clearly established "means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). This standard "requires that the contours of the legal rule be 'so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Garrett v. Clarke*, 74 F.4th 579, 584 (4th Cir. 2023) (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021)). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012) (cleaned up).

When analyzing qualified immunity, courts ordinarily need not look beyond the decisions of the Supreme Court, the Fourth Circuit, and "the highest court of the state in which the case arose" as of the date of the conduct at issue. *Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017). The Supreme Court has stressed the need to "identify a case" or a "body of relevant case law" where "an offic[ial] acting under similar circumstances … was held to have violated the [Constitution]." *Wesby*, 583 U.S. at 64.

There is no controlling authority in this Circuit which holds that using straps to secure an individual to a stretcher in a prone position and applying minimal to no pressure to their upper body constitutes a constitutional violation, as the Complaint alleges.

Though the facts are more egregious than those alleged here, a similar case was recently before the Ninth Circuit. *See Perez*, 98 F.4th 919. The Court ultimately held that the defendants

were entitled to qualified immunity because, at the time of the decedent's death, the law was not clearly established that the officers' actions, directed by medical personnel, would violate the decedent's constitutional rights and the law did not clearly establish that medical personnel were liable for constitutional torts for actions taken to provide medical care or transport. *Id.*

In *Perez*, officers observed Joseph Perez acting erratically, sprinting through the street, screaming, and hiding in the bushes. *Id.*, at 922. Believing him to be under the influence of a controlled substance, the officers called EMS providers to facilitate an involuntary psychiatric detention. *Id.* Prior to EMS arrival, Perez was lying on his stomach and kicking his legs to the point where officers applied a restraint to his ankles to control his leg movement. *Id.* Once the paramedics arrived, one paramedic stated that they were going to attach Perez to a backboard while he was prone so that he could be medically transported to the hospital. *Id.*, at 923. Though Perez yelled that he could not breathe, the paramedic instructed the officers to apply pressure to the backboard, including one officer sitting on it, in order to secure Perez to it. *Id.* This type of pressure was applied for approximately one minute and thirteen seconds and, once the seated officer stood up, paramedics continued securing the backboard to Perez for another two minutes before turning him over. *Id.* At that point, paramedics discovered Perez did not have a pulse, and he ultimately died. *Id.* The medical examiner later determined Perez's cause of death was compression asphyxia during restraint with methamphetamine toxicity as a significant contributor. *Id.*

Acknowledging sparse case law applying Fourth and Fourteenth Amendment standards to paramedics responding to a medical emergency, the Ninth Circuit looked to the other circuits for guidance in assessing whether the paramedics were entitled to qualified immunity. *Id.*, at 928-930. Beginning with the Sixth Circuit, the Court in *McKenna v. Edgell* held that if a paramedic

48

was acting in a law enforcement capacity at the time of the challenged conduct, then a claim can

be properly raised under § 1983; however, if the paramedic was acting in a medical capacity,

then the plaintiff is limited to a medical malpractice claim. *McKenna v. Edgell*, 617 F.3d 432,

439-440 (6th Cir. 2010). The Court further held that if there is a constitutional "right to be free

from … unintentional conduct by medical-emergency responders …, it is not clearly

established." *McKenna*, 617 F.3d at 440.

In *Peete v. Metro Gov't of Nashville & Davidson County*, the Sixth Circuit reversed a

district court's denial of qualified immunity for paramedics who restrained and applied pressure

to a patient who was prone and unconscious, ultimately causing the patient's death. *Peete v.

Metro Gov't of Nashville & Davidson County*, 486 F.3d 217, 220 (6th Cir. 2007). The Sixth

Circuit held that "there is no federal case authority creating a constitutional liability for the

negligence, deliberate indifference, and incompetence" of paramedics when their "purpose is to

render solicited aid in an emergency rather than to enforce the law, punish, deter, or incarcerate."

*Peete*, 486 F.3d at 221. The Court further concluded that the paramedics "were attempting to

help him, although they badly botched the job." *Id.* at 222.

The Eighth Circuit granted qualified immunity to paramedics who responded to an

emergency call involving an intoxicated woman threatening to harm herself. *Buckley v.

