## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ESTATE OF RENARDO GREEN, et

al.,

        Plaintiffs,

    v.

CITY OF ANNAPOLIS, et al.

        Defendants.

**Case No.: 1:24-CV-01351-MJM**

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Andrew S. Janet
Tara Eberly
Stephen C. Rigg
JANET, JANET & SUGGS, LLC
Executive Centre at Hooks Lane
4 Reservoir Circle, Suite 200
Baltimore, MD 21208

William H. Murphy, Jr.
Malcolm P. Ruff
Phylecia R. Faublas
MURPHY, FALCON & MURPHY
One South Street, 30th Floor
Baltimore, MD 21202

and

Dwayne A. Brown
LAW OFFICE OF DWAYNE A. BROWN
20 South Charles Street, Suite 400
Baltimore, Maryland 21201

## Table of Contents

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT ...................................................... 1

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT ...................................................... 1

FACTS AS PROPERLY ALLEGED ............................................................................... 1

    I.    Mr. Green's encounter with Defendants ............................................................ 2

    II.    Defendants' training and knowledge of the dangers posed by prone restraint cardiac arrest ............................................................................................................. 4

    III.    Brief procedural history ................................................................................ 5

STANDARD ................................................................................................................. 5

ARGUMENT ................................................................................................................ 7

    I.    Defendants' argument that Plaintiffs' claims are too vague are, themselves, too vague to properly argue against and, in any event, Plaintiffs have made specific reference to specific defendants and their actions. ....................................................................... 8

        A.    Defendants' arguments are too vague. ...................................................... 8

        B.    Plaintiffs' Complaint alleges claims against the individual Defendants. ....................... 8

    II.    It is inappropriate to utilize the unauthenticated body-worn footage at this stage of litigation because it is too early in the case, and they are completely unauthenticated ............ 11

        A.    There are no videos in the record: Defendants have simply linked ephemeral, unverified YouTube videos, coupled with an assertion by counsel that they are what counsel says they are. ....................................................................................................... 11

        B.    The videos are not sufficiently "integral to the complaint" to permit the Court to utilize them in a motion to dismiss. ....................................................................................... 12

        C.    Summary judgment is not ripe. ..................................................................... 13

    III.    There is no legal standard requiring Plaintiffs' Complaint to match with information not yet in evidence and to require otherwise would heighten the burden required to survive a Rule 12(b)(6) motion. ....................................................................................................... 14

    IV.    Plaintiffs' claims are well pled. ..................................................................... 15

        A.    Counts I and II: 42 U.S.C. § 1983 Claims for Excessive Force and Due Process Violations ............................................................................................................. 15

B.    Counts III and IV: *Monell* Claims ............................................................... 21

C.    Counts V and VI: 42 U.S.C. § 1985 Claims for Conspiracy to Deprive ..................... 25

D.    Count VII and VIII: 42 U.S.C. § 1983 Claims for Deliberate Indifference ................ 32

E.    Counts IX and X: Claims for Maryland Declaration of Rights Article 24 Deprivations 35

F.    Counts XI and XII: Claims for Battery .......................................................... 36

G.    Counts XIII and XIV: Claims for Negligence ................................................... 36

H.    Counts XV and XVI: Claims for Gross Negligence ............................................ 38

I.    Counts XVII and XVIII: Claims for Wrongful Death and Survival............................ 41

V.    Defendants' arguments that the Fourth Amendment does not apply are incorrect but also, ultimately, academic. .................................................................................... 42

VI.    None of Defendants' immunity arguments are persuasive, as Mr. Green had clearly established rights and the other immunities Defendants are seeking are state immunities for federal claims.............................................................................................. 44

A.    Defendants are not entitled to qualified immunity, as they violated well-established constitutional rights.................................................................................. 44

B.    Public Official Immunity ......................................................................... 47

C.    Good Samaritan Act and Fire & Rescue Companies Act ..................................... 50

CONCLUSION................................................................................................ 52

**Page(s)**

**Cases**

*Hinkle v. City of Clarksburg,*
    81 F.3d 416 (4th Cir. 1996) ................................................................. 31

*A Soc'y Without A Name v. Virginia,*
    655 F.3d 342 (4th Cir. 2011) ............................................... 25, 26, 28

*Abdullahi v. City of Madison,*
    423 F.3d 763 (7th Cir. 2005) ................................................................. 7

*Adickes v. S.H. Kress & Co.,*
    398 U.S. 144 (1970) ............................................................................. 14

*Aguirre v. City of San Antonio,*
    995 F.3d 395 (5th Cir. 2021) ............................................................... 47

*Andreadakis v. Ctr. for Disease Control & Prevention,*
    No. 3:22CV52 (DJN), 2022 WL 2674194 (E.D. Va. July 11, 2022) ...................................... 28

*Ashburn v. Anne Arundel Cnty.,*
    510 A.2d 1078 (Md. Ct. Spec. App. 1986) .......................................... 37

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................... 6, 7

*Aston v. Brown,*
    339 Md. 70 (1995) ............................................................................... 47

*Avery v. Burke Cnty.,*
    660 F.2d 111 (4th Cir. 1981) ............................................................... 22

*Barnes v. Maryland Nat. Cap. Park & Plan. Comm'n,*
    932 F. Supp. 691 (D. Md. 1996) ......................................................... 25

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ......................................................................... 6, 29

*Bell v. Wolfish,*
    441 U.S. 520 (1979) ............................................................................. 32

*Bing v. Brivo Systems, LLC,*
    959 F.3d 605 (4th Cir. 2020) ................................................................. 6

*Black v. Webster*,
   No. 20-CV-3644, 2022 WL 169669 (D. Md. Jan. 18, 2022)....................................... 47

*Bookhultz v. Sears Authorized Hometown Stores, LLC*,
   No. CV CBD-16-2176, 2018 WL 1795338 (D. Md. Apr. 13, 2018)....................... 11

*Brooks v. Jenkins*,
   104 A.3d 899 (Md. Ct. Spec. App. 2012) ............................................................. 38

*Brown v. Harris*,
   240 F.3d 383 (4th Cir. 2001) ............................................................................... 32

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ....................................................................................... 12, 13

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ................................................................................ 13

*Chase v. Mayor & City Council of Baltimore*,
   730 A.2d 239 (Md. Ct. App. 1999) ....................................................................... 51

*City of Canton Ohio v. Harris*,
   489 U.S. 378 (1989) ....................................................................................... 22, 23

*Conn v. City of Reno*,
   591 F.3d 1081 (9th Cir. 2009) ............................................................................. 22

*Connick v. Thompson*,
   563 U.S. 51 (2011) ............................................................................................... 23

*Cox v. Prince George's Cnty.*,
   296 Md. 162 (1983) .............................................................................................. 47

*Davis v. Scherer*,
   468 U.S. 183 (1984) ....................................................................................... 17, 18

*Deblois v. Gensel*,
   No. CCB-07-2596, 2009 WL 2713947 (D. Md. Aug. 26, 2009)............................ 12

*Dent v. Montgomery Cnty. Police Dep't*,
   745 F. Supp. 2d 648 (D. Md. 2010) ..................................................................... 46

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
   489 U.S. 189 (1989)............................................................................................. 18

*DiPino v. Davis*,
   729 A.2d 354 (Md. 1999) ................................................................ 36, 47

*Dunne v. State,*
   162 Md. 274 ........................................................................................ 48

*Durham v. Jones*,
   737 F.3d 291 (4th Cir. 2013) ............................................................ 44

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir. 1999) ............................................................ 6, 7

*Estate of Phillips v. City of Milwaukee*,
   123 F.3d 586 (7th Cir. 1997) ............................................................ 18

*Facey v. Dae Sung Corp.*,
   992 F. Supp. 2d 536 (D. Md. 2014) .................................................. 28

*Fried v. Archer*,
   775 A.2d 430 (Md. Ct. Spec. App. 2001) ........................................ 37

*Glisson v. Indiana Dep't of Corr.*,
   849 F.3d 372 (7th Cir. 2017) ............................................................ 22

*Goines v. Valley Cmty. Servs. Bd.*,
   822 F.3d 159 (4th Cir. 2016) ............................................................ 12, 13

*Great N. Ins. Co. V. Recall Total Info. Mgmt., Inc.*,
   No. Civ.A TDC-13-1829, 2014 WL 3845891 (D. Md. Aug. 1, 2014) .................................. 39

*Gutierrez v. City of San Antonio*,
   139 F.3d 441 (5th Cir. 1998) ............................................................ 47

*Hafner v. Brown*,
   983 F.2d 570 (4th Cir. 1992) ............................................................ 25

*Harrison v. United States Postal Serv.*,
   840 F.2d 1149 (4th Cir. 1988) .......................................................... 7

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
   599 U.S. 166 (2023) ............................................................................ 15

*Heinze v. Murphy*,
   180 Md. 423 (1942) ............................................................................ 48

*Helling v. McKinney*,
  509 U.S. 25 (1993) ............................................................................. 32, 38

*Henry v. County of Shasta*,
  132 F.3d 512 (9th Cir. 1997) ............................................................... 23

*Henry v. Purnell*,
  652 F.3d 524 (4th Cir. 2011) ............................................................... 35

*Hill v. Nicodemus*,
  979 F.2d 987 (4th Cir. 1992) ............................................................... 32

*Houghton v. Forrest*,
  412 Md. 578 (2010) ......................................................................... 48, 49

*In re Allen*,
  106 F.3d 582 (4th Cir. 1997) ............................................................... 45

*In re Mills*,
  Nos. 08-1024, 08-1032, 2008 WL 2937850 (4th Cir. July 29, 2008) ................... 44

*Jackson v. Lightsey*,
  775 F.3d 170 (4th Cir. 2014) ............................................................... 32

*James v. Prince George's Cnty.*,
  288 Md. 315 (1980) ........................................................................... 48

*Jenkins v. Averett*,
  424 F.2d 1228 (4th Cir. 1970) ............................................................. 20

*Jien v. Perdue Farms, Inc.*,
  2020 WL 5544183 (D. Md. Sept. 16, 2020) ........................................... 29, 30

*Johnson v. Balt. Police Dep't*,
  No. ELH-19-00698, 2020 WL 1169739 (D. Md. Mar. 10, 2020) ..................... 23

*Johnson v. Baltimore Police Dep't*,
  No. CV ELH-19-0698, 2022 WL 9976525 (D. Md. Oct. 14, 2022) ................. 22

*Johnson v. City of Cincinnati*,
  39 F. Supp. 2d 1013 (S.D. Ohio 1999) ................................................... 47

*Johnson v. City of Shelby, Miss.*,
  574 U.S. 10 (2014) .............................................................................. 5

*King v. Rubenstein,*
  825 F.3d 206 (4th Cir. 2016) ................................................................. 6

*King v. Taylor,*
  944 F.Supp.2d 548 (E.D. Ky. 2013) ...................................................... 18

*Koon as next friend of Glay v. Prince George's Cnty., MD,*
  No. CV-DKC-17-2799, 2019 WL 1317401 (D. Md. Mar. 22, 2019) ....................... 7

*Lake v. Arnold,*
  112 F.3d 686 (3d Cir. 1997) .................................................................. 28

*Lawhon v. Edwards,*
  477 F. Supp. 3d 428 (E.D. Va. 2020) ........................................... 18, 19, 20

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,*
  507 U.S. 163 (1993) ............................................................................ 5

*Lee v. Cline,*
  384 Md. 245 (2004) ..................................................................... 48, 49

*Long v. Cnty. Of Los Angeles,*
  442 F.3d 1178 (9th Cir. 2006) ............................................................. 22

*Ludwig v. Anderson,*
  54 F.3d 465 (8th Cir. 1995) ................................................................. 18

*Mang v. City of Greenbelt,*
  2012 WL 115454 (D. Md. 2012) ......................................................... 42

*Martinez v. State of Cal.,*
  444 U.S. 277 (1980) .......................................................................... 50

*Mason v. Wrightson,*
  205 Md. 481(1954) .......................................................................... 48

*Mays v. Sprinkle,*
  992 F.3d 295 (4th Cir. 2021) .............................................................. 32

*McCoy v. Hatmaker,*
  763 A.2d 1233 (Md. Ct. Spec. App. 2000) ............................................. 39

*McCue v. City of Bangor,*
  838 F.3d 55 (1st Cir. 2016) ................................................................ 47

*McLenagan v. Karnes*,
  27 F.3d 1002 (4th Cir. 1994) ................................................................. 18

*Medina v. Meilhammer*,
  489 A.2d 35 (Md. Ct. Spec. App. 1985) ................................................. 38

*Miller v. Maryland Dep't of Nat.*,
  *Res.*, 813 F. App'x 869 (4th Cir. 2020) .................................................. 6

*Miltier v. Beorn*,
  896 F.2d 848 (4th Cir. 1990) ................................................................. 16

*Monell v. Dep't of Soc. Servs. of City of New York*,
  436 U.S. 658 (1978) .............................................................................. 21

*Muthukumarana v. Montgomery Cnty.*,
  805 A.2d 372 (Md. 2002) ...................................................................... 37

*Myers v. City of Charleston*,
  No. 2:19-CV-00757, 2021 WL 925326 (S.D.W. Va. Mar. 10, 2021) ...... 47

*Okwa v. Harper*,
  360 Md. 161 (2000) ............................................................................... 48

*Orem v. Rephann*,
  523 F.3d 442 (4th Cir. 2008) ................................................................. 43