Hennepin County*, 9 F.4th 757, 759 (8th Cir. 2021). The woman refused to be transported to the

hospital, which resulted in officers and paramedics restraining her and carrying her to the

ambulance where the paramedics administered a sedative. *Id*. at 759. The woman went into

respiratory distress and had to be intubated. *Id.* at 759-60. The Court concluded that the actions

of the paramedics were reasonable given the woman's "intoxicated, suicidal, [and] semi-

conscious" state. *Id*. at 762. The fact that the paramedics sedated her to protect her (and themselves) from harm did not change the court's analysis. *Id*. at 764.

After a review of the aforementioned cases stemming out of sister circuits, the Ninth Circuit in *Perez* ultimately held that, the paramedic was trying to render medical aid to Perez and:

> Because we conclude that Anderson was acting in a medical capacity during the tragic event at issue in this case, we also conclude that he is entitled to qualified immunity. **There is no precedent imposing constitutional tort liability on a paramedic who attempts to render emergency medical aid to a patient by restraining him in preparation for a medical transport.**

*Perez*, 98 F.4th at 931. (emphasis added).

In the case at bar, the Individual Defendants are alleged to have responded to a medical emergency, and it was determined almost immediately that Mr. Green needed to be transported to the hospital. At no point was Mr. Green handcuffed or otherwise restrained so that he could be arrested. In fact, Mr. Green is repeatedly told that he was not in trouble and the Individual Defendants were only trying to help him. Despite this, Mr. Green's was uncooperative, yelling, and constantly moving around, including attempting to kick at anyone in the vicinity, all the while bleeding profusely. When Mr. Green was placed on both the portable stretcher and the rolling stretcher, he was done so by the AFD Defendants acting in a medical capacity and as a means of transporting him to the medic unit so that he could be transported to the hospital for the additional medical care that he needed. As stated by the Court in *Perez*, there existed no precedent on June 1, 2021, that an EMS provider restraining a patient in preparation for medical transport would be a violation of the Constitution. Thus, the AFD Defendants are entitled to qualified immunity in this case.

In determining that the police officers were entitled to qualified immunity, the Ninth

Circuit held:

> A paramedic concluded that Perez needed to be restrained so that he could be
> transported to a hospital and directed the officers involved to help attach Perez to
> a backboard while he was laying prone, including by sitting on the backboard.
> Under the circumstances, it was not obvious that applying the backboard in this
> manner – as directed by a medical professional trained to respond in emergency
> situations – would violate the Constitution.

*Perez*, 98 F.4th at 927.

Here, at worst, each of the Officer Defendants observed the AFD Defendants securing

Mr. Green to a stretcher using straps. At no point did any of the Officer Defendants physically

strap Mr. Green to a stretcher and, when Officers Bodmer, Siminyuk, and Sgt. Cochran assisted

with placing Mr. Green on the portable stretcher using the white sheet, they were taking such

action at the direction of the AFD Defendants. *See* fns. 4 and 5, at 2:35 a.m. – 2:36:26 a.m. No

legal precedent exists that requires officers to second guess EMS providers in their effort to

provide medical care. This is especially true in light of the Ninth Circuit's holding in *Perez* that it

has not been clearly established that medical personnel can be liable for constitutional torts when

responding to medical emergencies. *Perez*, 98 F.4th at 931.

As of June 1, 2021, no case nor body of law clearly established that conduct similar to

that of the Officer Defendants was unreasonable. Accordingly, the Officer Defendants are also

entitled to qualified immunity in this matter.

### 2. Public Official Immunity

At common law, public officials in Maryland enjoy immunity from suit for all actions

committed in the scope of their employment as public officials. *See Lovelace v. Anderson*, 366

Md. 690, 714 (2001) (citing *James v. Prince George's County*, 288 Md. 315, 323 (1980). This

immunity has been codified in CJP §5-507(a), which states: "[a]n official of a municipal

corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action."

Malice is established by proof that the defendant intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff. *Davis v. DiPino*, 99 Md. App. 282 (1994), *rev'd*, 337 Md. 642, (1995).