*Patel v. Lanier County Georgia*,
  969 F.3d 1173 (11th Cir. 2020) ............................................................. 33

*Patten v. Nichols*,
  274 F.3d 829 (4th Cir. 2001) ................................................................. 32

*Pendleton v. State*,
  921 A.2d 196 (Md. 2007) ...................................................................... 36

*Peprah v. Williams*, No. CV GLR-1,
  8-990, 2019 WL 224245 (D. Md. Jan. 15, 2019) ................................... 6

*Phillips v. Comm. Ins. Corp.*,
  678 F.3d 513 (7th Cir. 2012) ................................................................. 44

*Queen v. Prince George's County*,
  188 F.Supp.3d 535 (D. Md. 2016) ......................................................... 44

*R.A. v. Johnson,*
36 F.4th 537 (4th Cir. 2022) ............................................................. 49

*Raiche v. Pietroski,*
623 F.3d 30 (1st Cir. 2010) ............................................................... 18

*Randall v. Prince George's County,*
302 F.3d 188 (4th Cir. 2002) ...................................................... 22, 29

*Reed v. Okereke,*
No. 1:04-CV-1064-JOF, 2006 WL 2444068 (N.D. Ga. Aug. 22, 2006) ................. 45

*Ridpath v. Board of Governors Marshall University,*
447 F.3d 292 (4th Cir. 2006) ............................................................. 45

*Robertson v. Sea Pines Real Est. Companies, Inc.,*
679 F.3d 278 (4th Cir. 2012) .......................................................... 6, 10

*Robinson v. Bd. of Cnty. Commissioners for Prince George's County,*
262 Md. 342 (1971) ......................................................................... 49

*Rodriguez v. United States,*
575 U.S. 348 (2015) ........................................................................ 43

*Sallenger v. Oakes,*
473 F.3d 731 (7th Cir. 2007) ............................................................. 47

*Scott v. Harris,*
550 U.S. 372 (2007) ........................................................................ 45

*Sira v. Morton,*
380 F.3d 57 (2d Cir. 2004) ............................................................... 13

*Smith v. Danielczyk,*
400 Md. 98 (2007) .......................................................................... 49

*Smith v. Hogan,*
794 F.3d 249 (2d Cir. 2015) .............................................................. 13

*Spangler v. McQuitty,*
141 A.3d 156 (Md. 2016) .................................................................. 41

*Spell v. McDaniel,*
824 F.2d 1380 (4th Cir. 1987) ...................................................... 22, 23

*Stanton v. Elliott*,
25 F.4th 227 (4th Cir. 2022) ........................................................ 44

*Stracke v. Est. of Butler*,
214 A.3d 561 (Md. 2019) ........................................................... 51

*Street v. City of Bloomingdale*,
2007 WL 1752469 (S.D. Ga. June 15, 2007)............................... 45

*Swedish Civ. Aviation Admin. v. Project Mgmt. Enterprises, Inc.*,
190 F. Supp. 2d 785 (D. Md. 2002) ............................................ 30

*Tarashuk v. Givens*,
53 F.4th 154 (4th Cir. 2022) .................................................. 44, 49

*Tatum v. Gigliotti*,
565 A.2d 354 (Md. Ct. Spec. App. 1989) ................................... 39

*Thomas v. Younce*,
604 Fed. Appx. 325 (4th Cir. 2015) ........................................... 33

*Tolan v. Cotton*,
572 U.S. 650 (2014)................................................................... 14

*TransCare Maryland, Inc. v. Murray*,
64 A.3d 887 (Md. 2013) ............................................................ 51

*Truax v. Corrigan*,
257 U.S. 312 (1921)................................................................... 28

*Tserkis v. Baltimore Cnty.*,
No. CV ELH-19-202, 2021 WL 195310 (D. Md. Jan. 19, 2021)............ 45

*Turmon v. Jordan*,
405 F.3d 202 (4th Cir. 2005) ..................................................... 46

*Union Pacific Ry. Co. v. Bostford*,
141 U.S. 250 (1891)................................................................... 21

*Valentine v. PrimeCare Med., Inc.*,
697 F. Supp. 3d 431 (D. Md. 2023) ........................................... 32

*Valladares v. Cordero*,
552 F.3d 384 (4th Cir. 2009) ..................................................... 46

*Wakat v. Harlib*,
   253 F.2d 59 (7th Cir. 1958) ................................................................... 27, 28

*Washington v. Baltimore Police Dep't*,
   457 F. Supp. 3d 520 (D. Md. 2020) ........................................................ 22, 23

*Webb v. Deboo*,
   423 Fed. App'x. 299 (4th Cir. 2011) ............................................................. 32

*Weeden v. Prince George's Cnty.*,
   2018 WL 2694441 (D. Md. June 4, 2018) ...................................................... 30

*Jones v. Chapman*,
   2017 WL 247220 (D. Md. July 24, 2015) ....................................................... 30

*Weyler v. Gibson*,
   110 Md. 636 (1909) ...................................................................................... 48

*Willey v. Bd. of Educ. Of St. Mary's Cty.*,
   557 F. Supp. 3d 645 (D. Md. 2021) ............................................................... 41

*Williams v. Dimensions Health Corp.*,
   279 A.3d 954 (Md. 2022) .............................................................................. 16

*Willingham v. Crooke*,
   412 F.3d 553 (4th Cir. 2005) ........................................................................ 44

*Wilson v. State*,
   409 Md. 415 (2009) ...................................................................................... 43

*Wyatt v. Owens*,
   317 F.R.D. 535 (W.D. Va. 2016) ................................................................... 18

*Yang v. Hardin*,
   37 F.3d 282 (7th. Cir 1994) .......................................................................... 29

*Yoon v. Sebelius*,
   Civ. A. No. CBD-08-3173, 2010 WL 4293513 (D. Md. Nov. 1, 2010) ................ 12

## **<u>Statutes</u>**

<u>42 U.S.C. § 1983</u> ................................................................................. passim

<u>42 U.S.C. § 1985</u> ............................................................................. 3, 25, 27, 28

Cts. & Jud. Proc. Art. § 5-603 ......................................................................... 50, 51

Cts. & Jud. Proc. Art. § 5-604.................................................................... 50

Md. Code Ann., Educ. § 13-516 ................................................................ 16

*U*.S. Const. art. VI, cl. 2.......................................................................... 50

## **Rules**

Fed. R. Civ. P. 8 ......................................................................... 5, 7, 30, 38

Fed. R. Civ. P. 12 .................................................................................... 6

Fed. R. Civ. P. 56 .................................................................... 11, 13, 14

## **Other Authorities**

5B Fed. Prac. & Proc. Civ. § 1357 (3d ed. 2023) ...................................... 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ESTATE OF RENARDO GREEN, et

al.,

          **Plaintiffs,**

    v.

CITY OF ANNAPOLIS, et al.

          **Defendants.**

**Case No.: 1:24-CV-01351-MJM**

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Plaintiffs through their counsel submit this Opposition to Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment. In opposition of defendant's motion, Plaintiffs states as follows:

## FACTS AS PROPERLY ALLEGED

A year and a week after George Floyd was murdered by nine minutes of being forcibly restrained face-down, Renardo Green was similarly killed in what the medical examiner ruled a "prone restraint cardiac arrest" homicide stemming from *eleven minutes* of being forcibly restrained face-down. Compl. ¶¶ 81, 150. Despite this and hundreds of other prone restraint cardiac arrest custody deaths, Defendants, a collection of government officials, agencies, and municipalities, contend that they were, somehow, not on notice that such a homicide violated Mr. Green's well established civil rights. Defendants are wrong about that, and they are wrong about what happened.

Renardo Green died because the men and women trusted to save him killed him. He would not have died had they not restrained him face down. Whatever else happened, this is undeniable: Had they not been reckless, Mr. Green would have survived.

## I.     <u>Mr. Green's encounter with Defendants</u>

On June 1, 2021, Mr. Green's wife, Plaintiff Tracy Naylor, called 911 because "Mr. Green, a 51-year-old African American man, was suffering from a disturbed and impaired mental state caused by ingestion of PCP. He was bleeding profusely from self-inflicted lacerations caused by broken glass and ceramics." Compl. ¶ 41. At no time relevant to the incident was Mr. Green violent or a threat towards anyone but himself. *Id.*

Emergency services, namely Defendant Officers Bodmer and Woytko, arrived at the Green residence at 2:20 a.m. *Id.* ¶ 42. At the time, Mr. Green was already on the ground, being held in place by a relative, and was not being restrained face-down. About five minutes after entering the apartment, Defendants Bodmer and Woytko rolled Mr. Green to his stomach and handcuffed him. *Id.* ¶ 43. Within a minute or two, Mr. Green was rolled back onto his side. *Id.* ¶ 44. Over the next five minutes or so, Mr. Green was further restrained, with ankle cuffs and leg shackles. *Id.* ¶¶ 46–47. Mr. Green was still restrained on his side.

At some point between the initial handcuffing and the subsequent events, the Annapolis Fire Department, and the associated AFD Defendants, arrived on the scene. *Id.* ¶ 48.

At 2:33, the Defendants, except Defendant Woytko, forcibly rolled Mr. Green onto his stomach onto a sheet. *Id.* ¶ 50. At this point, there was no need to restrain Mr. Green face-down, as he was already cuffed and shackled. Despite this, Mr. Green would remain on his front for at least the next eleven minutes. *Id.* ¶ 51. This "impaired adequate breathing, oxygenation, and blood flow on a continuous, ongoing, and worsening basis, and put him at substantial and foreseeable risk of cardiopulmonary arrest and death." *Id.*

Over the course of the next eleven minutes, the Defendants shifted Mr. Green from the sheet to a scoop stretcher to a rolling stretcher and into an ambulance. *Id.* ¶¶ 52–63. All the while, it became increasingly obvious that Mr. Green was in clearer and clearer respiratory and cardiac distress. Within five minutes of being shackled face-down, "Mr. Green's movements became visibly slower. He began lifting his head to breathe because of the difficulty breathing in the face-down position." *Id.* ¶ 60. Even the stretcher Defendants placed Mr. Green on "squeezed and compressed Mr. Green's body further," "which further impaired adequate circulation and respiration." *Id.* ¶ 58. Each Defendant present observed Mr. Green's condition as it deteriorated, and "[a]ny reasonably trained professional, whether medical or law enforcement, would and should have known at this point that the pressure on Mr. Green's chest needed to be relieved and he needed to be turned onto his side or back."[1] *Id.* ¶ 64.

At 2:40, seven minutes after being first shackled face down, Mr. Green was loaded into the ambulance by the AFD Defendants and Defendant Bodmer, while Defendant Cochran watched. *Id.* ¶ 65. "Mr. Green was in clear and obvious respiratory distress and at clear and obvious risk of serious injury and death." *Id.* ¶ 63. Mr. Green was motionless and unresponsive, but it still took about five minutes *after being loaded, unresponsive, into the ambulance* to unstrap Mr. Green and roll him to his back. *Id.* ¶ 68. Defendants did not check Mr. Green's pulse for another couple minutes, and did not begin CPR until he had been unresponsive for about eight minutes. *Id.* ¶ 70. The ambulance delayed leaving for the hospital. *Id.* ¶ 71.

Mr. Green "suffered irreversible brain damage due to cardiopulmonary arrest that rendered him clinically brain dead, with no meaningful hope of recovery." *Id.* ¶ 73. He died three

---

[1] Defendants also elected not to utilize a chemical restraint, despite having prepared a dose, for reasons which are unclear. Compl. ¶ 54.

days later, after his family withdrew life support. *Id.* ¶ 73. The medical examiner would determine Mr. Green died of a homicide caused by "prone restraint cardiac arrest." *Id.* ¶ 81.

**II.** **Defendants' training and knowledge of the dangers posed by prone restraint cardiac arrest**

In 1995, the Department of Justice issued a bulletin warning of the dangers of prone restraint cardiac arrest, or "positional asphyxia," and "specifically advised law enforcement that '[a]s soon as the suspect is handcuffed, get him off his stomach.'" *Id.* ¶83.

The statewide standard for emergency services, the Maryland Medical Protocols for Emergency Medical Services directed, and still directs, in all caps, that "PATIENTS ARE NOT TO BE RESTRAINED IN A FACE-DOWN, HOBBLED, OR HOG-TIED POSITION," and that, if a patient is so restrained, to "JOINTLY WITH POLICE, REPOSITION THE PATIENT IN FACE-UP POSITION WITH HANDS ANTERIOR AND SECURED TO STRETCHER." *Id.* ¶ 5.

George Floyd was murdered in May of 2020 by a prone restraint cardiac arrest. He was one of more than 100 well-documented cases of prone restraint cardiac arrest in custody before Mr. Green's death. *Id.* ¶ 82.

Thus, clearly, as the Complaint alleges, the dangers of prone restraint cardiac arrest were well known well before Mr. Green's death.

Yet, Defendants "failed, with deliberate indifference to the rights of its citizens, including Mr. Green, to adequately train and supervise the Officer and AFD Defendants to not restrain persons who were experiencing a medical emergency face-down on their stomachs or face-up on their backs." *Id.* ¶ 78.

### III.     <u>Brief procedural history</u>

Mr. Green first sued various Defendants, including several "John Doe" Defendants, in December of 2022. Despite several proper Marland Public Information Act requests, the State did not turn over any evidence related to Mr. Green's death until well into that case. Accordingly, Plaintiffs were forced to utilize the Defendants' self-serving reports, one of which was actually falsified. Compl. ¶ 77. Because of this, the initial Complaint was dismissed, without prejudice, in a decision which credited the Defendants' reports, including the Defendants' self-serving assertions about what they had observed and their motivations for acting.