For the same reasons their gross negligence claim fails, Plaintiffs cannot overcome the Defendants' entitlement to public official immunity because they have utterly failed to allege malice on the part of any of the Individual Defendants. Though the Complaint consistently references "willful conduct" on the part of the Individual Defendants, the presence of a few conclusory legal terms do not insulate a complaint from dismissal when the facts alleged in the complaint cannot overcome an official's entitlement to immunity.

3. <u>Good Samaritan Act and Fire & Rescue Companies Act</u>

Lastly, first responders covered under the Good Samaritan Act and/or the Fire & Rescue Companies Act are immune from liability for any acts or omissions in providing assistance or in the performance of their duties in the absence of willful or grossly negligent conduct. *See* CJP, §§5-603 and 5-604.

The Good Samaritan Act provides, in relevant part, that a member of a municipal fire department is not civilly liable for any act or omission in providing assistance or medical care if:

> (1) The act or omission is not one of gross negligence; (2) The assistance or medical care is provided without fee or other compensation; and (3) The assistance or medical care is provided: (i) At the scene of an emergency; (ii) In transit to a medical facility; or (iii) Through communications with personnel providing emergency assistance.

CJP §5-603.

Similarly, the Fire and Rescue Companies Act states, in relevant part, that:
Except for any willful or grossly negligent act, a fire company or rescue company,
and the personnel of a fire company or rescue company, are immune from civil
liability for any act or omission in the course of performing their duties.

CJP §5-604.

As stated in Section III(B)(2)(viii), *supra*, Plaintiffs have not adequately pled gross

negligence on the part of any AFD Defendant. Accordingly, they are immune from liability on

the basis that they are covered by the Good Samaritan Act and/or the Fire & Rescue Companies

Act.

## IV.    CONCLUSION

For the reasons stated herein, Defendants respectfully request this Court enter an Order:

1.   Granting their Motion to Dismiss or, in the alternative, Motion for Summary

     Judgment and Request for Hearing;

2.   Dismissing all claims against Defendants with prejudice; and

3.   For such other and further relief as may be necessary to Defendants' case.

Respectfully submitted,

**CITY OF ANNAPOLIS
OFFICE OF LAW**


 */s/  Kerry E. Berger*
Kerry E. Berger, Assistant City Attorney
#19979

*/s/  Jessica D. Corace*
Jessica D. Corace, Assistant City Attorney
#29828

_/s/  D. Michael Lyles_____
D. Michael Lyles, City Attorney
#13120

City of Annapolis Office of Law
160 Duke of Gloucester Street
Annapolis, Maryland 21401
(410) 263-7954, (410) 268-3916 Fax
keberger@annapolis.gov
jdcorace@annapolis.gov
dmlyles@annapolis.gov
**_Attorneys for Defendants City of Annapolis,
Sergeant Mark Cochran, Officer Matthew
Bodmer, Officer Anna Woytko, Officer Ivan
Siminyuk, Thomas Frankhouser, Glenn
Makovsky, Bridget Weiss, Caleb Ward, and Ryan
Norris_**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 22, 2024, a copy of the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment and Request for Hearing was served electronically via e-filing through CM/ECF system to the following persons:

Andrew Janet
Tara L. Eberly
Stephen C. Rigg
JANET, JANET & SUGGS, LLC
Executive Centre at Hooks Lane
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
410-653-3200
asjanet@jjsjustice.com
teberly@jjsjustice.com
srigg@jjsjustice.com
***Attorneys for Plaintiffs Tracy Naylor
and Estate of Renardo Green***

William H. Murphy, Jr.
Malcom P. Ruff
MURPHY, FALCON & MURPHY
One South Street, 30th Floor
Baltimore, MD 21202
410-951-8744
billy.murphy@murphyfalcon.com
malcom.ruff@murphyfalcon.com
***Attorneys for Plaintiffs Brittany Green,
Tiffany Green, Jayda Green, and
Estate of Renardo Green***

Dwayne A. Brown
LAW OFFICE OF DWAYNE A. BROWN
20 South Charles Street, Suite 400
Baltimore, MD 21201
410-539-6855
dbrown@brownbonner.com
***Attorney for Plaintiffs Phyllis McGowan
and Estate of Renardo Green***

 /s/  Kerry E. Berger
Kerry E. Berger, Assistant City Attorney

55