Plaintiffs then filed the above-captioned case, with a new complaint that includes much more specificity as to the incidents at issue. Defendants have moved to dismiss it.

### <u>STANDARD</u>

Fed. R. Civ. P. 8(a)(2) requires a complaint to contain "a short and plain statement of the claim" demonstrating that the plaintiff is entitled to relief. Allegations should be "simple, concise, and direct," and "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(d)–(e). The Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014).

The usual requirements of notice pleading apply here to all claims. As the United States Supreme Court has repeatedly held, "a federal court may not apply a standard 'more stringent than the usual pleading requirements of Rule 8(a)' in 'civil rights cases alleging municipal liability.'" *Johnson*, 574 U.S. at 11 (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993)). A § 1983 plaintiff "is not required to 'detail the facts underlying his claims' or 'plead . . . multiple incidents of

constitutional violations." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244–45 (4th Cir. 1999); *Peprah v. Williams*, No. CV GLR-18-990, 2019 WL 224245, at \*9 (D. Md. Jan. 15, 2019).

A party may challenge the sufficiency of a complaint by way of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Edwards*, 178 F.3d at 243. In ruling on a Rule 12(b)(6) motion, a court must "consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing v. Brivo Systems, LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (citing *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). A court must deny the motion if the factual allegations "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Plausible" means "[c]onceivably true or successful; possibly correct or even likely." Black's Law Dictionary (11th ed. 2019).

Importantly, the purpose of a 12(b)(6) motion is not to "'resolve contests surround[ing] the facts, the merits of a claim, or the applicability of defenses.'" *Miller v. Maryland Dep't of Nat. Res.*, 813 F. App'x 869, 873 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d at 214). In reviewing a 12(b)(6) motion to dismiss, a court must "focus on the pleading requirements under the Federal Rules rather than the proof ultimately required to succeed on a claim." *Bing*, 959 F.3d at 616; *see also Robertson v. Sea Pines Real Est. Companies, Inc.*, 679 F.3d 278, 291 (4th Cir. 2012) ("*Iqbal* and *Twombly* do not require a plaintiff to prove his case in the complaint. The requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at his disposal at the outset. A 'complaint need not "make a case" against a defendant or "forecast evidence sufficient to prove

an element" of the claim. It need only 'allege facts sufficient to state elements' of the claim." (citation omitted)).

When evaluating the sufficiency of a civil rights complaint, courts "'must be especially solicitous of the wrongs alleged' and 'must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which it might plausibly be suggested by the facts alleged.'" *Edwards*, 178 F.3d at 244 (quoting *Harrison v. United States Postal Serv.*, 840 F.2d 1149, 1152 (4th Cir. 1988)). The Court may consider matters of public record and judicial notice, as well as matters referred or integral to the Complaint. 5B Fed. Prac. & Proc. Civ. § 1357 (3d ed. 2023).

Judgment as a matter of law "should be granted sparingly in excessive force cases." *Koon as next friend of Glay v. Prince George's Cnty., MD*, No. CV-DKC-17-2799, 2019 WL 1317401, at *3 (D. Md. Mar. 22, 2019) (citation omitted). This is because "the Graham reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom.'" *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citation omitted).

Here, Plaintiffs have fully satisfied the pleading standard required by Rule 8(a)(2) and stated a claim upon which relief may be granted. Contrary to Defendants' implication, Plaintiffs' 54-page Complaint supplies detailed factual allegations and legal theories, not mere "'[t]hreadbare recitals of the elements of a cause of action[.]'" Defs.' Mem., ECF 9-1, 10 (quoting *Iqbal*, 556 U.S. at 679).) Accordingly, Defendants' motion should be denied.

## **ARGUMENT**

Mr. Green, like George Floyd before him, died in government custody because the very people we trust to protect us forcibly placed and held him face down until they had made it impossible to save him. Various theories, as detailed in the Complaint and below, detail how

Defendants are and should be liable for Mr. Green's death, but the bottom line is that, despite being acutely aware of the dangers posed by putting and restraining Mr. Green into a prone position, Defendants put and restrained Mr. Green in a prone position, where he died. Defendants knew and disregarded the dangers, and Mr. Green paid the price.

## I. **Defendants' argument that Plaintiffs' claims are too vague are, themselves, too vague to properly argue against and, in any event, Plaintiffs have made specific reference to specific defendants and their actions.**

### A. **Defendants' arguments are too vague.**

Somehow, Defendants contend that "Plaintiffs' Complaint contains factual allegations that are too vague and generalized to support any plausible claims against any Individual Defendant." Defs.' Mem. 15. Other than contending that Plaintiffs' allegations do not properly specify which Individual Defendant was involved in precisely which action (an unjustified argument dealt with *infra*), Defendants offer no explanation as to which allegations are vague.

Plaintiffs' Complaint is a very detailed, minute-by-minute breakdown, to the extent possible, of what the Individual Defendants were doing, and, to the extent possible, who was doing it. Compl. ¶¶ 40–73. It is, at the very least, a sufficient framework of the Counts detailed in Section IV, *infra*. Discovery will help Plaintiffs understand the facts in more detail, but the Counts, as they now stand, are well pled.

### B. **Plaintiffs' Complaint alleges claims against the individual Defendants.**

The only concrete argument Defendants make about the "vagueness" of Plaintiffs' Complaint is that it allegedly fails to attribute actions to individual Defendants. Contrary to Defendants' conclusory argument that there is but one "unconstitutional physical contact alleged that is specifically attributable to one specific individual Defendant," Defs.' Mem. 15, the Complaint is rife with unconstitutional acts *and omissions* attributable to the various individual

defendants. Defendants spuriously argue that it is vague to allege that multiple people were involved in a single coordinated effort, and fail to grapple with the alleged omissions.

Defendants' argument ignores the defined classes of Defendants Plaintiffs provided in the "Parties" section of the Complaint. Compl. ¶¶ 29, 33. That is, the "AFD Defendants" are defined as Defendants Thomas J. Frankhouser, Glenn R. Makovsky, Bridget E. Weiss, Caleb M. Ward, and Ryan M. Norris; while the "Officer Defendants" are defined as "Defendants Sergeant Mark Cochran, Officer Matthew Bodmer, Officer Ivan Siminyuk, and Officer Anna Woytko." Compl. ¶¶ 29, 33.

Defendants' argument also fails to account for the fact that moving a man of Mr. Green's size was not a one-person job. While Mr. Green's precise weight is not in the record, counsel will represent that he was not a small man. Expecting Plaintiffs to individually list each Defendant involved at all times, when they acted in concert to accomplish their goals, would be unhelpful. Plaintiffs have properly made their allegations.

For example, at paragraph 50, Plaintiffs have properly alleged that "the AFD Defendants and the Officer Defendants (except for Woytko) forcibly rolled Mr. Green into a prone (face-down) position on the sheet and held him in that position, a grossly negligent act that violated his clearly established constitutional rights." Compl. ¶ 50. The Complaint is not alleging that certain, unspecified Defendants rolled Mr. Green over, it is alleging that all of the Defendants in these two classes, the Officers and the AFD Defendants, *except for a specific exception noted*, "violated his clearly established constitutional rights." *Id.* This is the same as if Plaintiffs had specifically listed Defendants Sergeant Mark Cochran, Officer Matthew Bodmer, Officer Ivan Siminyuk, Thomas J. Frankhouser, Glenn R. Makovsky, Bridget E. Weiss, Caleb M. Ward, and Ryan M. Norris. *Id.* ¶¶ 29, 33. This was not a one-person job, and could not have been done by

one or two defendants. All eight of these Defendants worked together to effectuate this particular constitutional deprivation. If any particular Defendant wishes to argue that they were not involved, despite being present and helping to forcibly roll Mr. Green into a dangerous face-down position, they may do so, but it is not an argument to be made at the pleading stage. *See Robertson*, 679 F.3d at 291.

Plaintiffs made numerous further allegations, many of which named specific Defendants, and none of which referred just generally to "Defendants." For example:

- Plaintiffs specifically note that Officers "Bodmer, Siminyuk, Cochran, and the AFD Defendants transported Mr. Green . . . and placed him face-down on that stretcher, a grossly negligent act that violated his clearly established constitutional rights." Compl. ¶ 55.

- As Defendants have noted, Plaintiffs allege that Defendant "Cochran forcibly held Mr. Green face down while the AFD Defendants strapped him face-down to two stretchers simultaneously, a grossly negligent act that violated his clearly established constitutional rights." Compl. ¶ 56.

- Plaintiffs properly allege that "the AFD Defendants, assisted by Cochran, forcibly placed and tightened straps over Mr. Green's legs and back while he was face down, a grossly negligent act that violated his clearly established constitutional rights." Compl. ¶ 57.

- Plaintiffs properly allege that the "AFD Defendants, assisted by Bodmer . . . forcibly placed and tightened straps over [Mr. Green's] legs and upper back, which violated his clearly established constitutional rights." Compl. ¶ 59.

The Complaint then recounts the warning signs and a series of *omissions* undertaken by the Defendants, who all failed to rescue Mr. Green from the peril *they had placed him in*. In

paragraphs 60 to 64, the complaint details how "Mr. Green's movements became visibly slower" as he "began lifting his head to breathe because of the difficulty," as he was "struggling to speak" and "struggling to raise himself to save his own life." Compl. ¶¶ 60–61. As the Complaint notes, "[a]ny reasonably trained professional, whether medical or law enforcement, would and should have known at this point that the pressure on Mr. Green's chest needed to be relieved and he needed to be turned." Compl. ¶ 64.

Defendants' argument is an attempt to avoid individual liability for acts undertaken as a group. This cannot be permitted.

**II.**    **It is inappropriate to utilize the unauthenticated body-worn footage at this stage of litigation because it is too early in the case, and they are completely unauthenticated.**

**A.**    **There are no videos in the record: Defendants have simply linked ephemeral, unverified YouTube videos, coupled with an assertion by counsel that they are what counsel says they are.**

A party seeking summary judgment may do so by "citing to particular parts of materials *in the record*," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1) (emphasis added). The Rule expressly permits several sources of information, *all of which involve certification or oath*, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." *Id.* (emphasis added).

In accordance with this requirement, in this Court, "any documents submitted that 'appear necessary to [the moving party's] argument and the satisfaction of its initial burden' must be 'authenticated by either an affidavit or deposition.'" *Bookhultz v. Sears Authorized Hometown Stores, LLC*, No. CV CBD-16-2176, 2018 WL 1795338, at *1 (D. Md. Apr. 13,

2018) (quoting *Yoon v. Sebelius*, Civ. A. No. CBD-08-3173, 2010 WL 4293513, at *1 (D. Md. Nov. 1, 2010) (itself citing to *Celotex Corp.*, 477 U.S. at 323; *Deblois v. Gensel*, No. CCB-07-2596, 2009 WL 2713947, at *6 (D. Md. Aug. 26, 2009))).

In this case, no discovery has been propounded or completed. No depositions have been taken. No affidavits have been submitted. Instead, Defendants seek to introduce footage, pre-discovery, which is not directly referenced in the Complaint, under the assumption that, by *purportedly* using it in drafting, Plaintiffs have somehow vouched for its authenticity. This is not the case. In fact, Defendants have not even attached any sort of "official" copy of this footage, *instead providing several links to YouTube*, a third-party website which could remove the footage at any time. Thus, even if this footage were an appropriate subject for summary judgment at this stage, which it is not, it would be untenable to use an ephemeral source to base that judgment on.

The YouTube footage should not be considered at this stage of litigation, if at all.

**B.** **The videos are not sufficiently "integral to the complaint" to permit the Court to utilize them in a motion to dismiss.**

Even if these videos were somehow authenticated, *which they are not*, they would have to be "integral to the complaint and there is no dispute about the[ir] authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). First, of course, there is a dispute as to the authenticity of these videos, as they are simply links to YouTube.

More importantly, for this section, these videos are not "integral to the complaint" in a way as to render their consideration appropriate.[2] Cases where Courts will consider external,

---

[2] While the Court in *Goines* actually did consider the relevant police report, this was only "because Goines does not argue otherwise," so the Court could "assume without deciding that the Incident Report was integral to the complaint." *Goines*, 822 F.3d at 166. These Plaintiffs argue otherwise.

unreferenced evidence include those where the documents have "independent legal significance," and "the complaint relies heavily upon its terms and effects." *Goines*, 822 F.3d at 166 (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Smith v. Hogan*, 794 F.3d 249, 255 (2d Cir. 2015)).

Even if everything Defendants say about these videos is true, they have no "independent legal significance." "Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)). These videos are clearly, if they are what Defendants claim, relevant evidence. They are not integral to the Complaint, and they are not even in the record. They should not be considered.

### C.    <u>Summary judgment is not ripe.</u>

Even if the Court were to find, without proof, that these videos are authentic videos and convert this motion into a motion for summary judgment, that motion must be denied.

While it is true that a motion for summary judgment may be brought "at any time," summary judgment is proper under Rule 56(c) where, "*after adequate time for discovery* and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (emphasis added). Pursuant to Rule 56(d), a nonmovant who is unable to "present facts essential to justify its opposition" may receive this "adequate time for discovery." Rule 56(d); *Celotex Corp.*, 477 U.S. at 322. Pursuant to the attached declaration of counsel, Plaintiffs have not had the opportunity to depose any of the purported subjects of these videos, or to submit the purported videos to review to determine their authenticity. *See* Declaration of Counsel, attached.

**III.** **There is no legal standard requiring Plaintiffs' Complaint to match with information not yet in evidence and to require otherwise would heighten the burden required to survive a Rule 12(b)(6) motion.**

Even if all of the conditions to consider these videos were satisfied (they are not), the Court should still deny Defendants' motion for summary judgment.

As a condition precedent to entertaining the possibility of summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is axiomatic that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment" because the evidence must be viewed "in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (*quoting Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

Defendants fail to demonstrate that there is no genuine dispute as to any material fact as to these videos, when the evidence is viewed in the light most favorable to Plaintiffs. Their characterization of the videos is often misleading, or at least open to interpretation. For one example, Defendants want this Court to conclude, as a matter of law, that the videos could not possibly show Defendants forcing Mr. Green onto his stomach. Defs.' Mem. 21. Indeed, Defendants want to blame Mr. Green for his own predicament, arguing that he "continuously moves around and places himself on his stomach." *Id.* Plaintiffs posit that the videos to which Defendants' links are currently directed, if they are authentic, clearly show that these Defendants were in direct contact with Mr. Green when he went onto his stomach. The level of force used, and its appropriateness, is a jury question, not a matter that can be decided at this early stage.

Moreover, the videos currently accessible at the links provided show Mr. Green becoming non-responsive, after a period of being very active, while being restrained on his stomach. This fact is consistent with the Complaint's well-pled allegations that "Defendants completely ignored these clear directives, placing Mr. Green face down, while he was

handcuffed and secured to two stretchers simultaneously, thereby causing a situation where Mr. Green was unable to breathe." Compl. ¶ 7. It reflects the well-pled allegation that "*before* being loaded into the ambulance," and thus while still under the care of *all* Defendants, "Mr. Green was in clear and obvious respiratory distress and at clear and obvious risk of serious injury and death." Compl. ¶ 63 (emphasis added). The facts when viewed in the light most favorable to the nonmoving party are fully consistent with Plaintiffs' complaint.

Ultimately, a jury will review the official bodycam footage and determine as to whether Defendants' conduct was reasonable. Defendants cannot now show that it was.

## IV. <u>Plaintiffs' claims are well pled.</u>

### A. <u>Counts I and II: 42 U.S.C. § 1983 Claims for Excessive Force and Due Process Violations</u>

42 U.S.C. § 1983 allows suits against any person who, under color of law, "subjects, or causes to be subjected," any person within United States jurisdiction "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 does not itself confer any rights beyond the right to sue; instead, it permits an action to recover for State actors' violations of rights conferred elsewhere. *See, e.g.*, *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 175 (2023) ("[A]ny person within the jurisdiction of the United States may invoke this cause of action against any other person who, acting 'under color of' state law, has deprived them of 'any rights, privileges, or immunities secured by the Constitution and laws' of the United States."). There is no dispute over whether Defendants, employees of the State of Maryland or one of its sub-units, were acting under color of state law. Thus, the only dispute is whether Defendants deprived Mr. Green of rights, privileges, or immunities. As Plaintiffs' complaint alleges, they did.

Defendants make many arguments in response, including that non-medical officials, like Officer Bodmer, are entitled to rely on the professional judgment and expertise of trained medical personnel. Defendants rely on *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990), to support this argument. The court in *Miltier* held that supervisory prison officials are entitled to rely on professional judgment of trained medical personnel. The court's decision in *Miltier* was limited to supervisory relationships between a warden and a medical professional, stating that it is appropriate for a warden to rely on his subordinate's medical decisions in caring for an inmate. Here, there is no supervisory relationship between Officer Bodmer and the AFD Defendants, and therefore the case law Defendants used to support their contention does not fit the circumstances in the instant case.

"Professional judgment," moreover, is a concept ill-fitted to this case. The prohibition on face-down restraint is a matter of state law, not mere professional judgment. The Maryland Institute for Emergency Medical Services Systems ("MIEMMS") Protocols, which could not be clearer in prohibiting what the Individual Defendants did here, are and were incorporated into the state administrative code.

Furthermore, contrary to Defendants' assertions, the Officer Defendants are subject to the MIEMSS Protocols. "MIEMSS is charged with 'coordination of all emergency medical services' in the state." *Williams v. Dimensions Health Corp.*, 279 A.3d 954, 957 (Md. 2022). The regulatory scheme applies to law enforcement officers. *See, e.g.*, Md. Code Ann., Educ. § 13-516(a)(14), (b)(2)(vii). Officers are supposed to receive training in emergency medical services. *See* Annapolis Police, Gen. Order B.18(D)(5) (Oct. 2018), *available at* https://www.annapolis.gov/DocumentCenter/View/4822/B-18-Department-Training-October-2018-PDF.

Turning to the AFD Defendants, Defendants incorrectly argue that their failure to adhere to local policies, rules, or laws—such as MIEMSS protocols—does not violate section 1983 under any set of circumstances. Defendants rely on the Supreme Court's decision in *Davis v. Scherer*, 468 U.S. 183 (1984), in their response. *Davis* does not support Defendants' argument.

In *Davis*, the plaintiff argued that defendants who fail to comply with a clear state regulation forfeit their qualified immunity from suit for violation of federal constitutional rights. 468 U.S. at 193. The court held that officials sued for constitutional violations do not lose their qualified immunity *merely* because their conduct violates some statutory or administrative provision. *Id.* at 194. The court rationalized that "under the 'objective' component of the good-faith immunity test, an official would not be held liable in damages under § 1983 unless the constitutional right he was alleged to have violated was clearly established at the time of the violation." *Id.* The court noted that the regulation allegedly violated by the defendants was not one that was itself actionable under § 1983 or bore upon the claim of constitutional right that plaintiff asserts under § 1983. *Id.* The court concluded that "neither federal nor state officials lose their immunity by violating the clear command of a statute or regulation—of federal or state law—*unless the statute or regulation provides the basis for the cause of action sued upon.*" *Id.* (emphasis added).

Defendants' argument ignores this clearly laid exception.[3] Here, Plaintiffs allege that Mr. Green was deprived of "his right to life, liberty, personal security, and bodily integrity, and the right to be free from physical abuse and excessive force at the hands of state actors, when" they "restrain[ed] Mr. Green in a face-down position . . . by manual means and by tight straps that

---

[3] As Justice Brennan notes in his concurrence in *Davis*, the existence of the regulation forbidding a defendant's conduct militates against a finding of qualified immunity. *Davis*, 468 U.S at 204 n.2 (Brennan, J. concurring in part).

compromised his respiration and circulation, in contravention of clear and longstanding minimal constitutional standards reflected in the MIEMSS Protocols.." Compl. ¶ 96. This case is not like the Defendants' cited cases of *Davis v. Scherer*, 468 U.S. 183 (1984) or *McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir. 1994), where the plaintiffs were not in custody[4] and had no basis to claim the defendants' violation of the state regulation was either itself actionable under § 1983 or bore upon the claim of constitutional right that the appellee asserted under § 1983, Plaintiffs here claim that failure to comply with an express command in the MIEMSS Protocols—regulations designed to "prevent harm to patient[s]"—was part and parcel of deprivation of life and liberty prohibited by the Fourth and Fourteenth Amendments, which are actionable violations of clearly established rights under § 1983.[5]

Defendants also assert that being placed in a prone position alone does not constitute deadly force. *Lawhon v. Edwards*, 477 F. Supp. 3d 428,446 (E.D. Va. 2020) (quoting *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997)). As *Lawhon* and controlling

---

[4] "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being. . . . [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989).

[5] Indeed, this view comports with a district court determination that "objective reasonableness" for a claim of excessive force, pursuant to 42 U.S.C. § 1983 may include a consideration as to "compliance (or noncompliance) with training and established policy." *See Wyatt v. Owens*, 317 F.R.D. 535, 542 (W.D. Va. 2016) (citing *Raiche v. Pietroski*, 623 F.3d 30, 37 (1st Cir. 2010); *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995) ("Although these police department guidelines do not create a constitutional right, they are relevant to the analysis of constitutionally excessive force."); *King v. Taylor*, 944 F.Supp.2d 548, 556 (E.D. Ky. 2013) ("[C]ompliance with [police] policies and procedures is a factor that may be considered by the jury when evaluating whether [an officer] acted reasonably.")). The established policy in the instant matter is the MIEMSS Protocols, which Defendants neglected to follow.

precedent indicate, this argument is a non-sequitur. The question is whether the force is excessive, not simply whether it was deadly.

The court in *Lawhon* summarized, in detail, the Fourth Circuit's test in determining whether an official's use of force violates the Fourth Amendment. The court cited to its previous decision in *Armstrong*, stating that "[a] claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other seizure of a person is properly analyzed under the Fourth Amendment's objective reasonableness standard." In applying this standard, courts must consider three factors in assessing whether the conduct exhibited constituted excessive force. First, courts must look to the severity of the crime at issue; second, examine the extent to which the suspect poses an immediate threat to the safety of the officers or others; and third, consider whether the suspect is resisting arrest or attempting to evade arrest by flight. The Fourth Circuit has also instructed that the severity of the injuries is a factor to be considered in determining whether the force was excessive. The court noted that to properly consider the reasonableness of the force employed the court must view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. In analyzing the reasonableness of the force used, the court noted that the Fourth Circuit has continually held that force that may be justified at the beginning of an encounter may not be justified even seconds later if the justification for the initial force has been eliminated. *Id.* at 445.

In *Lawhon*, the court found that the initial force used to take Lawhon into custody was not a violation of a clearly established right. However, the court acknowledged that the continued use of force—holding Lawhon down in the prone position for over five minutes, even after he exclaimed that he could not breathe—could not be justified at the motion to dismiss stage. The court stated that, in taking the facts as alleged in the plaintiff's complaint as true, Lawhon was

sufficiently secured after being restrained in handcuffs, the defendants' continued application of force, while maintaining him in the prone position allegedly caused his death. The court concluded that these allegations not only form a sufficient claim for excessive force, but that at the time of the incident it was clearly established that the defendants' conduct constituted a Fourth Amendment violation. *Id.* at 447.

At this stage, the Court is bound by the facts as alleged in the Complaint. The Complaint alleges that the officers subdued Mr. Green by holding his ankles down and using two sets of handcuffs to place his hands behind his back. Subsequently, Mr. Green was placed on his side in handcuffs on the floor of the kitchen until AFD arrived. Sometime thereafter, the Officer Defendants and/or AFD Defendants rolled Mr. Green into a face-down position. Although Mr. Green continued to kick and swing his arms around, he presented no threat to Defendants and there was no reason to place him on the stretcher in a prone position, further limiting his ability to move freely. The court should find that placing and maintaining[6] Mr. Green on the stretcher face-down was a continued application of force that cannot be justified at this stage.

Lastly, Defendants argue that Plaintiffs have not adequately pled a constitutional interest in bodily integrity recognized under the Fourteenth Amendment Due Process Clause of the U.S. Constitution. Defendants unduly limit the liberty interest in bodily integrity to circumstances involving instances where individuals are subject to invasive procedures. As the Fourth Circuit has long held, the "shield" of the "constitutional right to be free from unreasonable interference by police officers . . . covers the individual's physical integrity," and that "[i]njuries arbitrarily inflicted by the police are constitutionally cognizable and remediable." *Jenkins v. Averett*, 424 F.2d 1228, 1232 (4th Cir. 1970).

---

[6] Mr. Green was kept prone for "at least eleven minutes." Compl. ¶ 150.

As the Supreme Court has acknowledged, "no right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restrain or interference of others, unless by clear and unquestionable authority of law." *Union Pacific Ry. Co. v. Bostford*, 141 U.S. 250, 251 (1891). The right to one's person may be said to be a right of complete immunity; to be let alone. *Id.* "The inviolability of the person is as much invaded by a compulsory stripping and exposure as by a blow. To compel anyone . . . to lay bare the body, or to submit it to the touch of a stranger, without lawful authority, is an indignity, an assault, and a trespass; and no order of process, commanding such an exposure or submission, was ever known to the common law in the administration of justice between individual." *Id.* at 252.

Although Defendants have cited many cases that acknowledge the principles of bodily integrity in regard to unwanted medical treatment, Defendants have not cited any cases that limit the ambit of the right to unwanted medical treatment. Persons being detained also possess a right to bodily integrity. As stated, the Supreme Court has held that absent lawful authority, a person's right to bodily integrity, in all contexts, entitles a person to be free from unlawful restraint, and not simply to refuse unwanted medical care. Mr. Green had the right to bodily integrity, which was violated when Defendants restrained him without lawful authority.

**B.** **Counts III and IV: *Monell* Claims**

Counts III and IV sufficiently set forth claims for deprivation of constitutional rights, pursuant to 42 U.S.C. § 1983, for the unconstitutional policy or custom of the City failing to train and supervise the Officer Defendants and AFD Defendants, which led to Mr. Green's death. Under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), a § 1983 cause of action may lie against a local government when a plaintiff's injury flows from the government's unconstitutional policy or custom. To be liable under *Monell*, the local government "must have

actual or constructive knowledge of the custom and usage by its responsible policy makers" and "there must be a failure by those policymakers, as a matter of specific intent or deliberate indifference, to correct or terminate the improper custom and usage." *Randall v. Prince George's County*, 302 F.3d 188, 210 (4th Cir. 2002).

Further, a plaintiff may "establish the requisite policy for *Monell* liability through a failure to train, if it reflects a deliberate or conscious choice to not do so." *Washington v. Baltimore Police Dep't*, 457 F. Supp. 3d 520, 533 (D. Md. 2020)) (internal quotation marks omitted) (citing *City of Canton Ohio v. Harris*, 489 U.S. 378 (1989)). A failure to train can be established on three different theories: "(1) 'express authorizations of unconstitutional conduct,' (2) 'tacit authorizations' of such unconstitutional conduct, and (3) failures to adequately 'prohibit or discourage readily foreseeable conduct[.]'" *Id.* (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987)). A "specific deficiency" must be shown. *Id.*

The City erroneously argues that its policies' silence on the topic of face-down restraint is insufficient to establish a *Monell* claim. Defs.' Mem. 27–28. "A policy can be one of action or inaction." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 380–81 (7th Cir. 2017); *see also Long v. Cnty. Of Los Angeles*, 442 F.3d 1178,1189 (9th Cir. 2006) ("[A] county's lack of affirmative policies or procedures to guide employees can amount to deliberate indifference, even when the county has other general policies in place."); *Johnson v. Baltimore Police Dep't*, No. CV ELH-19-0698, 2022 WL 9976525, at *67 (D. Md. Oct. 14, 2022). A municipality may be liable under section 1983 if a jury determines a failure to promulgate policies constitutes deliberate indifference or tacit authorization of unconstitutional conduct; the issue is generally one of fact, not law. *Avery v. Burke Cnty.*, 660 F.2d 111, 114 (4th Cir. 1981). Evidence of a new policy can show the absence of an earlier policy, *e.g., Conn v. City of Reno*, 591 F.3d 1081, 1104 n.7 (9th

Cir. 2009), *vacated on other grounds*, 563 U.S. 915 (2011); *Henry v. County of Shasta*, 132 F.3d 512, 518 (9th Cir. 1997). A municipality may even be held liable for failure to train without proof of a preexisting pattern of violations if "the unconstitutional consequences of failing to train are patently obvious." *Connick v. Thompson*, 563 U.S. 51, 64 (2011).

After establishing a deficiency, a plaintiff must establish that the local government's failure to train showed a "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Spell*, 824 F.2d at 1390. Deliberate indifference is demonstrated by showing that "the need for more or different training is so obvious, and the inadequacy [is] so likely to result in the violation of constitutional rights." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). "Finally, the plaintiff must show that 'the officer's conduct resulted from said training,' or lack thereof." *Washington*, 457 F. Supp 3d at 533.

Defendants contend that Plaintiffs have not sufficiently pled a claim upon which relief can be granted because Plaintiffs have not identified a "specific deficiency" regarding the "sort of training that City police and fire personnel actually receive." Defs.' Mem. 28. Defendants' argument lacks merit. As noted in *Washington*, "oftentimes, 'a plaintiff lacks specific details regarding the municipal actor's internal policies and training procedures before discovery.'" 457 F. Supp. 3d at 533 (quoting *Johnson v. Balt. Police Dep't*, No. ELH-19-00698, 2020 WL 1169739, at *34 (D. Md. Mar. 10, 2020)). Though more than boilerplate language is required to survive a motion to dismiss, "courts should not expect the plaintiff to possess a rich set of facts concerning the allegedly unconstitutional policy and the responsible policymakers." *Johnson*, 2020 WL 1169739 at *34.

In the instant matter, Plaintiffs have adequately pled three different theories of *Monell* liability that identify the nature of specific deficiency in the training of the Individual Defendants. Specifically:

- "At the time of the events giving rise to this action, Defendant City had one or more unconstitutional policies or customs that authorized or permitted face-down restraint of individuals in custody under the same or similar circumstances as Mr. Green." Compl. ¶ 118.

- "At the time of the events giving rise to this action, Defendant City had one or more unconstitutional policies or customs that authorized or permitted failing to train, re-train, and supervise its personnel, including APD officers and AFD paramedics and emergency response personnel, to ensure they did not restrain individuals like Mr. Green in the face-down position." Compl. ¶ 119.

- "At the time of this incident, Defendant City had no APD policy that prohibited facedown restraint or warned officers of the dangers attendant upon face-down restraint, notwithstanding well-publicized incidents of in-custody deaths from face-down restraint (such as George Floyd) and the prohibition in the MIEMSS Protocols on face-down restraint due to its risk of serious injury and death." Compl. ¶ 120.

As the Complaint further explains, before June 1, 2021, as early as 1995, "[t]he link between face-down restraint and sudden death has been nationally known," which the City knew or should have known. Compl. ¶ 4. At that same time, as a matter of state law, the Maryland Medical Protocols for Emergency Medical Services directed emergency responders not to restrain patients "in a face-down, hobbled, or hog-tied position." *Id.* at ¶ 5. The City had no

policy prohibiting face-down restraint or warning emergency service personnel of its dangers. *Id.* at ¶ 8.

Accordingly, the Complaint properly alleges the City failed to adequately prohibit or discourage readily foreseeable conduct and demonstrated a deliberate indifference in failing to implement such a policy and train the Officer Defendants and AFD Defendants appropriately. Because the Complaint contains these factual allegations, it sufficiently pleads a cause of action for which relief can be granted as to Counts III and IV. Thus, Defendants' motion to dismiss should be denied.

**C.**     **Counts V and VI: 42 U.S.C. § 1985 Claims for Conspiracy to Deprive**

42 U.S.C. § 1985 provides that if two or more persons conspire to deprive any person or class of persons of their constitutional rights and another is injured or deprived of having or exercising any right or privilege as a citizen of the United States, the injured party has a cause of action against the conspirators. *Barnes v. Maryland Nat. Cap. Park & Plan. Comm'n*, 932 F. Supp. 691, 696 (D. Md. 1996).

Defendants allege that Plaintiffs have failed to show any agreement among the conspirators that the transport of Mr. Green caused Mr. Green's injury. With respect to demonstrating agreement in a civil rights conspiracy claim, a plaintiff is not required to show direct evidence of communication between the conspirators. *See Hafner v. Brown*, 983 F.2d 570, 576–77 (4th Cir. 1992). Agreement to conspire can be shown through circumstantial evidence, including that of acquiescence. *Id.* at 578. "Acquiescence can amount to a conspiracy agreement when, as here, one police officer watches an open breach of the law and does nothing to seek its prevention." *Id.*

Defendants erroneously compare this case to *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), in which the court found that where the plaintiffs failed to allege

with any specificity the persons who agreed to the alleged conspiracy, the specific communications amongst the conspirators, or the manner in which any such communications were made, the allegations were insufficient to support a meeting of the minds by the defendants. *Id*. at 347. The court noted that plaintiffs' allegations that "Doe(s) and the City entered into a conspiracy" and that "Homeward was created as part of the conspiracy and . . . became part of the conspiracy" were "threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, and therefore not sufficient to state a claim." *Id*.

By contrast, Plaintiffs have properly alleged, in the alternative, the agreement here:

- "AFD and Officer Defendants, by their concerted actions, conspired, confederated, and agreed to violate Mr. Green's constitutional rights through their overt acts alleged herein (i.e., restraining and strapping Mr. Green to two stretchers simultaneously in a face-down position), and these overt acts were performed in furtherance of the conspiratorial objective." Compl. ¶ 144.

- "AFD and Officer Defendants, by their concerted actions, conspired and confederated to deprive Mr. Green of his constitutional rights by acquiescing to the actions of their coconspirators by watching them openly breach the law (*i.e.*, by strapping Mr. Green to two stretchers simultaneously in a face-down position) while doing nothing to seek its prevention, and their actions were objectively unreasonable, reckless, deliberately indifferent, and shock the conscience." Compl. ¶ 146.

To support their contention, the Complaint noted, among other things, that the AFD Defendants and the Officer Defendants (except for Woytko) placed Mr. Green into the prone position while he was on the kitchen floor, Compl. ¶ 50; Defendant Woytko observed Mr. Green

in the prone position on the floor and the stretcher, *id.* at ¶ 174; Defendant Siminyuk observed Mr. Green being strapped to the stretcher while remaining the prone position; *id.* at ¶ 175; Defendant Bodmer assisted AFD Defendants with moving Mr. Green onto the stretcher in the prone position, *id.* at ¶ 176; and Sergeant Cochran observed Mr. Green being strapped down onto two stretchers simultaneously in a face-down position with handcuffs behind his back, *id.* ¶ 177. The Officer and AFD Defendants' acquiescence plausibly alleges agreement.

Additionally, Plaintiffs have properly alleged that the position in which Defendants transported Mr. Green caused injury. Mr. Green was handcuffed, shackled, and unable to move freely—including being unable to roll out of the face-down, prone position, which Defendants placed him in. Compl. ¶ 52. The Officer and AFD Defendants kept Mr. Green in the face-down position, even as they moved him onto a stretcher and strapped him down. *Id.* at ¶¶ 55–57. Mr. Green yelled and made attempts to lift his upper body up off the stretcher, but he was unable to sufficiently do so. *Id.* at ¶ 60–61. When he became unresponsive during transport, Defendants continued to keep him in this position until finally placing him on his back. *Id.* at ¶¶ 66–68. As a result of keeping Mr. Green in this position, he suffered a cardiac arrest, which ultimately resulted in his homicide as concluded by the medical examiner's office. *Id.* at ¶¶ 15, 80–81. Defendants' actions and acquiescence directly and proximately resulted in the injuries alleged in the Complaint. *Id.* at ¶¶ 153, 159.

Defendants also point out that these counts were previously dismissed for failing to allege discriminatory animus, but correctly note that this Court is not bound by the prior ruling. Defs.' Mem. 30. In reality, it is long-settled that "if [42 U.S.C.] § 1985 extends to a conspiracy to deny to plaintiff equal protection of the laws, it is not necessary, to justify the result in the district court, to point to any class of which he was a member." *Wakat v. Harlib*, 253 F.2d 59, 65 (7th

Cir. 1958) (citing *Truax v. Corrigan*, 257 U.S. 312, 332 (1921)). State actors are simply not free to ignore the Constitution. *See id.*

If the Court believes the previous order was correct in requiring animus against an identified class, the Court should find that the previous order held Plaintiffs to too high a standard to establish facts pertaining to animus at the motion to dismiss stage, as information about the Officer and AFD Defendants' levels of animus is not available to Plaintiffs at this stage of the litigation and will need to be explored through discovery.

In order to plausibly establish animus, Plaintiffs are permitted to "allege[] several specific facts that, taken together, might support" their contention that Defendants were "motivated by a specific class-based, invidiously discriminatory animus." *Facey v. Dae Sung Corp.*, 992 F. Supp. 2d 536 (D. Md. 2014) (quoting *A Soc'y Without A Name*, 655 F.3d at 346). The Complaint states that Mr. Green was African-American and suffering from a disturbed mental state, Compl. ¶ 41, both of which are classes that form the basis for a discriminatory animus.[7] The Complaint also states that the Officer and AFD Defendants were aware of Mr. Green's mental impairment. *See id.* at ¶¶ 3, 41. It continues by asserting that Defendants knew that death is a likely consequence of face-down restraint and ignored the prohibitions against doing so. *Id.* at ¶ 7. Further, Defendants neglected to attempt to resuscitate Mr. Green for about seven minutes after they first knew or should have known that he was experiencing respiratory distress. *Id.* at ¶¶ 60–69. Taken together, these facts give rise to a facially plausible claim supporting Defendants being motivated

---

[7] Although the Fourth Circuit "has not applied a § 1985(3) claim to disabled individuals," it has also "not foreclosed that application since the passage of the ADA. Other courts have determined that the passage of the ADA renders individuals with a disability protected under § 1985(3)." *Andreadakis v. Ctr. for Disease Control & Prevention*, No. 3:22CV52 (DJN), 2022 WL 2674194, at *1, *8 (E.D. Va. July 11, 2022) (citing *Lake v. Arnold*, 112 F.3d 686, 687–88 (3d Cir. 1997) as evidence that the passage of the ADA extended § 1985 to include disabled individuals).

by a class-based animus. A complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations. *Twombly*, 550 U.S. at 555. The direct evidence offered need only make plausible a conclusion that Defendants engaged in a conspiracy. *Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at *1 (D. Md. Sept. 16, 2020) (Court found that the direct evidence offered need only make plausible a conclusion that the pre-2018 secret meetings involved an agreement to fix wages, and/or that plant-to-plant communications furthered the wage fixing conspiracy).

Defendants further contend that Plaintiffs have failed to state a claim for failure to intervene. It is well-established that an omission to act, when coupled with a duty to act, may provide a basis for liability. *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 203 (4th Cir. 2002). A bystander officer may be deemed an accomplice if they were (1) confronted with a fellow officer's illegal act, (2) possessed the power to prevent it, and (3) chose not to act. *Id*. The court in *Randall* turned to the framework adopted in other circuits and noted that many courts have concluded that an officer possesses "an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers." *Id*. "According to the Second Circuit, such a duty attaches when an officer observes or has reason to know that a 'constitutional violation [is being] committed' by other officers and possesses 'a realistic opportunity to intervene to prevent the harm from occurring.'" *Id*. at 204; *see also Yang v. Hardin*, 37 F.3d 282, 285 (7th. Cir 1994). The court's decision in *Randall* turned on the officer's knowledge of their fellow officer's illegal act. The court found that no evidence showed that the officers were aware that plaintiffs were being held against their will, and therefore bystander liability could not be attached to those officers.

Here, Plaintiffs' bystander liability claims are sufficient under Rule 12(b)(6), because they adequately plead that the Officer Defendants had knowledge of the illegality of the actions taken by the AFD Defendants. Plaintiffs "cannot be expected, at this early stage of the case without having the benefit of discovery, to provide detailed specifics . . ." *Jien*, 2020 WL 5544183 at *4. Contrary to Defendants' assertion, Plaintiffs have made more than indeterminate assertions against all Defendants, as each Defendant's actions known to Plaintiffs have been delineated, as far as Plaintiffs could determine from the information available to them. *See* Compl. ¶¶ 42–71 (detailing the actions of the Officer and AFD Defendants).

Defendants argue that because the officers "participated in the fray," they were not acting as bystanders. *Jones v. Chapman*, 2017 WL 247220 at *35 (D. Md. July 24, 2015). In *Weeden v. Prince George's Cnty.*, the plaintiff's complaint alleged that all defendant police officers participated in causing injury to Plaintiff. The court found that defendant police officers cannot be held liable for both participating in the injury and failing to prevent the injury. *Weeden v. Prince George's Cnty.*, 2018 WL 2694441, at 5 (D. Md. June 4, 2018). The officers who are alleged to be liable for causing injury to Mr. Green cannot also be liable for failure to intervene or bystander liability, but those officers who did not assist in putting Mr. Green onto the stretcher could be liable for bystander liability as they did not assist in the final act that caused Mr. Green's death.[8]

---

[8] At this stage, Plaintiffs' Complaint cannot be dismissed for not specifying which officers failed to intervene and which officers actively participated. Plaintiffs are permitted—as they have here—to plead in the alternative, and if either alternative statement is sufficient, then the Complaint is sufficient. Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."). *See also Swedish Civ. Aviation Admin. v. Project Mgmt. Enterprises, Inc.*, 190 F. Supp. 2d 785 (D. Md. 2002) ("Parties may plead alternative theories of liability, indeed as many theories as the facts will fit."). Although Defendants essentially argue that the body-worn camera

As for the argument that the Officer Defendants lacked medical knowledge of the risks of Mr. Green's restraint, it is contradicted by the complaint's allegations, *id.* ¶ 64, and Defendants' spurious attempt to suggest that they could not have known about such risks because one officer did not know what a Reeves sleeve was, Defs.' Mem. 31–32, is insufficient to invalidate the complaint's allegations.

Lastly, Defendants argue that Plaintiffs' conspiracy and bystander liability claims must be dismissed because they are not predicated on an underlying constitutional violation. As explained above, Plaintiffs have properly pled allegations that would support a claim of excessive force and infringement of the right to bodily integrity against the AFD Defendants and Officer Defendants. Moreover, Defendants cite *Hinkle v. City of Clarksburg*, where the court refused to address the merits of the bystander and supervisory liability claims because they were derivative of appellants' claim that the officer used excessive force. 81 F.3d 416, 420 (4th Cir. 1996). However, Defendants, in their argument, fail to note that the court did not address the merits of these claims because a jury had already found that excessive force had not been used. The court then stated that in the absence of any underlying use of excessive force, liability cannot be placed on either the non-shooting officers, a supervisor, or the city. *Id.* The court's statement here makes clear that (1) whether the force used was excessive is for the fact finder to decide, and (2) only when there has not been a finding of excessive force will the court refuse to address the merits of concomitant claims. Here, there has not been a finding of whether excessive force was used. For this reason, because the Plaintiffs claims are dependent on a

---

footage should resolve all factual disputes, even if the videos currently hosted at Defendants' links were to be considered, it is not clear at who exactly is speaking or acting throughout the footage, so Plaintiffs cannot determine this matter with certainty.

finding of excessive force, the claims should only be dismissed if no use of excessive force is found.

**D.**     <u>**Count VII and VIII: 42 U.S.C. § 1983 Claims for Deliberate Indifference**</u>

"Pretrial detainees are protected while in custody by the Due Process clause of Fourteenth Amendment." *Valentine v. PrimeCare Med., Inc.*, 697 F. Supp. 3d 431, 442 (D. Md. 2023) (citing *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001)). Specifically, they are protected from "deliberate indifference to serious medical needs." *Hill v. Nicodemus*, 979 F.2d 987, 991–92 (4th Cir. 1992). This is because deliberate indifference to the serious medical needs of a pretrial detainee and/or a substantial risk of serious harm to a pre-trial detainee violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). A pretrial detainee establishes a violation by "show[ing] deliberate indifference to serious medical needs," and the Fourth Circuit has "traditionally looked to Eighth Amendment precedents in considering a Fourteenth Amendment claim of deliberate indifference to serious medical needs." *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021).

A deliberate-indifference claim should set forth that a pre-trial detainee/prisoner suffered from an "objectively serious medical condition and subjective knowledge by a prison official of both the 'serious medical condition and the excessive risk posed by the official's action or inaction.'" *Id.* at 301 (citing *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)).

The serious medical need prong of the deliberate indifference standard extends to conditions that threaten to cause health problems in the future—here, prolonged face-down restraint—as well as to current, serious health problems. *Helling v. McKinney*, 509 U.S. 25 (1993); *see also Webb v. Deboo*, 423 Fed. App'x. 299, 301 (4th Cir. 2011) (*per curiam*) (concluding that the district court erred by only considering actual injury suffered and not the

risk of harm); *Thomas v. Younce*, 604 Fed. Appx. 325, 326 (4th Cir. 2015) (*per curiam*)

("Although Thomas may have suffered a relatively minor injury to his knee, the risk of more

significant harm from a fall down the stairs (or out of an upper bunk) is obvious."). Being

restrained under circumstances that impair breathing satisfies the standard. *See Patel v. Lanier

County Georgia*, 969 F.3d 1173 (11th Cir. 2020) (holding that placing pretrial detainee in

unventilated, un-airconditioned transport van on hot autumn day constituted excessive force and

failing to treat his unconsciousness, shaking, profuse sweating, and labored breathing

demonstrated deliberate indifference to a serious medical need).

The Complaint appropriately pleads that Mr. Green had objectively serious medical

needs. It alleges that Mr. Green, through the affirmative actions of Defendants, was restrained

face-down for a prolonged period in a state of helpless peril, a life-threatening situation, which

killed him. *See, e.g.*, Compl. ¶¶ 64, 52, 18. The Complaint establishes that Defendants knew of

this risk and affirmatively disregarded it.

Defendants erroneously argue that Mr. Green's "serious medical need 'so obvious that

even a lay person would easily recognize the necessity for a doctor's attention' was not apparent

until 2:42:21 a.m.," when Defendant Weiss had Mr. Green put on a monitor. Defs.' Mem. 35.

This was, according to Defendants' own reasoning, *more than a minute after Mr. Green had

already become non-responsive*. *Id.* According to Defendants, this is because they "believed Mr.

Green had fallen asleep." *Id.* This is patently absurd. Mr. Green was, by Defendants' own

assertions, "*continuously* moving around and screaming" right "up until he was placed in the

medic unit" less than a minute before they now purportedly believed he had fallen asleep. *Id.* The

reasoning here is strained beyond recognition.

Even if this were accurate, which it is not, Mr. Green was not moved off his back for another two to three minutes, and CPR was not started until six minutes after Defendants admit Mr. Green's medical needs were obvious. Compl. ¶¶ 68, 70.

At any rate, Defendant's version of events inaccurately describes the Complaint. Mr. Green's first serious medical need was apparent immediately: that he, just like every other person, especially those under the influence of drugs, cannot be safely restrained in a prone position, and that they need to be moved as soon as possible. *See, e.g.*, Compl. ¶ 84 (outlining a 1995 DOJ bulletin which "specifically advised law enforcement that '[a]s soon as the suspect is handcuffed, get him off his stomach.'").

Mr. Green's more particularized medical need was obvious, at the very latest, by "2:39 AM." Compl. ¶ 60. His "movements became visibly slower," and he "was visibly and obviously struggling to raise himself to save his own life" "because of the difficulty breathing in the face-down position."[9] Compl. ¶¶ 60–61. Thus, as the Complaint establishes, "before being loaded in to the ambulance, Mr. Green was in clear and obvious respiratory distress and at clear and obvious risk of serious injury and death," to the point that "[a]ny reasonably trained professional, whether medical or law enforcement, would and should have known at this point that the pressure on Mr. Green's chest needed to be relieved and he needed to be turned onto his side or back." Compl. ¶ 64.

Even so, the Complaint continues with more examples of Defendants' deliberate indifference. Some examples include:

---

[9] Then, moving even beyond deliberate indifference "various EMTs applied pressure to Mr. Green's back when he tried to lift himself." Compl. ¶ 62.

- "Officer Defendants were on scene the entirety of the eleven (11) minutes that Mr. Green was immobilized in a face-down position." Compl. ¶ 173.

- "Officer Woytko observed Mr. Green strapped down . . . in a face-down position with handcuffs behind his back but did not intervene to prevent AFD Defendants from strapping Mr. Green down, or intervene while Mr. Green remained in that position, despite the known danger to Mr. Green's life and safety." Compl. ¶ 174.

- "Officer Defendants were deliberately indifferent to Mr. Green's life and safety when they caused Mr. Green to be restrained in a face-down position and then failed to prevent and intervene when AFD Defendants transferred and then restrained Mr. Green in a face-down position . . . despite known long-standing protocols prohibiting such restraint because of its dangerous and deadly consequences, and despite obvious signs of distress from Mr. Green." Compl. ¶ 172.

In these paragraphs and throughout the complaint, Plaintiffs have sufficiently pled their claims for deliberate indifference.

### E. Counts IX and X: Claims for Maryland Declaration of Rights Article 24 Deprivations

Counts IX and X set forth claims under Article 24 of the Maryland Declaration of Rights for deprivation of liberty through the use of excessive force and homicide. For the reasons set forth above,[10] Plaintiffs have sufficiently pled an excessive force claim pursuant to Article 24 of the Maryland Declaration of Rights. Moreover, Defendants fail to recognize that, unlike under Section 1983, the City is vicariously liable for state constitutional violations of the Officer and

---

[10] The standards for analyzing claims under Article 24 of Maryland Declaration of Rights are the same as for analyzing Fourth Amendment and Fourteenth Amendment claims prohibiting the use of excessive force. *See Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011).

AFD Defendants. *DiPino v. Davis*, 729 A.2d 354, 373 (Md. 1999). Accordingly, Defendants' motion to dismiss should be denied.

### F.     Counts XI and XII: Claims for Battery

Defendants incorrectly assert that only the AFD Defendants could be liable for battery. They rely on body-worn camera footage, wherein it is not fully clear who exactly is taking what action at what time (an issue that should be explored through discovery), to suggest that the Officer Defendants were not involved in restraining Mr. Green in a face-down position and strapping him to the stretcher. Defs.' Mem. 39. In reality, as noted above, Mr. Green was a large man who required many individuals to restrain him in a face-down position and/or coordinate the process of securing him to the stretcher, and Plaintiff has properly alleged battery against all of those individuals. Compl. ¶¶ 50–51, 55–59.

Review of the body-worn camera footage does not clearly reveal that any of the Officer or AFD Defendants were uninvolved in the harmful touching of Mr. Green, in the form of the prone restraint and procedure of strapping him to multiple stretchers. If any of the individual Defendants were indeed uninvolved in that process, that fact can be established through discovery and can effectuate the discontinuance of this count against that Defendant.

### G.     Counts XIII and XIV: Claims for Negligence

Defendants assert that Plaintiffs have substantially failed to present any evidence that the police officer and EMS providers owed Plaintiffs a duty to protect Mr. Green from harm. A valid negligence claim alleges that: (1) the defendant had a duty to protect plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered an actual injury or loss; and (4) the defendant's breach of duty proximately caused the loss or injury. *Pendleton v. State*, 921 A.2d 196, 204 (Md. 2007). It is well established that "there can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another." *Id*.

The public duty doctrine holds that "when a status or common law imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort." *Muthukumarana v. Montgomery Cnty.*, 805 A.2d 372, 395 (Md. 2002). But the public duty doctrine "has no application when the court concludes that a statute or court order has created a *special duty* or specific obligation to a particular class of persons rather than to the public at large." *Id.* at 396. "For a special relationship between police officer and victim to be found, it must be shown that the local government or the police officer affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection." *Ashburn v. Anne Arundel Cnty.*, 510 A.2d 1078, 1085 (Md. Ct. Spec. App. 1986). The special duty rule is applied on a case-by-case basis. *Fried v. Archer*, 775 A.2d 430, 438 (Md. Ct. Spec. App. 2001).

Here, Plaintiffs do allege: "By placing Mr. Green in their 'protective custody' without his consent, AFD and Officer Defendants and Defendant City all undertook duties toward and entered a special relationship with Mr. Green by limiting his freedom to act on his own behalf, whereby they assumed an affirmative duty to protect his safety and general well-being as he was wholly dependent on the City and its agents to provide him services and care at all times relevant to this Complaint." Compl. ¶ 43. Defendants argue that "Plaintiffs have failed to allege action taken specifically to protect Mr. Green and his specific reliance on that protection," Defs.' Mem. 41, which contradicts arguments from earlier in their brief. Earlier, Defendants stress that the Court should determine their motion based on the body-worn camera footage and argue that the Officer Defendants "repeatedly tell Mr. Green that he is not in trouble and they are only trying to help him." Defs.' Mem. 34. They argue that Mr. Green needed to be handcuffed and shackled "for his own safety" because he kept flailing around while the Individual Defendants "were

attempting to help him." *Id.* at 36. Mr. Green and his family reasonably relied on their assurance that they were trying to help him; if he had known they would soon cause his death, Mr. Green and his family would not have called the authorities and/or resisted the restraint more strenuously.

The Officer Defendants thus created a special relationship through their undertaking. The Officer Defendants had a duty to Mr. Green to ensure his safety and well-being while in their care. The Officer Defendants breached this duty when they forcefully restrained Mr. Green in a prohibited and precarious position. This infamously fatal restraint proximately caused Mr. Green's untimely death. Therefore, Plaintiffs have plausibly alleged facts for a claim upon which relief may be granted, and Defendants motion to dismiss should be denied.

### H. Counts XV and XVI: Claims for Gross Negligence

Gross negligence occurs when "the defendant, whatever his state of mind, has proceeded in disregard of a high and excessive degree of danger, either known to him or apparent to a reasonable person in his position." *Medina v. Meilhammer*, 489 A.2d 35, 36 (Md. Ct. Spec. App. 1985). This standard requires that defendant's conduct must "take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Id.* Whether a defendant is liable for gross negligence is ordinarily a question of fact for the jury, not the court. *Brooks v. Jenkins*, 104 A.3d 899, 901–02 (Md. Ct. Spec. App. 2012).

The gross negligence standard has been properly pled here. In their motion to dismiss, Defendants, citing Maryland state case law, erroneously contend a pleading standard requiring heightened levels of specificity applies to gross negligence claims. This is incorrect. The notice pleading standards of Federal Rule of Civil Procedure 8 apply, not state-law pleading rules.

*Great N. Ins. Co. V. Recall Total Info. Mgmt., Inc.*, No. Civ.A TDC-13-1829, 2014 WL 3845891, at *4 (D. Md. Aug. 1, 2014).

Defendants erroneously rely on *Tatum v. Gigliotti*[11] and *McCoy v. Hatmaker*,[12] two cases that exemplify what is not deemed gross negligence in the law enforcement and medical services context. Contrasting *McCoy* and *Tatum* with the case at bar, Mr. Green was not improperly treated as a result of a misdiagnosis or failure to follow proper protocol. Here, Plaintiffs allege as follows:

- Pursuant to the known and well-established risk that prone restraint leads to death, MIEMSS Protocols directed all EMS responders not to restrain individuals in a face-down position. Compl. ¶¶ 4–5. These rules were not simply put in place to create red tape; they exist to prevent a well-known cause of death.

- There have been highly-publicized incidents involving face-down restraint leading to death, such as the murder of George Floyd, which led to the largest protest movement in U.S. history and is a case that officers and EMS responders were undoubtedly familiar with. Compl. ¶ 8.

- Despite these known risks, the Individual Defendants chose to restrain Mr. Green in a prone, face-down position for approximately eleven minutes, leading to Mr. Green's foreseeable cardiac arrest and death. Compl. ¶ 51.

---

[11] *Tatum v. Gigliotti*, 565 A.2d 354 (Md. Ct. Spec. App. 1989).

[12] *McCoy v. Hatmaker*, 763 A.2d 1233 (Md. Ct. Spec. App. 2000).

- Specifically, the Individual Defendants physically restrained Mr. Green, his arms forced behind his back and handcuffed, his ankles held down and his legs placed in restraints. Compl. ¶¶ 43, 46, 47, 52.

- Wholly and completely dependent on the defendants, unable able to stand up or even turn over on his own, Mr. Green was then placed in a face-down position and restrained there. Compl. ¶¶ 50.

- With the assistance of the Officer Defendants, the AFD Defendants strapped Mr. Green down to a stretcher in this same face-down position, where he ultimately died due to prone restraint cardiac arrest. Compl. ¶¶ 55–59.

- Even after Mr. Green's movements became visibly slower due to a difficulty breathing that should have been readily apparent to police officers and EMS responders, the Individual Defendants failed to attempt resuscitation for about seven minutes. Compl. ¶¶ 60–69.

- None of this was necessary. There is no reason whatsoever why Mr. Green could not have been restrained on his side or back. Compl. ¶ 53.

These actions are different in kind from merely making an incorrect diagnosis or negligence in implementing a medical procedure, which is what was at issue in the *McCoy* and *Tatum* cases. This case extends well beyond the scope of failing to adhere to protocols, and Defendants' conduct extends beyond that of ordinary negligence.

As such, Defendants knew or should have known that restraining Mr. Green in a face-down position would interfere with his ability to breathe and create a substantial probability of great bodily harm or death. Defendants, whatever their state of mind, proceeded in disregard of a high and excessive degree of danger, either known to them or apparent to a reasonable person in

their position. Defendants' conduct was indifferent, deliberate, unreasonable, reckless, an extreme departure from ordinary care, and, most importantly, grossly negligent. As such, Plaintiffs have plausibly alleged facts to sustain a claim for relief of the gross negligence against Defendants.

## I.     Counts XVII and XVIII: Claims for Wrongful Death and Survival

### 1.     Plaintiffs have properly pled a wrongful death action.

Under Maryland's wrongful death statute, a cause of action may be brought against "a person whose wrongful act causes the death of another." CJP § 3-902(a). A wrongful act is defined as "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." CJP § 3-901.

Defendants argue that Plaintiffs failed to name a "wrongful act" as defined in the wrongful death statute because Plaintiffs failed to state a claim for Counts 1-8 of the Complaint. Defs.' Mem. 45. Defendants' assertion is without merit. "Maryland's wrongful death statute created a new and independent cause of action[.]" *Willey v. Bd. of Educ. Of St. Mary's Cty.*, 557 F. Supp. 3d 645, 670 (D. Md. 2021) (citing *Spangler v. McQuitty*, 141 A.3d 156 (Md. 2016)). The statute permits "'the decedent's beneficiaries or relatives to recover damages for loss of support or other benefits that would have been provided, had the decedent not died as a result of another's negligence.'" *Id.*

Plaintiffs have plausibly alleged that Mr. Green's death was a proximate result of Defendants' negligence in placing him in the face-down, prone position, which caused him to suffer from cardiac arrest. *See generally* Compl. ¶¶ 249–51. Further, Plaintiffs have alleged that, as a result of Mr. Green's death, they have suffered and will continue to suffer from numerous compensable injuries. *Id.* at ¶ 255. Plaintiffs Brittany Green, Tiffany Green, Jayda Green, Phyllis McGowan, and Tracy Naylor also fall within the category defined by the statute—"wife,

husband, parent, and child of the deceased person," CJP § 3-904(a)(1)—and they brought their claims within the applicable statutory period. Accordingly, Plaintiffs have sufficiently pled facts facially plausible to sustain a claim against Defendants for wrongful death, and Defendants motion must be denied.

### 2.  Plaintiffs have properly pled a survival action.

Defendants argue that a survival action is not a separate cause of actions, but rather the mechanism by which an estate can bring a wrongful death suit. Further, Defendant argues that Count XVIII should be dismissed as duplicative and prejudicial. To support their contention, Defendants cite to *Mang v. City of Greenbelt*, 2012 WL 115454 at *22 (D. Md. 2012). Defendants' reliance on *Mang* is misplaced. In *Mang*, a decedent's estate incorrectly asserted a "wrongful death" claim on behalf of decedent. *Id.* at *2. Because the claim was being made on behalf of the decedent's estate, the court determined that it was more appropriately recognized as a survival action. *Id.* at *8. However, decedent's estate "fail[ed] to describe a separate tort or other claim that [decedent] may have brought had he survived the [conduct leading to his death]." *Id.* Mr. Green's estate has not made this error because, by incorporating by reference, his estate has established independent claims that Mr. Green could have brought against Defendants had he still been alive, which makes reliance on *Mang* inapposite. *See generally* Compl.; *see also* Compl. ¶¶ 256–262.

### V.  Defendants' arguments that the Fourth Amendment does not apply are incorrect but also, ultimately, academic.

Defendants argue that the Fourth Amendment does not protect Mr. Green beyond the initial seizure, which they characterize as essentially the first moment any Defendant laid a hand on him. Defs.' Mem. 19. However, Defendants ignore that a constitutional seizure for one purpose does not permit an unconstitutional further seizure.

It is true that "[t]he point at which Fourth Amendment protections end and Fourteenth Amendment protections begin is often murky." *Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008). However, the acceptable scope of a seizure "is determined by the seizure's 'mission,' which," here, was, initially, "for purposes of restraining [Mr. Green] for his safety." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015); Compl. ¶ 45. In *Rodriguez*, what *began* as a constitutional seizure to effect a traffic stop became an unconstitutional seizure when the detainee was required to wait for a drug dog to come sniff the car, without any reasonable suspicion that there were drugs present in the car.[13] *Rodriguez*, 575 U.S. at 351–52.

In Maryland (and in general), police are permitted to engage in "community caretaking" functions. *Wilson v. State*, 409 Md. 415, 437 (2009) ("As did the Delaware Supreme Court, as well as the majority of jurisdictions in the country, we find that the public welfare component of the community caretaking function of the police encompasses a non-investigative, non-criminal role to ensure the safety and welfare of our citizens, reflecting that principle that the role of the police is not limited to the investigation, detection and prevention of crime in this State.") (internal quotation marks omitted). Contact beyond this "must be supported by a warrant, reasonable articulable suspicion of criminal activity, or another exception to the warrant requirement." *Id.*

Here, as in *Rodriguez*, a seizure for one purpose, whether to effect a traffic stop or to help Mr. Green with his medical issue, effectively ended when the police exceeded its scope, whether to conduct a warrantless drug search or to forcibly restrain Mr. Green to a stretcher.

However, the end result is the same: the key question is whether Defendants acted objectively unreasonably. Here, they did.

---

[13] There were, however, drugs present in the car. *Rodriguez*, 575 U.S. at 352.

**VI.** **None of Defendants' immunity arguments are persuasive, as Mr. Green had clearly established rights and the other immunities Defendants are seeking are state immunities for federal claims.**

    **A.** **Defendants are not entitled to qualified immunity, as they violated well-established constitutional rights.**

        **1.** **The qualified immunity standard.**

Qualified immunity is an affirmative defense for which Defendants have the burdens of proof and persuasion.[14] *Durham v. Jones*, 737 F.3d 291, 299 (4th Cir. 2013); *but see Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). There is no heightened pleading requirement for qualified immunity. *In re Mills*, Nos. 08-1024, 08-1032, 2008 WL 2937850, at *6 (4th Cir. July 29, 2008). Because resolving claims of qualified immunity requires a detailed factual inquiry, courts disfavor dismissing a claim on qualified immunity grounds at the motion to dismiss stage, before any discovery has been taken. *See, e.g.*, *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005).

Officials are not entitled to qualified immunity where 1) "the alleged facts, when viewed in the light most favorable to the party asserting the injury, demonstrate that the official's conduct violated a federal right" and (2) "where such right was 'clearly established' at the time of the alleged violation." *Tarashuk v. Givens*, 53 F.4th 154, 162 (4th Cir. 2022) (citation omitted). A plaintiff may also establish the second prong by showing "there was such a clear trend in the case law that . . . the recognition of the right by a controlling precedent was merely a question of time." *Phillips v. Comm. Ins. Corp.*, 678 F.3d 513, 528 (7th Cir. 2012). In resolving qualified immunity claims, "courts are required to view the facts and draw reasonable inferences

---

[14] Defendants do not appear to argue that any State claims are shielded by qualified immunity. Defs.' Mem. 46 ("Qualified immunity protects government officials 'from federal claims when they act in objectively reasonable reliance on existing law.'") (quoting *Queen v. Prince George's County*, 188 F.Supp.3d 535, 541 (D. Md. 2016)).

in the light most favorable to the party opposing the summary judgment motion. In qualified immunity cases, this usually means adopting … the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 377–79 (2007) (internal quotations, alterations, and citations omitted).

Qualified immunity shields government officials performing *discretionary functions* from personal liability for civil damages under § 1983, so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ridpath v. Board of Governors Marshall University*, 447 F.3d 292, 306 (4th Cir. 2006) (citation omitted).

To assert qualified immunity, a defendant must show he or she was performing a discretionary function within the defendant's duties. *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997) (citation omitted); *see also Tserkis v. Baltimore Cnty.*, No. CV ELH-19-202, 2021 WL 195310, at *5 (D. Md. Jan. 19, 2021). Defendants have not met this burden. Their briefing on the issue nowhere contends that the conduct for which they seek qualified immunity falls within their discretion. This precludes any finding of qualified immunity. *See Street v. City of Bloomingdale*, 2007 WL 1752469, at *4 (S.D. Ga. June 15, 2007); *Reed v. Okereke*, No. 1:04-CV-1064-JOF, 2006 WL 2444068, at *19 (N.D. Ga. Aug. 22, 2006). And as described herein, their conduct was not discretionary: they directly violated a mandatory state MIEMSS regulation prohibiting face-down restraint.

### 2. **Defendants are not entitled to qualified immunity because Defendants cannot meet their burden to show the rights violated were not "clearly established."**

As discussed in detail *supra*, Defendants violated various rights. The question for qualified immunity is whether those rights were "well established." They were.

As to the second prong, Defendants have not met their burden, let alone mounted a cogent argument. In the Fourth Circuit, "the law is clearly established that individuals have a

right to be free from excessive force during the course of a seizure." *Dent v. Montgomery Cnty. Police Dep't*, 745 F. Supp. 2d 648, 661 (D. Md. 2010) (citing *Turmon v. Jordan*, 405 F.3d 202, 206 (4th Cir. 2005)); *Valladares v. Cordero*, 552 F.3d 384, 388 (4th Cir. 2009) ("It is clearly established that citizens have a Fourth Amendment right to be free from unreasonable seizures accomplished by excessive force.") (Gregory, J., joined by Bennett, J., sitting by designation). In fact, "[t]he general right to be free from unreasonable seizures is as old as the Fourth Amendment." *Turmon v. Jordan*, 405 F.3d 202, 206 (4th Cir. 2005).

The Fourth Circuit has consistently denied qualified immunity to officers who used excessive force against individuals who had not committed any crimes, were secured in handcuffs, and posed no threat to the officers or others. Defendants do not contest that Mr. Green was secured in handcuffs, was not formally arrested or charged with a crime, and did not pose a threat to the officers. Plaintiffs' Complaint pleads accordingly. *See generally* Compl.

Defendants attempt to unreasonably narrow the inquiry as to whether there is "controlling authority in this Circuit which holds that using straps to secure an individual to a stretcher in a prone position and applying minimal to no pressure to their upper body constitutes a constitutional violation, as the Complaint alleges." Defs.' Mem. 47. First, this misstates the Complaint. The Complaint *clearly and directly states* that "as Mr. Green was being wheeled into the ambulance, various EMTs applied pressure to Mr. Green's back." Compl. ¶ 62. Defendants used "brute physical force to subdue Mr. Green in a face-down position, in violation of his clearly established constitutional rights." *Id.* ¶ 54.

Setting aside that Defendants have mischaracterized the Complaint, they are attempting to define the right involved with such a specific level of particularity as to be impossible to satisfy.

However, beginning in at least 1998, federal district and circuit courts have found that prone restraint of individuals with diminished capacity or under the influence of drugs can constitute excessive force even without additional pressure on the victim's back. In 1998, the United States Court of Appeals for the Fifth Circuit held that officers who restrained a mentally ill man and placed him face down in the back of a squad car, where he suffered cardiac arrest, could be found to have used unjustified deadly force and were not entitled to qualified immunity. *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446, 448–49 (5th Cir. 1998). Courts around the country have come to similar conclusions in the years since. *See Aguirre v. City of San Antonio,* 995 F.3d 395, 416 (5th Cir. 2021); *Myers v. City of Charleston*, No. 2:19-CV-00757, 2021 WL 925326, at *12 (S.D.W. Va. Mar. 10, 2021); *Black v. Webster*, No. 20-CV-3644, 2022 WL 169669, at *11 (D. Md. Jan. 18, 2022); *McCue v. City of Bangor*, 838 F.3d 55, 64–65 (1st Cir. 2016); *Sallenger v. Oakes*, 473 F.3d 731, 741 (7th Cir. 2007) (holding that "[f]ailing to place [the arrestee] in the proper position after hobbling him" (meaning "immediately on his side, to assist his breathing") "could be deemed excessive by a jury"); *Johnson v. City of Cincinnati*, 39 F. Supp. 2d 1013, 1020 (S.D. Ohio 1999).

Defendants have not shown an entitlement to qualified immunity.

### B.     Public Official Immunity

#### 1.     There is no public official immunity for intentional torts.

Maryland does not extend public official *immunity* to intentional tortious acts or to violations of State Constitutional rights. *See, e.g.*, *Cox v. Prince George's Cnty.*, 296 Md. 162 (1983) ("[A] police officer does not enjoy [public official] immunity if he commits intentional torts or acts with malice."); *Aston v. Brown,* 339 Md. 70, 116 (1995) ("the plaintiffs' nonconstitutional tort claims are not limited to negligence, but include so-called intentional torts. Public official immunity is not a defense in these torts."); *DiPino v. Davis*, 354 Md. 18, 48, 51

(1999) (public official immunity does not apply to intentional acts or "action based on rights protected by the State Constitution."); *Okwa v. Harper*, 360 Md. 161, 200 (2000) (a public official is not entitled to public official immunity where they have violated a person's constitutional rights), *Lee v. Cline*, 384 Md. 245, 255 (2004) (the Maryland legislature chose to exclude intentional torts and torts based on state constitutional violations from the Tort Claims Act); *Mason v. Wrightson,* 205 Md. 481, 487(1954) ("When a peace officer goes beyond the scope of the law, he may become liable civilly and is not shielded by the immunity of the law."); *Heinze v. Murphy,* 180 Md. 423, 434 (1942) ("[T]he law tolerates no abuse of power," and thus a police officer making an unlawful arrest was held liable for compensatory damages); *Dunne v. State,* 162 Md. 274, 284–288, *appeal dismissed,* 287 U.S. 564, 53 S. Ct. 23 (1932) (public officials do not have the immunity of the State when they enforce an unconstitutional act); *Weyler v. Gibson,* 110 Md. 636, 653–654 (1909) (refusing to extend immunity to a public official violating the plaintiff's constitutional rights).

Counts I through XII of the Complaint are all intentional torts or allegations of violations of constitutional rights, both federal and state, and therefore not subject to any public official immunity. Therefore, any argument that public official immunity applies to these counts is without merit due to stare decisis.

## 2. <u>Defendants' malicious acts bar any public official immunity for their negligence.</u>

In 2010, the Maryland Supreme Court (then Court of Appeals of Maryland) examined all possible sources of public official immunity for allegations of negligence in *Houghton v. Forrest*, 412 Md. 578 (2010). Common law public official immunity "is reserved for public officials (as opposed to mere employees) who perform negligent acts during the course of their discretionary duties." *Id*. at 585 (*citing James v. Prince George's Cnty.*, 288 Md. 315, 323

(1980)). Police officers are public officials. *Id.* (*citing Smith v. Danielczyk*, 400 Md. 98, 128–29 (2007)). The purpose is to shield public officials from being liable in situations where "a better choice could have been made." *Id.* at 588 (*citing Lee v Cline*, 384 Md. 245, 261 (2004)).

No public official is granted immunity from their malicious acts against another. *Robinson v. Bd. of Cnty. Commissioners for Prince George's County*, 262 Md. 342, 348 (1971) ("Indeed we can not think of any reason why a public official should not be held responsible for his malicious actions even though he claims they were done within the scope of his discretionary authority."). A malicious act is one that is done wantonly, contrary to the actor's duty, and intended to be either actually or constructively injurious to another. *R.A. v. Johnson*, 36 F.4th 537, 545 (4th Cir. 2022). For constructive intent to injure, defendant's actions must be "so reckless or manifestly indifferent to the consequences, where the safety of life or limb is involved." *Id.*

Mr. Green also had a right to receive adequate medical care and be free from deliberate indifference to his medical needs. The Fourth Circuit has recognized that, as of 2018 at the latest, "a pretrial detainee's right to adequate medical care and freedom from deliberate indifference to his known medical needs" was clearly established. *Tarashuk*, 53 F.4th at 164; *see also id.* at 165–167. Plaintiffs have properly alleged a deliberate indifference claim against the Defendants.

Plaintiffs' Complaint states with specificity acts that are clearly malicious by the Individual Defendants. Paragraphs 55–68 of the Complaint highlight the acts of Officers Bodmer, Woytko, and Siminyuk during the last moments of Mr. Green's life where they choose to restrain and transport him in a face down position, without any concern about his health or safety. No police report mentioned Mr. Green's cardiac arrest or injuries, though he had to be resuscitated and suffered irreversible brain damage. Compl. ¶¶ 61, 62, 65, 71, 74.

Therefore, there are sufficient questions of fact to survive a Rule 12(b)(6) motion to dismiss.

## C.    Good Samaritan Act and Fire & Rescue Companies Act

Defendants assert immunity under the Good Samaritan and Fire and Rescue Company Acts for the AFD Defendants. The Good Samaritan Act provides for limited immunity from certain state law causes of action for individuals who provide assistance or medical care without compensation. Md. Code Ann., Cts. & Jud. Proc. Art. § 5-603 (providing immunity if "(1) The act or omission is not one of gross negligence; (2) The assistance or medical care is provided without fee or other compensation; and (3) The assistance or medical care is provided: (i) At the scene of an emergency; (ii) In transit to a medical facility; or (iii) Through communications with personnel providing emergency assistance.").

The Fire and Rescue Companies Act provides limited immunity from state law causes of action. Md. Code Ann., Cts. & Jud. Proc. Art. § 5-604 ("Except for any willful or grossly negligent act, a fire company or rescue company, and the personnel of a fire company or rescue company, are immune from civil liability for any act or omission in the course of performing their duties.").

The Good Samaritan and Fire and Rescue Company Acts plainly do not apply to Plaintiffs' federal constitutional claims (Counts I–VIII), because they are immunities premised on state law. *Martinez v. State of Cal.*, 444 U.S. 277, 284 n.8 (1980); *see also U.*S. Const. art. VI, cl. 2 ("Supremacy Clause").

Under the *plain language of the statutes*, these defenses also do not apply to Plaintiffs' claims arising from willful conduct (Counts XI–XII) or gross negligence (Counts XV–XVI).[15]

The Good Samaritan Act also does not apply to any of Plaintiffs' claims because the "assistance or medical care" was not "provided without fee or other compensation." Md. Code Ann., Cts. & Jud. Proc. Art. §5-603(a)(1). The City charges a fee if a response from the Annapolis Fire Department results in ambulance transportation, as it did here.[16] This is sufficient to overcome Good Samaritan Act immunity. *See Chase v. Mayor & City Council of Baltimore*, 730 A.2d 239, 243–246 (Md. Ct. App. 1999), *rev'd on other grounds*, 756 A.2d 987 (Md. 2000). Defendants present no evidence or argument that the services were rendered free of charge. The Court lacks an adequate basis for granting any immunity to Defendants under the Good Samaritan Act.

Thus, the most that asserting the defense could accomplish, in theory, is to immunize the AFD Defendants for simple negligence under the Fire and Rescue Company Act. *Stracke v. Est. of Butler*, 214 A.3d 561, 564 (Md. 2019); *TransCare Maryland, Inc. v. Murray*, 64 A.3d 887, 892 (Md. 2013). Yet the AFD Defendants violated state law, in the form of the MIEMMS Protocols. It would hardly serve the purposes of state law to immunize Defendants from civil liability for conduct that clearly runs afoul of duly promulgated laws and regulations. Neither the

---

[15] By logical extension, the defenses also clearly do not bar Plaintiffs' stand-alone wrongful death and survival counts to the extent these claims arise from violations of the federal constitution or intentional conduct/gross negligence.

[16] This is a reasonable inference from the Complaint, which is also accurate. *See* FY2020 Fees Schedule, Annapolis.gov https://www.annapolis.gov/DocumentCenter/View/13144/R-16-19-FINAL-FY2020-Fees-Schedule-PDF (last visited Jan. 25, 2023) (providing for fees for "covered emergency medical services"); FAQs, *Annapolis.gov*, https://www.annapolis.gov/Faq.aspx?QID=102 (last visited January 25, 2023) ("Does the City of Annapolis charge a fee for ambulance services? Yes, the Annapolis Fire Department charges a fee if you are transported via ambulance. If we respond to your call for assistance and you were not transported, there will be no fee.").

Good Samaritan Act nor the Fire and Rescue Company Act should permit Defendants to escape accountability.

Plaintiffs' claims are well pled.

**CONCLUSION**

Defendants seek to have their role in Mr. Green's homicide swept under the rug and laundered into the realm of legality. Defendants' acts were unlawful and tortious, and plaintiffs' claims are well pled. For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss or for Summary Judgment, hold a hearing on Defendants' Motion, permit Plaintiffs to amend their Complaint if the Court should deem it necessary, and for any other such relief as this Honorable Court deems appropriate and just.


Dated: September 6, 2024               Respectfully submitted,

                                        By: /s/ *Tara Eberly*
                                        Andrew S. Janet (Bar # 20901)
                                        Stephen C. Rigg (Bar # 19891)
                                        Tara Eberly (Bar # 14239)
                                        JANET, JANET & SUGGS, LLC
                                        Executive Centre at Hooks Lane
                                        4 Reservoir Circle, Suite 200
                                        Baltimore, MD 21208
                                        Telephone: (410) 653-3200
                                        Facsimile: (410) 653-9030
                                        Email: asjanet@jjsjustice.com
                                        Email: srigg@jjsjustice.com
                                        Email: teberly@jjsjustice.com
                                        Attorneys for Plaintiffs Tracy Naylor and
                                        Estate of Renardo Green

/s/ Malcolm P. Ruff (with permission)
William H. Murphy, Jr. (Bar # 07985)
Malcolm P. Ruff (Bar # 21595)
Phylecia R. Faublas (Bar # 30435)
MURPHY, FALCON & MURPHY
One South Street, 30th Floor
Baltimore, MD 21202
Telephone: (410) 951-8744
Facsimile: (410) 539-6599
Email: billy.murphy@murphyfalcon.com
Email: malcolm.ruff@murphyfalcon.com
Attorneys for Plaintiffs Brittany Green,
Tiffany Green, Jayda Green, and
Estate of Renardo Green

and

/s/ Dwayne A. Brown (with permission)
Dwayne A. Brown (Bar #04724)
LAW OFFICE OF DWAYNE A. BROWN
20 South Charles Street, Suite 400
Baltimore, Maryland 21201
Telephone: (410) 539-6855
Email: dbrown@brownbonner.com
Attorneys for Plaintiffs Phyllis McGowan and
Estate of Renardo Green