## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **ESTATE OF RENARDO GREEN, et al.,** | * | |
| | * | |
| **Plaintiffs** | * | |
| | * | **Civ. No.: MJM-24-1351** |
| **v.** | * | |
| | * | |
| **CITY OF ANNAPOLIS, et al.,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

The Estate of Renardo Green, Brittany R. Green, Tiffany R. Green, Jayda A. Green, Phyllis McGowan, and Tracy L. Naylor (collectively, "Plaintiffs") filed this civil action against the City of Annapolis and several officers of the Annapolis Police Department ("APD") and emergency responders of the Annapolis Fire Department ("AFD"), in their individual capacities, (collectively, "Defendants") alleging the wrongful death of decedent Renardo Green and related constitutional and common-law claims. ECF No. 1 (the "Complaint"). Defendants' Motion to Dismiss or in the Alternative for Summary Judgment, ECF No. 9, is fully briefed and ripe for disposition. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For reasons stated below, the Court grants Defendants' Motion to Dismiss.

## I.    PROCEDURAL HISTORY

This action arises out of the death of Renardo Green, a 51-year-old African American man who died while in protective custody. The instant action is the reinstatement of a separate action filed in this Court. *See* Civ. No. JRR-22-3198 (the "Prior Action"). The Complaint in the Prior

Action (the "Prior Complaint") was filed in this Court on December 13, 2022, and Judge Rubin presided. Civ. No. JRR-22-3198, ECF No. 1. On September 30, 2023, Judge Rubin granted a motion to dismiss filed in that case and dismissed the Prior Complaint without prejudice. *Id.*, ECF Nos. 30, 31; *Est. of Green v. City of Annapolis*, 696 F. Supp. 3d 130 (D. Md. 2023).

The Complaint in the instant matter is nearly identical to the Prior Complaint that Judge Rubin dismissed, with a limited set of changes. First, instead of suing the defendant police officers (the "Officer Defendants") in both their individual and official capacities, they are sued only their individual capacities in the instant Complaint. Second, while the Prior Complaint named the defendant AFD emergency responders as "Does," the instant Complaint identifies four AFD emergency responders (the "AFD Defendants") by name and asserts claims against them in their individual capacities. Third, certain references to reports written by some of the Defendants and body-worn camera ("BWC") footage contained in the Prior Complaint, upon which the Court relied in granting the motion to dismiss in the Prior Action, have been removed from the instant Complaint. Fourth, as further explained in Part II *infra*, Plaintiffs add new factual details about how Mr. Green was restrained in Paragraphs 104, 163, 169, 170, 206, 232, and 233. Fifth, claims for negligent hiring, training, retention, and supervision asserted in the Prior Complaint have been removed from the instant Complaint. Finally, the instant Complaint changes the defendants against whom certain causes of action are asserted.

The causes of action asserted in the instant Complaint are as follows: (I) 42 U.S.C. § 1983 Excessive Force – Survival by Estate of Renardo Green against AFD and Officer Defendants; (II) 42 U.S.C. § 1983 Excessive Force – Wrongful Death by Individual Plaintiffs against AFD and Officer Defendants; (III) Deprivation of Constitutional Rights (*Monell*) – Survival by Estate of Renardo Green against the City of Annapolis; (IV) Deprivation of Constitutional Rights (*Monell*)

– Wrongful Death by Individual Plaintiffs against the City of Annapolis; (V) 42 U.S.C. §§ 1983, 1985 Conspiracy to Deprive Constitutional Rights and/or Failure to Intervene – Survival by Estate of Renardo Green against AFD and Officer Defendants; (VI) 42 U.S.C. §§ 1983/1985 Conspiracy to Deprive Constitutional Rights and/or Failure to Intervene – Wrongful Death by Estate of Renardo Green against AFD and Officer Defendants; (VII) 42 U.S.C. § 1983 Deprivation of Constitutional Rights, Deliberate Indifference – Survival by Estate of Renardo Green against all Defendants; (VIII) 42 U.S.C. § 1983 Deprivation of Constitutional Rights, Deliberate Indifference – Wrongful Death by Individual Plaintiffs against all Defendants; (IX) Maryland Declaration of Rights Article 24, Excessive Force – Survival by Individual Plaintiffs against All Defendants; (X) Maryland Declaration of Rights Article 24, Excessive Force – Wrongful Death by Individual Plaintiffs against all Defendants; (XI) Battery – Survival by Estate of Renardo Green against Officer and AFD Defendants; (XII) Battery – Wrongful Death by Individual Plaintiffs against Officer and AFD Defendants; (XIII) Negligence and Negligence Per Se – Survival by Estate of Renardo Green against Officer Defendants; (XIV) Negligence and Negligence Per Se – Wrongful Death by Individual Plaintiffs against Officer Defendants in their Individual Capacities; (XV) Gross Negligence – Survival by Estate of Renardo Green against all Defendants; (XVI) Gross Negligence – Wrongful Death by Individual Plaintiffs against all Defendants; (XVII) Wrongful Death by Individual Plaintiffs against all Defendants; and (XVIII) Survival by Estate of Renardo Green against all Defendants.

Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. ECF No. 9. Plaintiffs filed a response in opposition to the motion, ECF No. 13, and Defendants filed a reply in support of the motion, ECF No. 16.

## II.    FACTUAL BACKGROUND

### A.  Facts Alleged in the Complaint

The following facts alleged in the Prior Complaint, as summarized in Judge Rubin's opinion in the Prior Action, are retained in the instant Complaint:

> Defendant City is a municipality and maintains control over the City of Annapolis Police Department ("APD"). [ECF No. 1 (Compl.) ¶ 27.] The APD is responsible for establishing customs, policies, and standing orders controlling the actions of its police officers, as well as their training and supervision regarding the appropriate use of force against, and restraint of, individuals taken into custody. [*Id.* ¶ 29.] At all times relevant to the Complaint, the City employed the Officer Defendants as law enforcement officers in the APD; and the Officer Defendants acted within the course and scope of their employment, and under color of state law. [*Id.* ¶ 30.]
>
> The City also maintains and controls the Annapolis Fire Department ("AFD"), which includes Emergency Medical Services ("EMS") for the purposes of providing health care and rescue services. [*Id.* ¶¶ 31-32.] The City employs paramedics, emergency responders, and other health care workers within AFD's EMS Division, including the [AFD Defendants], to provide health care services to Annapolis residents. [*Id.* ¶ 33.] AFD is responsible for establishing customs and policies controlling the actions of its personnel, including the [AFD Defendants]. [*Id.* ¶ 34.] At all relevant times, the [AFD Defendants] were employed by the City, and acted within the course and scope of their employment. [*Id.* ¶ 35.]
>
> Plaintiffs allege that "the AFD did not train its personnel to avoid face-down restraint or promulgate a policy prohibiting face-down restraint until November 1, 2022," despite the MIEMSS[1] protocol that EMS responders not place patients "in a face-down, hobbled, or hog-tied position." [*Id.* ¶¶ 5, 13.]

---

[1] MIEMSS means Maryland Medical Protocols for Emergency Medical Services as promulgated by the Maryland Institute for Emergency Medical Services Systems. Compl. ¶ 5.

*Green*, 696 F. Supp. 3d at 142–43.

In addition to the foregoing facts, the instant Complaint alleges the following:

On June 1, 2021, the Officer Defendants responded to a 911 call placed by Ms. Naylor requesting assistance for Mr. Green, her spouse, who was under the influence of PCP and suffering from a disturbed mental state with self-inflicted lacerations. Compl. ¶¶ 14, 40–41. Officers Bodmer and Woytko were permitted entry into the home at 2:20 a.m., where they observed Mr. Green in a delirious state, flailing his legs, yelling "yeah bitch" repeatedly, and otherwise behaving erratically. *Id.* ¶ 42. Upon deciding to place Mr. Green in protective custody, Officers Bodmer and Siminyuk rolled Mr. Green rolled onto his stomach at 2:25 a.m. to handcuff him. *Id.* ¶ 43. At 2:26 a.m., Mr. Green was rolled onto his side. *Id.* ¶ 44. At 2:30 a.m.,[2] Officer Bodmer placed ankle cuffs on Mr. Green. *Id.* ¶ 46. At 2:32 a.m., Sgt. Cochran brought shackles to the scene, and they were placed on Mr. Green's legs. *Id.* ¶ 47.

Paramedics with AFD ("AFD Defendants") brought a white sheet into the kitchen at 2:33 a.m. *Id.* ¶ 49. From 2:33 to 2:34 a.m., the AFD Defendants, Sgt. Cochran, Officer Bodmer, and Officer Siminyuk "forcibly rolled" Mr. Green into a prone (face-down) position on the white sheet and held him in that position. *Id.* ¶ 50. At 2:36 a.m., they moved Mr. Green to a portable stretcher, placing him face-down on that stretcher. *Id.* ¶ 55. From 2:36 to 2:37 a.m., Sgt. Cochran "forcibly held" Mr. Green in a face-down position while the AFD Defendants strapped him to two stretchers simultaneously,[3] and the AFD Defendants "forcibly placed and tightened straps" over Mr. Green's

---

[2] Body-worn camera footage of the events shows this time to be incorrect. Shackles were not placed on Mr. Green's ankles until 2:34 a.m. *See* https://perma.cc/E8CW-35CP.

[3] This allegation also appears to be an error, considering the body-worn camera footage. The portable stretcher was placed on a rolling stretcher after Mr. Green was transported out of the residence. While the straps on the portable stretcher remained in place, the straps on the rolling stretcher were applied at around 2:39 a.m. *See* https://perma.cc/E8CW-35CP.

legs and back while he remained face down. *Id.* ¶¶ 56, 57. From 2:37 to 2:39 a.m., the AFD Defendants and Officer Bodmer transported Mr. Green out of the residence, with the sides of the portable stretcher squeezing and compressing his body, and placed Mr. Green onto a rolling stretcher, "forcibly" placing and tightening straps over his legs and back. *Id.* ¶¶ 58, 59. At 2:39 a.m., Mr. Green's movements became slower, and he began lifting his head to breathe. *Id.* ¶¶ 60, 61. At 2:40 a.m., while in respiratory distress, Mr. Green was loaded into the ambulance by AFD Defendants and Officer Bodmer. *Id.* ¶ 65. At 2:41 a.m., Mr. Green was motionless and no longer responsive to emergency medical services ("EMS") personnel. *Id.* ¶ 66. Mr. Green was unstrapped and rolled onto his back from 2:44 to 2:45 a.m. *Id.* ¶ 68. Mr. Green's pulse was checked at 2:47 a.m., and CPR was started at 2:48 a.m. *Id.* ¶ 70.

Mr. Green was then transported to Anne Arundel Medical Center ("AAMC"), and he arrived at 3:15 a.m. *Id.* ¶ 71. Ms. Naylor learned at approximately 8:00 a.m. on June 1, 2021, that Mr. Green had "likely suffered brain death" due to cardiopulmonary failure. On June 4, 2021, Mr. Green's family chose to discontinue his life support, and Mr. Green died. *Id.* ¶¶ 72, 73. On September 20, 2021, the Maryland Office of the Chief Medical Examiner "reportedly ruled" Mr. Green's death a homicide "caused by 'prone restraint cardiac arrest.'" *Id.* ¶ 81.

### B. Events Depicted in Body-Worn Camera Footage

Footage from body-worn cameras ("BWC") worn by Officer Defendants depicts the following:[4]

When Officers Bodmer and Woytko arrived at Mr. Green and Ms. Naylor's residence at 2:20 a.m., Mr. Green was on the floor of the kitchen flailing his arms and legs and shouting, while bleeding from his hand. Ms. Naylor's brother stood above Mr. Green with his foot on Mr. Green's

---

[4] *See* https://perma.cc/E8CW-35CP.

chest, and Mr. Green struck and pulled at the man's legs while stomping his feet on the floor. The officers repeatedly instructed Mr. Green to relax and to calm down. Officer Siminyuk arrived at 2:23 a.m. and placed handcuffs on one of Mr. Green's wrists at 2:24 a.m., while Mr. Green continued kicking and flailing his legs and stomping his feet. The officers rolled Mr. Green to his side, as Ms. Naylor's brother stepped away, and told Mr. Green that he was not in trouble and that they were trying to get him help. At 2:26 a.m., the officers rolled Mr. Green face down on the floor and finished cuffing his wrists with a chain of handcuffs, behind his back. Mr. Green continued shouting and flailing his legs as the officers rolled him onto his side. Sgt. Cochran arrived with a set of shackles around 2:29 a.m. The officers rolled Mr. Green on the floor from one side of his body to the other and then placed the shackles on his ankles. Mr. Green then began shouting, "I'll fuck you up, bitch!" multiple times.

The AFD Defendants arrived at 2:29 a.m. as Mr. Green continued shouting and flailing. Officer Bodmer, Officer Siminyuk, and an APD Defendant applied their hands to Mr. Green, keeping him on his side as he continued move his legs around. At 2:32 a.m., Officer Woytko stepped away from Mr. Green to speak with Ms. Naylor, who was sitting on a chair outside of the kitchen. Mr. Green continued flailing and shouting on the floor of the kitchen, with Officer Bodmer and Officer Siminyuk struggling to keep him on his side. AFD Defendants bandaged Mr. Green's wounded hand, spread a sheet on the floor next to Mr. Green, and cut Mr. Green's t-shirt off of his torso. At the AFD Defendants' direction, Mr. Green was rolled forward onto the sheet, face down. Then, at 2:36 a.m., at AFD Defendants' direction, Officer Bodmer and Officer Siminyuk assisted them in using the sheet to lift Mr. Green onto a portable stretcher resting on the floor a few feet away. AFD Defendants strapped Mr. Green to the stretcher as he continued to flail and shout while in a face-down position. The AFD Defendants then lifted the stretcher and carried Mr. Green

outside, where they placed him on a rolling stretcher and strapped him to it, in a face-down position. At 2:39 a.m., the AFD Defendants rolled the stretcher to a nearby EMS vehicle. Mr. Green continued to shout and move around, lifting his upper torso up from the stretcher multiple times. Sgt. Cochran and Officer Siminyuk each stepped away by this point. Officer Woytko was in the residence taking photos and speaking with Ms. Naylor and her brother. Mr. Green was lifted into the EMS vehicle, where AFD Defendants tended to him, with Officer Bodmer observing and assisting.

### III.    STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A complaint need not include "detailed factual allegations," but it must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 555–56 (internal quotation marks omitted).

Furthermore, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 10 (2014) (per curiam). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (cleaned up). When considering a motion to dismiss, a court must take the factual allegations in the complaint

as true and draw all reasonable inferences in favor of the plaintiff. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). At the same time, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## IV.    CONSIDERATION OF VIDEO EXHIBITS

Before reaching the merits of Defendants' motion, the Court first notes the parties' dispute as to whether it is proper for the Court, at this stage of the case, to consider BWC footage depicting events described in the instant Complaint. Defendants argue that the Court can and should consider the BWC footage, notwithstanding Plaintiffs' removal of certain references to this footage from their Prior Complaint. ECF No. 9-1 (Def. Mem.) at 12–14; ECF No. 16 (Def. Reply) at 7–9. Plaintiffs characterize the footage proffered by Defendants as "unauthenticated" and not "integral to the complaint" and argue, therefore, that the footage should not be considered in deciding a motion to dismiss. ECF No. 13 (Pl. Opp'n) at 11–13.

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). However, courts may "consider documents that are explicitly incorporated into the complaint by reference" or "document[s] submitted by the movant" that are "integral to the complaint[,]" if "there is no dispute about the document's authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (citations omitted). Additionally, "courts may take judicial notice of publicly available records without converting a motion to dismiss to a motion for summary judgment." *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 502–03 (D. Md. 2019). "Specifically, the court may take judicial notice of publicly available information on state and federal government websites without converting the motion to one for summary judgment."

*Green*, 696 F. Supp. 3d at 147 (citing *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017)). Generally, converting a motion to dismiss to a summary judgment motion is not appropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. Du Pont de Nemours & Co. v. Kolon Indus.*, *Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).

The Court finds that the BWC footage may be properly considered as public records that have been certified as authentic and whose content is integral to the Complaint. The BWC footage is linked to the City's website: https://perma.cc/E8CW-35CP. In their opposition, Plaintiffs challenge the authenticity of the linked videos containing the footage, pointing out that the authenticity of exhibits must be established by affidavit or deposition. Pl. Opp'n at 11–12 (citing *Bookhultz v. Sears Authorized Hometown Stores, LLC*, Civ. No. CBD-16-2176, 2018 WL 1795338, at *1 (D. Md. Apr. 13, 2018)). In reply, Defendants submit an affidavit from a custodian of records with the City certifying the authenticity of BWC footage linked on the City's website. ECF No. 16-1 (Certification of Custodian of Records). Plaintiffs never dispute that the video files accurately depict events described in the Complaint. Defendants' certification is sufficient to establish the authenticity of the BWC footage, and because it depicts events upon which Plaintiffs' legal claims are founded, the Court finds the BWC footage to be integral to the Complaint.

Moreover, the instant Complaint does contain references to the BWC footage and therefore incorporates the footage into the Complaint by reference. As noted previously, in the instant Complaint, Plaintiffs removed references to BWC footage that had been included in the Prior Complaint. *See, e.g.*, Civ. No. JRR-22-3198, ECF No. 1 ¶¶ 42, 81. However, Plaintiffs have retained in the instant Complaint multiple references to specific timestamps reflected in the BWC footage—even down to the second in one instance. *See* Compl. ¶¶ 42–60, 65-71, 96, 104. These references do not challenge the accuracy of the footage but instead rely upon it and therefore

10

"provide ample support for the [C]ourt to consider the body-worn camera footage in resolving the Motion." *Green*, 696 F. Supp. 3d at 149.

Accordingly, the Court may consider the BWC footage without converting Defendants' motion to one for summary judgment. Further, considering the reliability of the video recordings, any conflicts between the content of the BWC footage and Plaintiff's bare allegations shall be resolved in favor of the footage, as necessary to correct obvious inaccuracies in the Complaint.[5] *See Green*, 696 F. Supp. 3d at 149 (crediting the BWC footage "to the extent it conflicts with the [Prior] Complaint, if at all"); *Thompson v. Badgujar*, No. 20-CV-1272-PWG, 2021 WL 3472130, at *3 (D. Md. Aug. 6, 2021) ("[W]hen, as here, a document or video is referenced as integral to the complaint, disputes between the allegations of the complaint and what is plain from the video are resolved in favor of the video.") (citing *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).

## V.    ANALYSIS

### A.  Counts I, II, IX, and X: Excessive Force and Violation of Due Process Rights

The Complaint asserts several constitutional claims for relief under 42 U.S.C. § 1983 and Article 24 of the Maryland Declaration of Rights based on allegations of excessive force.

Section 1983 provides a cause of action against a person who, acting under color of state law, subjects a person within the jurisdiction of the United States to the deprivation of federal rights. 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a 'person acting under the color of state law.'" *Gaines v. Baltimore Police Dep't*, 657 F. Supp. 3d 708, 748 (D. Md. 2023) (quoting *West v. Atkins*, 487 U.S. 42, 48

---

[5] *See* notes 2 and 3 *supra*.

(1988)). Liability under § 1983 attaches only upon personal participation by a defendant in a constitutional violation. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (dismissing claim for willful denial of medical care when plaintiff was unable to show that the official charged acted personally in the deprivation of rights); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) ("[L]iability is personal, based upon each defendant's own constitutional violations.").

In Counts I and II, Plaintiffs allege that the Officer Defendants and the AFD Defendants, while acting under color of state law, violated Mr. Green's rights to be free from excessive force and deprivations of life and liberty without due process of law under the Fourth and Fourteenth Amendments to the U.S. Constitution. Compl. ¶¶ 92 –113.

In Counts IX and X, Plaintiffs allege corresponding violations of Article 24 of the Maryland Declaration of Rights. *Id.* ¶¶ 194–213. Article 24 is commonly referred to as the "Maryland equivalent of the federal Due Process Clause." *Holloway-Johnson v. Beall*, 103 A.3d 720, 736 (Md. Ct. Spec. App. 2014), *aff'd in part, rev'd in part*, 130 A.3d 406 (Md. 2016). Generally, when claiming a Fourth Amendment violation, the state analogue a plaintiff should invoke is Article 26, which is read *in pari materia* with the Fourth Amendment. *Id.* at 737. However, "[w]hether an excessive force claim is brought under Article 24 or Article 26 . . . is a distinction without a difference." *Id.* Also, "[t]he fact that Maryland's excessive force law is read *in pari materia* with the federal analogue does not imply that an excessive force claim must be pursued solely under the Fourth Amendment." *Tremellen v. Leopre*, Civ. No. RBD-12-02900, 2013 WL 1867978, at *5 (D. Md. May 2, 2013). Plaintiffs commonly bring both state and federal claims of excessive force based on a single incident. *Id.*

### 1.    Excessive Force During Seizure

Excessive force claims brought under § 1983 are first examined by determining the "specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). Plaintiffs' excessive force claims are analyzed under the Fourth Amendment to the extent that the claims are based upon the apprehension and seizure of Mr. Green as a free citizen. *Id.* at 395.

"To state an excessive force claim under the Fourth Amendment, a plaintiff must show that he was seized and that the force used was objectively unreasonable." *Parson v. Miles,* 2018 U.S. Dist. LEXIS 50100, at *14 (D.S.C. Mar. 27, 2018) (citing *Graham,* 490 U.S. at 395), *quoted in Est. of Green*, 696 F. Supp. 3d at 154. A seizure occurs only when the government "by means of physical force or show of authority, … in some way restrain[s] the liberty of a citizen[.]" *Graham*, 490 U.S. at 395 n.10 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). Importantly, a seizure under the Fourth Amendment "is a single act, and not a continuous fact." *Riley v. Dorton*, 115 F.3d 1159, 1163 (4th Cir. 1997) (quoting *California v. Hodari D.*, 499 U.S. 621, 625 (1991)). "Once the single act of detaining an individual has been accomplished, the [Fourth] Amendment ceases to apply." *Robles v. Prince George's Cnty., Maryland*, 302 F.3d 262, 268 (4th Cir. 2002) (citing *Riley*, 115 F.3d at 1163).

Claims of excessive force in connection with an arrest are "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard," *Graham*, 490 U.S. at 388, which "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016) (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015)). Factors the court should consider include (1) "the

severity of the crime at issue;" (2) "the extent to which the suspect poses an immediate threat to the safety of the officers or others;" and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Armstrong*, 810 F.3d at 899 (quoting *Graham*, 490 U.S. at 396). "Ultimately, the question to be decided is 'whether the totality of the circumstances justifie[s] a particular sort of ... seizure.'" *Smith*, 781 F.3d at 101 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9, (1985)). The court must view the use of force "in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Armstrong*, 810 F.3d at 899 (quoting *Smith*, 781 F.3d at 101).

First, the Court finds that the seizure of Mr. Green occurred when, between 2:24 and 2:26 a.m., Officers Bodmer and Siminyuk placed handcuffs on Mr. Green's wrists, in an effort to place Mr. Green in protective custody. Plaintiffs do not contend that any constitutional violation occurred during this period. Compl. ¶ 45. To the extent that Plaintiffs contend that Mr. Green's seizure continued beyond 2:26 a.m., the Court disagrees. *See Robles*, 302 F.3d at 268. But if the seizure continued beyond 2:26 a.m., it certainly concluded by 2:30 a.m., when shackles were placed on Mr. Green's ankles. Ultimately, Plaintiffs fail to state a plausible claim that any seizure that occurred between 2:24 and 2:30 a.m. was unreasonable.

The Court now considers the *Graham* factors to assess the objective reasonableness of the Officer Defendants' conduct between 2:24 and 2:30 a.m. The first *Graham* factor—the severity of the crime at issue—weighs in Plaintiffs' favor. Although Mr. Green was injured from apparently self-inflicted wounds and may have been reasonably viewed as capable of violence,[6] Mr. Green

---

[6] The Court notes Plaintiffs' allegation that "[a]t no time was Mr. Green violent or threatening toward Ms. Naylor or any other individual. Compl. ¶ 41. The BWC footage disproves this allegation. Between 2:21 and 2:23 a.m., Mr. Green used his hands to hit and pull at Ms. Naylor's brother's leg while on the kitchen floor. Also, between 2:30 a.m. and 2:32 a.m., Mr. Green shouted, "I'll fuck you up, bitch!" multiple times after his ankles were shackled.

had not committed any serious crime at the time of his seizure. According to the Complaint, Ms. Naylor called 911 not because Mr. Green had committed any crime, but because she was "concern[ed] for her husband Mr. Green's safety." Compl. ¶ 40. Further, BWC footage shows that, while placing handcuffs on Mr. Green's wrists, Officer Defendants told Mr. Green that that he was not in trouble and that they were only trying to get him help.[7] Therefore, the first factor weighs "against the imposition of force." *Armstrong*, 810 F.3d at 901; *see also Green*, 696 F. Supp. 3d at 154–55.

The second *Graham* factor calls for consideration of whether Mr. Green posed an immediate threat to the safety of the officers or others. According to the Complaint, Mr. Green was "in a state of distress and PCP intoxication" and, upon arrival, Officers Bodmer and Woytko "observed Mr. Green in a delirious state, flailing his legs, yelling 'yeah bitch' repeatedly, and otherwise behaving erratically." Compl. ¶¶ 14, 42. The BWC footage shows that, for several minutes following their arrival, the officers repeatedly tried to communicate with Mr. Green, telling him to "relax," but he was generally unresponsive to these efforts.[8] Further, the footage shows that, at the time the Officers arrived at the home, Mr. Green was bleeding from his hand, blood was streaked on the floor and elsewhere, and Ms. Naylor's brother had his foot on Mr. Green to restrain him as Mr. Green flailed on the floor while hitting and pulling at the man's leg and stomping his feet. Mr. Green also shouted continuously both before and after being handcuffed and, at 2:30 a.m., shouted a violent threat. The Complaint alleges that Mr. Green was impaired by PCP during this encounter with law enforcement, *id.* ¶ 41, and the BWC footage shows that this fact was conveyed to the officers on the scene. The facts alleged in the Complaint, considered in

---

[7] *See* https://perma.cc/G5U7-HANW.

[8] *See id*

conjunction with the BWC footage,[9] demonstrates that Mr. Green was a danger to himself and others, and he posed an immediate threat to the safety of the officers and others, such that the use of force to restrain him was reasonable. Therefore, the second *Graham* factor weighs against any plausible finding of excessive force.

The third *Graham* factor calls for consideration of whether Mr. Green was actively resisting arrest or attempting to evade arrest by flight. Mr. Green continually resisted being placed into custody before, during, and after the seizure. Mr. Green flailed and swung his arms and kicked his legs until his arms were restrained by two linked pairs of handcuffs, and, thereafter, he continued flailing his legs, even after they too were shackled. Indeed, the officers struggled to place handcuffs on Mr. Green's wrists due to his resistance. It took about two minutes of moving Mr. Green around before handcuffing was completed. Throughout this period, Mr. Green was generally unresponsive to the Officer Defendants' efforts to calm him down verbally. Compl. ¶¶ 41, 42.[10] Therefore, the third *Graham* factor weighs against any plausible finding of excessive force.

The fourth *Graham* factor is "the proportionality of the force in light of all the[] circumstances." *Armstrong,* 810 F.3d at 902 (citation omitted). The Court considers and accepts as true the facts alleged in the Complaint to the extent that they are not contradicted by the BWC footage, *see* Part IV *supra*, but all reasonable inferences are drawn in Plaintiffs' favor, *see King*, 825 F.3d at 212. Considering all circumstances of Mr. Green's encounter with the Officer Defendants, the Court finds it implausible that the Officer Defendants applied disproportionate force at any point during Mr. Green's seizure between 2:20 a.m. and 2:30 a.m. Throughout this

---

[9] *See id.*

[10] *See id.*

period, Mr. Green continued to shout and flail his body on the kitchen floor. It is particularly clear from the BWC footage that the Officer Defendants applied no more force than necessary to place Mr. Green in handcuffs and in shackles and, generally, to keep him from harming himself and others. That use of force included Officers Bodmer and Woytko each applying their hands to Mr. Green's legs when he flailed and kicked; Officers Bodmer and Siminyuk handling Mr. Green's arms and rolling him onto his side and then onto his stomach so that he could be handcuffed; the same officers using their hands to hold Mr. Green in place, on his side, until he could be attended-to by AFD Defendants; and the officers finally moving his body in order to place shackles on his ankles. The fourth *Graham* factor weighs against any plausible finding of excessive force.

Balancing the *Graham* factors, the Court does not find a plausible claim that the Officer Defendants effected an unreasonable seizure of Mr. Green or otherwise violated the Fourth Amendment. *See Lawhon v. Edwards*, 477 F. Supp. 3d 428, 434, 448 (E.D. Va. 2020), *aff'd sub nom. Lawhon v. Mayes*, No. 20-1906, 2021 WL 5294931 (4th Cir. Nov. 15, 2021) (finding the force used to initially seize decedent non-excessive where officer grabbed decedent and "threw him to the ground, forcing him into the prone position face down into a pillow," while the officer "secured [the decedent's] hands behind his back with handcuffs"). Accordingly, any such claim in Count I of the Complaint is dismissed.

## 2.    Excessive Force While in Custody

The question of excessive force following completion of a seizure and while in government custody is assessed under the Due Process Clause of the Fourteenth Amendment. *Riley*, 115 F.3d at 1166. The Due Process Clause "protects pretrial detainees from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.'" *Short v. Hartman*, 87 F. 4th 593, 608–09 (4th Cir. 2023)

(quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)). To prevail on a claim of excessive force in the context of pretrial detention,[11] a plaintiff must generally show that "the use of force is deliberate—*i.e.*, purposeful or knowing"—and "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396–97; *see also Dilworth v. Adams,* 841 F.3d 246, 255 (4th Cir. 2016). Objective reasonableness "turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham*, 490 U.S. at 396). The court must "make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* at 397. In *Kingsley*, the Supreme Court provided a non-exclusive list of circumstances to consider that "may bear" on the objective reasonableness of the force used in this context: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* The Due Process Clause also protects pretrial detainees "from the use of excessive force that amounts to punishment[,]" *Kingsley*, 576 U.S. at 397–98 (quoting *Graham*, 490 U.S. at 395, n. 10), which may consist of "actions taken with an 'expressed intent to punish[,]'" *id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)).

In the instant Complaint, Plaintiffs allege that, beginning at 2:34 a.m., following Mr. Green's seizure, the AFD and Officer Defendants "unlawfully deprived Mr. Green of his rights to life, liberty, personal security, dignity, and bodily integrity, and the right to be free from physical abuse and excessive force" when they "forcibly" restrained Mr. Green by strapping him "in a face-

---

[11] Persons who are not under arrest but are taken into involuntary custody by the government are "owed . . . the same duties owed to a more typical pretrial detainee." *Young v. City of Mount Ranier*, 238 F.3d 567, 575 n.5 (4th Cir. 2001).

down position to two stretchers . . . ." Compl. ¶ 96. Plaintiffs claim that these defendants "had no need to apply force to Mr. Green by restraining him (manually and through the use of tight straps) in a face-down position from 2:34–2:45 AM on June 1, 2021." *Id.* ¶ 104. Further, Plaintiffs allege, these defendants' actions "directly and proximately resulted in Mr. Green's death, was not applied in good faith, and amounted to unconscionable pretrial punishment." *Id.* They characterize the defendants' actions as grossly disproportionate and "unconstitutionally arbitrary[,]" as well as "brutal and offensive to human dignity." *Id.* Additionally, Plaintiffs allege that Defendants' conduct ran afoul of the "minimal constitutional standards reflected in the MIEMSS Protocols."[12] *Id.* ¶ 96.

### a. *Kingsley* Factors

The Court now assesses the objective reasonableness of AFD and Officer Defendants' conduct after 2:30 a.m. under the *Kingsley* factors. Between 2:30 and 2:34 a.m., Officer Defendants kept Mr. Green on his side while he was handcuffed and shackled as he continued to move his legs and torso on the kitchen floor, while shouting "yeah bitch" and a violent threat.[13] Compl. ¶¶ 46–49. Meanwhile, AFD Defendants spread a white sheet next to Mr. Green so that he could be lifted to a nearby portable stretcher. *Id.* ¶ 50. By this point, AFD Defendants were directing the officers' actions. The Court also notes that Officer Woytko did not touch Mr. Green

---

[12] The MIEMSS protocols are described in the Complaint as regulations applicable to the work of emergency responders. Compl. ¶ 5. Plaintiffs do not allege that these protocols apply to the Officer Defendants. Further, Plaintiffs do not cite any authority for their legal conclusion that these protocols set "minimal constitutional standards." *Id.* ¶ 96. To the contrary, "a failure to follow directives or regulations does not, in and of itself, amount to a constitutional violation." *McClellan v. Monyei*, Civ. No. PWG-17-3307, 2019 WL 859217, at *6 (D. Md. Feb. 21, 2019) (citing *Roberts v. City of Troy*, 773 F.2d 720, 726 (6th Cir. 1985)); *cf. Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."), *quoted in Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 546 (4th Cir. 2017).

[13] *See* https://perma.cc/G5U7-HANW.

at any point after AFD Defendants arrived. At approximately 2:35 a.m., AFD and Officer Defendants rolled Mr. Green forward and face-down onto the sheet and then, using the sheet, lifted him on the stretcher a few feet away. AFD Defendants then strapped Mr. Green to the stretcher, while Sgt. Cochran's right hand was placed on Mr. Green's left shoulder. *Id.* ¶¶ 55–57.

Once Mr. Green was secured to the stretcher, none of the Officer Defendants appeared to have touched him again, much less applied any appreciable force. It is clear from the BWC footage that any actions Officer Defendants took in relation to Mr. Green after 2:34 a.m. were at the direction of AFD Defendants and none involved any use of force that was disproportionate to the need of securing Mr. Green to the portable stretcher.[14] The Officer Defendants were entitled to rely upon the direction and medical expertise of the AFD Defendants during this time. *See, e.g.*, *Dorsey v. Dep't of Pub. Safety & Corr. Servs.*, Civ. No. TDC-14-2568, 2016 WL 1239922, at *6 (D. Md. Mar. 24, 2016) (custodial officials generally may rely on the expertise of medical personnel); *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995) (contravening instructions of medical personnel may result in liability for interfering with treatment). Thus, the Court finds that the Complaint fails to state a plausible claim that the Officer Defendants are liable for any due process violation based on excessive force after Mr. Green's initial seizure.

Turning to the AFD Defendants, their conduct between 2:34 and 2:45 a.m. included lifting Mr. Green onto the portable stretcher, securing him to the stretcher using straps, carrying him on the stretcher outside the residence, placing the portable stretcher onto a rolling stretcher, securing Mr. Green to the rolling stretcher, rolling the stretcher to the EMS vehicle, loading it onto the

---

[14] Plaintiffs' allegation that Sgt. Cochran "forcibly held" Mr. Green face down while he was strapped to the portable stretcher is belied by the BWC footage. Sgt. Cochran had the fingertips of his right hand on Mr. Green's left shoulder while AFD Defendants were applying straps, but it is clear from the BWC footage that he was not applying any substantial force to Mr. Green's shoulder or back. *See* https://perma.cc/G5U7-HANW.

vehicle, and then rendering medical attention to Mr. Green on the vehicle.[15] Compl. ¶¶ 55–68. Mr. Green remained in a face-down position during most of this period, as his hands were cuffed at his back. The need to secure Mr. Green first to the portable stretcher and then to the rolling stretcher is obvious. Mr. Green was in a delirious mental state, in constant movement, and uncooperative with efforts to restrain him so that he could receive medical aid. The force used in applying straps was no greater than necessary to secure Mr. Green to each stretcher. Plaintiffs suggest in the Complaint that the straps were unnecessarily or unreasonably tight, but the BWC footage shows that the straps used on Mr. Green's torso were loose enough for him to lift his upper torso upward multiple times while strapped to the rolling stretcher.[16] In sum, there is no plausible claim that, in applying straps, any AFD Defendant used force that was disproportionate to the obvious need to secure Mr. Green to the stretchers.[17]

Turning next to "the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting[,]" *Kingsley*, 576 U.S. at 397, Mr. Green presented a significant security problem by kicking his legs, flailing his torso, shouting violent threats ("I'll fuck you up, bitch!"), and generally resisting efforts to calm him down verbally and restrain him physically. All of this conduct occurred in the presence of both the AFD and Officer Defendants and underscored the need to secure Mr. Green to a stretcher in order to transport him safely and attend to his medical needs.

---

[15] *See* https://perma.cc/G5U7-HANW.

[16] *See id.*

[17] Plaintiffs' suggestion in paragraphs 54 and 62 of the Complaint that defendants applied pressure to Mr. Green's back or used brute force to put him face down is not consistent with the BWC footage. *See* https://perma.cc/G5U7-HANW.

Considering "the extent of the plaintiff's injury[,]" 576 U.S. at 397, here, the defendants' conduct is alleged to have resulted in Mr. Green's death. No injury could be more severe. While this factor, standing in isolation, weighs in favor of finding excessive force, all other *Kingsley* factors demonstrate the need and proportionality of the defendants' conduct and weigh against a plausible finding that the use of force by any AFD or Officer Defendant was objectively unreasonable.

In sum, the BWC footage and well-pleaded facts alleged in the Complaint fail to demonstrate any action by any AFD or Officer Defendant that was not "rationally related" to the "legitimate nonpunitive governmental purpose" of securing Mr. Green for purposes of transporting him and rendering him medical aid. *Short*, 87 F. 4th at 608–09. Moreover, Plaintiffs fail to present facts to support any reasonable inference that any AFD or Officer Defendant intended to punish him. *Kingsley*, 576 U.S. at 397–98.

However, even assuming that the AFD Defendants' conduct in keeping Mr. Green in a prone, face-down position for approximately ten to eleven minutes violated his due process rights, the Court finds that the AFD Defendants are entitled to qualified immunity.

### b. Qualified Immunity

In their Motion to Dismiss, Defendants assert qualified immunity as a defense to Plaintiffs' excessive force claims. Def. Mem. at 45–51; Def. Reply at 32–37. The Supreme Court has "emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The doctrine of qualified immunity "bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and

(2) the unlawfulness of their conduct was clearly established at the time.'" *Barrett v. Pae Gov't Servs., Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) (quoting *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018)). Only one of these questions must be resolved in favor of the official for qualified immunity to apply. So, "even if a court finds or assumes that a government official violated an individual's constitutional rights, the official is entitled to immunity so long as the official did not violate clearly established law." *Id.* at 429.

The qualified immunity inquiry begins by "determining 'the precise right' at issue." *Tarashuk v. Givens*, 53 F.4th 154, 163 (4th Cir. 2022). In the Complaint, Plaintiffs assert that Mr. Green had "clearly established rights to personal security, liberty, dignity, and bodily integrity." Compl. ¶¶ 87, 93. The Complaint also asserts a right "to be free from physical abuse and excessive force at the hands of state actors[]" that applied to Defendants' conduct beginning at 2:34 a.m. *Id.* ¶ 96. While the second formulation of the relevant right is more specific than the first, both are "far too general[]" for a proper qualified immunity analysis. *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 43 (2019) (finding the "right to be free of excessive force" to be "far too general[]"). "[T]he clearly established right must be defined with specificity[]" and not "at a high level of generality." *Id.* at 42 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). The Court finds the "the precise right at issue" in Plaintiffs' excessive force claims, as they relate to the conduct of the AFD Defendants, is a right to be free from being strapped in a prone position to a stretcher while being medically transported. It is this conduct by the AFD Defendants that Plaintiffs allege to constitute excessive force. *See, e.g.*, Compl. ¶ 104.[18]

---

[18] Plaintiffs also allege that Mr. Green was restrained manually during this period, but the BWC footage shows that no Defendant used their hands to restrain Mr. Green in a face-down position between 2:34 a.m. and 2:45 a.m., their period in question. Sgt. Cochran had his fingertips on Mr. Green's shoulder while he was being strapped to the portable stretcher, but this occurred for less than one minute, and it is obvious from the BWC footage that he was not applying any substantial pressure to Mr. Green to keep him face down. This physical contact between Sgt. Cochran's hand and Mr. Green's shoulder was minimal.

"To determine if the right in question was clearly established," courts in the Fourth Circuit "first look to cases from the Supreme Court, [the Fourth Circuit] Court of Appeals, or the highest court of the state in which the action arose." *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 98 (4th Cir. 2017). "In the absence of 'directly on-point, binding authority,' courts may also consider whether 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" *Id.* (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017)).

The right to be free from the use of straps on a stretcher in the way they were used in this case was not clearly established at the time of the incident on July 1, 2019. Plaintiffs do not cite any binding authority recognizing any such right. *See* Pl. Opp'n at 45-47. And a review of case law outside the circuit involving similar facts shows that the right at issue here was not clearly established.

The Court finds the Ninth Circuit case *Perez v. City of Fresno*, 98 F.4th 919 (9th Cir. 2024), to be factually and legally similar enough to the instant case warrant consideration. In 2017, law enforcement in Fresno, California encountered Perez while he was screaming, running, and acting erratically on a public street. *Perez*, 98 F.4th at 922. Believing Perez to be under the influence of drugs, the officers placed him handcuffs and eventually called EMS to facilitate an involuntary psychiatric detention. *Id.* When Perez failed to cooperate with the officers while waiting for EMS to arrive, they used force to take him to the ground, causing injuries in the process. *Id.* When EMS arrived, a paramedic, Anderson, decided that Perez should be placed prone on a backboard "so that he could be medically transported." *Id.* at 923. It took several minutes to secure Perez to the backboard, during which time he remained prone and stated he could not breathe while several officers applied pressure to his body. *Id.* When Perez was eventually turned over and placed on his

back, "the paramedics discovered that he did not have a pulse." *Id.* The paramedics transported him to the hospital, where he was pronounced dead. *Id.* The decedent's family asserted claims against the City of Fresno, police officers, sheriff deputies, and an ambulance service alleging federal and state civil rights violations and state-law tort claims. *Id.* The district court granted summary judgment in favor of the defendants, finding, in part, that the defendant officers and paramedic were entitled to qualified immunity. *Id.* at 923–24. The plaintiffs appealed. *Id.* at 924.

The Ninth Circuit declined to address whether the paramedic's conduct amounted to a constitutional violation but concluded that the right at issue was not clearly established. *Id.* at 928. Specifically, "the law did not clearly establish at the time of the events at issue that a paramedic restraining a person in order to secure the person for medical transport could be held liable for a constitutional violation under either the Fourth or Fourteenth Amendment." *Id.* The court noted that "there are few cases applying Fourth and Fourteenth Amendment standards to paramedics responding to medical emergencies[,]" and the court found no binding precedent "establishing constitutional liability under similar circumstances." *Id.*

Finding relevant case law outside the circuit, the court noted, first, the Sixth Circuit's decision in *McKenna v. Edgell*, holding that the conduct of a paramedic "acting in a medical capacity . . . properly sounds in medical malpractice[,]" not in a § 1983 action. *Id.* at 929 (citing *McKenna*, 617 F.3d 432, 440 (6th Cir. 2010).

The *Perez* court next noted the Sixth Circuit's decision in *Peete v. Metro. Gov't of Nashville & Davidson County*, where that court "reversed the denial of qualified immunity for paramedics who restrained and applied pressure to an unconscious patient in a prone position, thereby causing the patient's death." *Id.* (citing *Peete*, 486 F.3d 217, 220 (6th Cir. 2007)). In *Peete*, the defendants responded to an emergency call requesting medical attention for an epileptic seizure suffered by

the decedent. 486 F.3d at 219–20. The defendants restrained the decedent "by using their bodies to apply weight and pressure to [the decedent's] head, neck, shoulders, arms, torso and legs in an attempt to prevent the decedent from moving[;]" and then tying the decedent's "hands and ankles behind his back and continu[ing] to apply pressure to [the decedent] while he was in a prone position." *Id.* at 220. Further, the defendants "did not take any precautions to ensure that [the decedent] had a clear passage to breathe[.]" *Id.* The decedent died "shortly after being restrained . . . ." *Id*. The Sixth Circuit held, based on these allegations, that the defendant paramedics' conduct did not amount to a violation of any clearly established constitutional right. *Id.* at 220–22.

Next, the *Perez* Court examined the Seventh Circuit's decision *Thompson v. Cope*, where that court "granted qualified immunity to a paramedic who sedated an injured arrestee before taking the arrestee to the hospital because it was not clearly established that such conduct violates the Fourth Amendment." *Perez*, 98 F.4th at 929 (citing *Thompson*, 900 F.3d 414, 422–24 (7th Cir. 2018)). The *Perez* court also examined the Eighth Circuit's decision in *Buckley v. Hennepin County*, where the court held that paramedics responding to an emergency call were "acting in a medical capacity" when they restrained the plaintiff and injected her with a sedative after she refused to be transported to the hospital. *Perez*, 98 F.4th at 929-30 (citing *Buckley*, 9 F.4th 757, 759-61 (8th Cir. 2021)). In a decision issued a few weeks after the incident at issue in the instant case, the Eighth Circuit affirmed dismissal of the plaintiff's excessive force and due process claims against the paramedics. *Buckley*, 9 F.4th at 761–64.

Ultimately, in *Perez*, the Ninth Circuit held that the paramedic defendant "act[ed] in a medical capacity" during the incident at issue and was "entitled to qualified immunity." *Perez*, 98 F.4th at 931.

It is clear from the Ninth Circuit's review of the relevant out-of-circuit case law that Mr. Green's asserted right to be free of prone restraint in the manner conducted by the Defendants in this case was not clearly established at the time of the incident. Indeed, the conduct at issue in *Perez* and *Peete* substantially exceeded the amount of force alleged in the instant case, and the courts in each of those cases found either the lack of a constitutional violation or entitlement to qualified immunity. Accordingly, AFD Defendants are entitled to qualified immunity from Plaintiffs' excessive force claims in Counts I, II, IX, and X.

Accordingly, Counts I, II, IX, and X are dismissed.[19]

### B. Counts III and IV: *Monell* Liability

Counts III and IV of the Complaint assert *Monell* claims against the City of Annapolis under 42 U.S.C. § 1983. Compl. ¶¶ 114–40. Specifically, Plaintiffs allege that the City is "obligated…to train and supervise its emergency responder employees, officers, agents, ostensible agents, and/or volunteers, in the constitutional parameters of restraining a subject who is experiencing a medical emergency to ensure that the constitutional rights of citizens are not violated." *Id.* ¶ 115. Further, Plaintiffs allege that, at the time of the emergency response incident at issue in this case, the City had "unconstitutional policies" that resulted in a failure to train emergency response personnel and permitted the use of face-down restraint of persons in custody, and the City had no policy prohibiting the restraint of individuals in a face-down position. *Id*. ¶¶ 118–20. According to the Complaint, the City's policies and practices, or lack thereof, caused injuries to Mr. Green that resulted in his death. *Id*. ¶¶ 134–35.

---

[19] Plaintiffs argue in their opposition brief that they pleaded claims for a violation of Mr. Green's liberty interest in bodily integrity, Pl. Opp'n at 20, but they do not articulate any basis, or cite any supporting legal authority, for asserting any such claim that is distinct from their excessive force claims. Notably, Plaintiffs here do not claim that either Ms. Naylor or Mr. Green refused AFD Defendants' medical assistance.

A municipality may be liable for a deprivation of federal rights "[o]nly in cases where [it] causes the deprivation 'through an official policy or custom' . . . ." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citation omitted); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("[In § 1983], Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."). "[A] viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights." *Green v. Obsu*, Civ. No. ELH-19-2068, 2020 WL 758141, at *10 (D. Md. Feb. 13, 2020) (citations omitted). To prevail on a *Monell* claim, a plaintiff must "adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). "To hold a municipality (a local government entity) liable for a constitutional violation under § 1983, the plaintiff must show that the execution of a policy or custom of the municipality caused the violation." *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Thus, "a *Monell* claim cannot lie 'where there is no underlying constitutional violation by the employee.'" *Johnson v. Baltimore Police Dep't*, 500 F. Supp. 3d 454, 459–60 (D. Md. 2020) (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001)).

Plaintiffs fail to state a plausible *Monell* claim against the City because (1) they do not state a plausible claim that Mr. Green's federal rights were violated by the conduct of any individual municipal employee, and (2) they do not allege sufficient facts to support a reasonable inference that the City had any policy or custom that caused any individual employee to act in a way that violated Mr. Green's federal rights. Accordingly, Counts III and IV are dismissed. *See Green*, 696 F. Supp. 3d at 162 (dismissing *Monell* claims in Prior Complaint).

28

### C. Counts V and VI: 42 U.S.C. § 1985(3) Conspiracy to Deprive Constitutional Rights and § 1983 Failure to Intervene

Counts V and VI of the Complaint assert claims against the AFD and Officer Defendants for conspiracy to deprive constitutional rights and failure to intervene under 42 U.S.C. §§ 1985 and 1983, respectively. Compl. ¶¶ 141–60.

#### 1.   Conspiracy to Deprive Constitutional Rights

Plaintiffs allege that "AFD and Officer Defendants, by their concerted actions, conspired, confederated, and agreed to violate Mr. Green's constitutional rights . . . [by] restraining and strapping Mr. Green to two stretchers simultaneously in a face-down position" or, alternatively, by "acquiescing" to such actions. Compl. ¶¶ 144, 146.

Section 1985(3) "permits an individual to bring a civil action for damages based on a conspiracy to deprive a plaintiff of her civil rights." *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 528 (4th Cir. 2025) (citing 42 U.S.C. § 1985(3)). To state a claim for conspiracy to deprive constitutional rights under § 1985, a plaintiff must "show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights." *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995). More specifically, a § 1985(3) conspiracy claim requires "(1) a conspiracy of two or more persons (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive plaintiff of equal enjoyment of rights under the law to all (4) and which results in injury to the plaintiff as (5) a consequence of any overt act committed by the Defendants." *Id.* A § 1985 claim may be dismissed where a plaintiff fails to plead "with any specificity the persons who agreed to the alleged conspiracy, the specific communications amongst the conspirators, or the manner in which any such communications were made." *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011). Section 1985

claims are subject to dismissal "whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Simmons*, 47 F.3d at 1377.

Here, Plaintiffs do not allege sufficient facts to raise above the speculative level that there existed among the AFD and Officer Defendants any "specific class-based, insidiously discriminatory animus" or conspiracy to deprive Mr. Green of his rights. *Simmons*, 47 F.3d at 1377. Plaintiffs allege that Mr. Green was African American and suffering from a mental health disturbance, these facts were known to the AFD and Officer Defendants, and that these defendants witnessed each other's acts, which, Plaintiffs allege, unlawfully deprived Mr. Green of this rights. But these allegations do not suffice to make a plausible claim of a discriminatory animus or any agreement or "meeting of the minds" motivated by one. *Id.* Accordingly, Plaintiffs' § 1985 conspiracy claims in Counts V and VI must be dismissed. *See Green*, 696 F. Supp. 3d at 163 (dismissing § 1985 conspiracy claims in Prior Complaint).

### 2. Failure to Intervene

In Counts V and VI, Plaintiffs also assert claims against the AFD and Officer Defendants under § 1983 for their failure to intervene in alleged use of excessive force that Plaintiffs contend violated Mr. Green's federal rights. As noted in Part V.A *supra*, "[t]o state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a 'person acting under the color of state law.'" *Gaines*, 2023 WL 2185779, at *23. Under § 1983 "[a]n officer may only be held liable under a bystander liability theory in connection with a constitutional violation where the officer knows that a fellow officer is violating an individual's rights, has a reasonable opportunity to prevent the violation, and chooses not to intervene." *Quinn v. Zerkle*, 111 F.4th 281, 295 (4th Cir. 2024) (citing *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 203 (4th Cir. 2002)). As

explained in Part V.A *supra*, Plaintiffs fail to state a plausible claim that any AFD or Officer Defendants violated Mr. Green's constitutional rights through use of excessive force against him. Accordingly, Plaintiffs' failure-to-intervene claims in Counts V and VI fail and must be dismissed. *See Green*, 696 F. Supp. 3d at 164 (dismissing § 1983 failure-to-intervene claims in Prior Complaint).

### D. Counts VII and VIII: 42 U.S.C. § 1983 Deliberate Indifference to Serious Medical Needs

Counts VII and VIII of the Complaint assert constitutional claims against all Defendants for deliberate indifference to serious medical needs under 42 U.S.C. § 1983 and the Fourteenth Amendment. Compl. ¶¶ 161–93. Plaintiffs allege that, with regards to the way Mr. Green was restrained, "Officer Defendants treated Mr. Green as a combative criminal suspect instead of treating him as a person requiring immediate medical care." Compl. ¶¶ 171–72. Further, Plaintiffs allege that Officer Bodmer helped AFD Defendants transfer Mr. Green on the stretcher, and that Officers Woytko, Siminyuk, and Cochran "observed Mr. Green being strapped down onto two stretchers simultaneously in a face-down position with handcuffs behind his back but did not intervene" to prevent AFD Defendants from doing so. *Id.* ¶¶ 174–77. Further, Plaintiffs allege that Officer Defendants "disregarded Mr. Green's incapacitated psychiatric and emotional state by handcuffing his wrists behind his back and shackling his ankles . . . and then . . . failing to intervene when Mr. Green was restrained in a face-down position on a stretcher." *Id.* ¶ 178. Further, Plaintiffs allege that AFD Defendants "disregarded Mr. Green's incapacitated psychiatric and emotional state . . . by leaving him handcuffed and shackled in a face-down position" while on the stretcher. *Id.* ¶ 180.

A pretrial detainee may assert a claim against government officials "for deliberate indifference to a medical need" under the Due Process Clause of the Fourteenth Amendment. *See Short*, 87 F. 4th at 611. To state such a claim for relief, a detainee must allege that

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Id.* It is "not enough for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee." *Id.* at 611–12; *see also Stevens v. Holler*, 68 F.4th 921, 931 (4th Cir. 2023) ("[T]he mere negligent or inadvertent failure to provide adequate care is not enough."). The plaintiff need not show "that the defendant had actual knowledge of [his] serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." *Short*, 87 F. 4th at 611. But "the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly." *Id.* "[I]t is enough that the plaintiff show that the defendant acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). Thus, when asserted by a pretrial detainee, a claim of deliberate indifference to medical needs is assessed under a "purely objective" standard. *Id.*

### 1. Deliberate Indifference Claim Against the City

To start, the instant Complaint lodges deliberate indifference claims against all Defendants, including the City of Annapolis. Compl. at 34. As Judge Rubin held in the Prior Action, these claims are improperly lodged against the City because *respondeat superior* principles have no place in § 1983's framework or application. *See Green*, 696 F. Supp. 3d at 164 ("Municipalities

are not liable under *respondeat superior* principles for all constitutional violations of their employees simply because of the employment relationship.") (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987) (citing *Monell*, 436 U.S. at 692–94)). Accordingly, the claims in Counts VII and VIII against the City are dismissed.

### 2.  Deliberate Indifference Claims Against the Officer Defendants

With respect to the Officer Defendants, the Complaint, considered in conjunction with the BWC footage, does not set forth sufficient facts to allege plausibly that any Officer Defendant "knew or should have known" that their actions or failure to act "posed an unjustifiably high risk of harm" to Mr. Green. *Short*, 87 F. 4th at 611. First, Plaintiffs allegation that "Officer Defendants treated Mr. Green as a combative criminal suspect" is belied both by other allegations in the Complaint and by the BWC footage. Instead, by placing Mr. Green in protective custody, Officer Defendants' actions were fully consistent with an effort Mr. Green safe while ensuring the safety of others until he could receive medical attention.[20] Mr. Green obviously presented a significant mental disturbance while shouting and flailing on the floor of his kitchen and suffering from self-inflicted lacerations. Apart from placing Mr. Green in handcuffs and shackles for purposes of protective custody, the Officer Defendants consistently sought to keep Mr. Green on his side. During this time, Mr. Green did not exhibit any obvious signs that the Officer Defendants' conduct harmed him or "posed an unjustifiably high risk of harm" to him. *Short*, 87 F. 4th at 611. The AFD Defendants arrived within a few minutes to provide medical attention and, from that point, any conduct of the Officer Defendants in relation to Mr. Green was done at the AFD Defendants' direction. The Officer Defendants were entitled to rely upon the medical expertise of the paramedics. *See Dorsey*, 2016 WL 1239922, at *6 (custodial officials generally may rely on the

---

[20] *See* https://perma.cc/E8CW-35CP.

expertise of medical personnel); *Shakka*, 71 F.3d 162, 167 (contravening instructions of medical personnel may result in liability for interfering with treatment). Accordingly, Plaintiffs fail to state a plausible claim against any Officer Defendant for deliberate indifference to serious medical needs. The claims against the Officer Defendants in Counts VII and VIII must be dismissed.

### 3. Deliberate Indifference Claims Against the AFD Defendants

#### a. The AFD Defendants' Actions

AFD Defendants' conduct, as alleged in the instant Complaint and shown in the BWC footage, was entirely consistent with an effort to transport Mr. Green safely from his residence to the EMS vehicle outside and render emergency medical aid.[21] First, at about 2:35 a.m., AFD Defendants momentarily moved Mr. Green from the kitchen floor to the portable stretcher using a sheet. Then, at around 2:36 a.m., they strapped Mr. Green to the portable stretcher, ensuring that he would not fall out of it. Mr. Green was in a face-down position at the time. The AFD Defendants next promptly carried Mr. Green in the portable stretcher to a rolling stretcher outside the residence and strapped him to that stretcher, which would secure him while in transit. Then, the AFD Defendants promptly rolled Mr. Green to the EMS vehicle nearby. In total, it took approximately five minutes for the AFD Defendants to remove Mr. Green from his residence and lift him into the EMS vehicle on the rolling stretcher. Throughout this period, Mr. Green was in a face-down position but continued to shout and move his body. While these were continued signs of his mental disturbance, they were not obvious signs that that the AFD Defendants' conduct harmed him or "posed an unjustifiably high risk of harm" to him. *Short*, 87 F. 4th at 611. And straps on the rolling stretcher were loose enough that Mr. Green could push his upper torso upward while restrained.

---

[21] *See id.*

34

Thus, no action or failure to act by any AFD Defendant during this period plausibly constituted deliberate indifference under *Short*'s objective standard.

Once Mr. Green was on the EMS vehicle, he became unresponsive at around 2:41 a.m.[22] Ms. Weiss initially expressed a belief that Mr. Green had fallen asleep but acted promptly and began to check Mr. Green's airway at around 2:42 a.m. AFD Defendants began repositioning Mr. Green at 2:44 a.m. Mr. Green's handcuffs had to be removed to permit turning him onto his back. Once Mr. Green was repositioned, AFD Defendants promptly began administering CPR at about 2:48 a.m. In sum, the AFD Defendants responded promptly to the first obvious sign that their care may be placing Mr. Green at a risk of harm. Plaintiffs fail to state a plausible claim that, during this period, any AFD Defendant "knew or should have known" that their actions or failure to act "posed an unjustifiably high risk of harm" to Mr. Green. *Short*, 87 F. 4th at 611.

### b. Qualified Immunity

To the extent that the AFD Defendants maintaining Mr. Green in a prone, face-down position between 2:35 and 2:45 a.m. constituted deliberate indifference in violation of the Fourteenth Amendment, the Court finds that they are entitled to qualified immunity from Plaintiffs' deliberate indifference claims. As noted in Part V.A.2.b *supra*, Defendants' motion asserts qualified immunity as a defense to Plaintiffs' constitutional claims, Def. Mem. at 45–51, and questions of qualified immunity "should be resolved at the earliest possible stage of a litigation[,]" *Anderson*, 483 U.S. at 646 n.6.

The qualified immunity inquiry begins by "determining 'the precise right' at issue. *Tarashuk*, 53 F.4th at 163. In the Complaint, Plaintiffs assert that Mr. Green had "clearly established rights to personal security, liberty, dignity, and bodily integrity." Compl. ¶¶ 87, 162.

---

[22] *See id.*

The Court finds these rights, as articulated by Plaintiffs, to be defined at too high a "level of generality" to fit a proper qualified immunity analysis. *Emmons*, 586 U.S. at 43. But the Complaint also asserts a right "to receive constitutionally adequate medical care incident to an arrest and while in custody[.]" Compl. ¶ 163. The Fourth Circuit has held "a pretrial detainee's right to adequate medical care and freedom from deliberate indifference to their serious medical needs[]" to be defined in "sufficiently precise[]" terms. *Tarashuk*, 53 F.4th at 163. The Court accepts this definition of the right at issue in Plaintiffs' deliberate indifference claims.

Having defined the right at issue, the Court proceeds to "determine whether the law at the time of the challenged conduct was 'sufficiently clear [such] that every reasonable official would understand that what he is doing violates that right.'" *Id.* at 164 (quoting *Halcomb v. Ravenell*, 992 F.3d 316, 320 (4th Cir. 2021)). For the relevant legal principle to have been "clearly established," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). To make this determination, as noted *supra*, courts in the Fourth Circuit "look to cases from the Supreme Court, [the Fourth Circuit] Court of Appeals, or the highest court of the state in which the action arose." *Thompson*, 878 F.3d at 98 (citation omitted). "In the absence of 'directly on-point, binding authority,' courts may also consider whether 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" *Id.* (quoting *Booker*, 855 F.3d at 543).

On July 1, 2019—when the alleged violations in this case occurred—a detainee's due process right to adequate medical care and to be free from deliberate indifference to serious medical needs was clearly established. *See Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001); *Grayson v. Peed,* 195 F.3d 692, 695 (4th Cir. 1999); *Belcher v. Oliver,* 898 F.2d 32, 34 (4th Cir. 1990). The deliberate indifference standard applicable to persons in non-punitive

custody at the time "requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." *Young*, 238 F.3d at 575-76. "Deliberate indifference is a high bar." *Koon v. North Carolina*, 50 F.4th 398, 407 (4th Cir. 2022). "In general, good-faith efforts to remedy the plaintiff's problems will prevent finding deliberate indifference, absent extraordinary circumstances." *Id.* (citing *S.B. ex rel. A.L. v. Bd. of Educ.*, 819 F.3d 69, 77 (4th Cir. 2016); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); and *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)). In *Koon*, the Fourth Circuit stated, "Where medical personnel examine and diagnose a patient, where they try to help but fail to live up expectations, that is more naturally described as negligence than indifference." *Id.* (citing *Scinto v. Stansberry*, 841 F.3d 219 (4th Cir. 2016)).

Here, Plaintiffs cite no authority binding in this jurisdiction to support their claim that any AFD Defendant unconstitutionally acted or failed to act while Mr. Green was in their care. The AFD Defendants' conduct as depicted in the BWC footage and alleged in the Complaint, *see* Part V.D.3.a *supra*, is inconsistent with deliberate indifference to Mr. Green's medical needs.[23] Plaintiffs do not cite, and this Court is not aware, of any precedent of the Supreme Court, the Fourth Circuit, or the Maryland Supreme Court to suggest that paramedic violates a patient's right to adequate medical care by restraining him in a face-down position. And, as examined in Part V.A.2.b *supra*, the state of case law outside this circuit did not clearly establish that emergency medical personnel may run afoul of a patient's constitutional rights for restraining a patient in a

---

[23] The Court notes Plaintiffs' allegations that the AFD Defendants used "brute physical force to subdue Mr. Green in a face-down position," Compl. ¶ 54, and "various EMTs applied pressure to Mr. Green's back[]" while he "was being wheeled into the ambulance," *id.* ¶ 62. At no point before or while Mr. Green was transported to the EMS vehicle did any AFD Defendant apply any force to Mr. Green apart from strapping him to stretchers. *See* https://perma.cc/E8CW-35CP. And the straps were not so tight as to impose any more pressure on Mr. Green's back than necessary to secure him to the stretchers. *Id.* Indeed, Mr. Green lifted his upper torso up several times while strapped. *Id.*

prone position or, more generally, errors in medical judgment. See *Perez*, 98 F.4th at 928–31 ("[T]he law did not clearly establish at the time of the events at issue that a paramedic restraining a person in order to secure the person for medical transport could be held liable for a constitutional violation under either the Fourth or Fourteenth Amendment."); *McKenna*, 617 F.3d at 440 (wrongful conduct of a paramedic acting in a medical capacity generally does not give rise to § 1983 liability); *Peete*, 486 F.3d at 220 (reversing denial of qualified immunity for paramedics who restrained and applied pressure to an unconscious patient in a prone position, thereby causing the patient's death); *Thompson*, 900 F.3d at 422–24 (granting qualified immunity to paramedic who involuntarily sedated arrestee before taking her to the hospital).[24] Therefore, it cannot be said that a reasonable paramedic in any AFD Defendant's position would understand that their conduct violated Mr. Green's constitutional rights.

Accordingly Counts VII and VIII are dismissed as to the AFD Defendants.

### E. Counts XV and XVI: Gross Negligence

In Counts XV and XVI of the instant Complaint, Plaintiffs assert claims of gross negligence against all Defendants. Compl. ¶¶ 239–50. Specifically, Plaintiffs allege that Defendants' conduct in restraining Mr. Green was "intentional, willful, and wanton misconduct with reckless disregard for the consequences to Mr. Green." Compl. ¶ 241.

Under Maryland law, gross negligence is considered "something *more* than simple negligence, and likely more akin to reckless conduct." *Barbre v. Pope*, 935 A.2d 699, 717 (2007) (citing *Taylor v. Harford County Dep't of Soc. Servs.*, 862 A.2d 1026, 1035 (2004)). Specifically,

---

[24] Plaintiffs cite several non-binding cases in support of their position that the AFD Defendants' conduct violated clearly established rights. *See* Pl. Opp'n at 47 (citing, e.g., *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998); and *Black v. Webster*, No. 20-CV-3644, 2022 WL 169669 (D. Md. Jan. 18, 2022). The Court finds each of these cases to be materially different from the instant case such that, even setting aside their non-binding status, they do not clearly establish that a constitutional violation occurred in the instant case.

gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another[.]" *Id.* "An individual acts with gross negligence when that person 'inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.'" *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (quoting *Barbre*, 935 A.2d at 717).

The Maryland Supreme Court has long recognized that "the principle of objective reasonableness as articulated in *Graham* 'controls'" gross negligence claims are based on allegations of excessive force. *Id.* (quoting *Richardson v. McGriff*, 762 A.2d 48, 56 (2000)). Thus, to the extent that Plaintiffs' gross negligence claims are based on the excessive force alleged in Counts I, II, IX, and X, the gross negligence claims in Counts XV and XVI fail for the same reasons. *See* Part V.A *supra*. Moreover, Plaintiffs fail to allege that any Officer or AFD Defendant acted with "wanton and reckless disregard" for Mr. Green's welfare. *Barbre*, 935 A.2d at 717; *see also* Parts V.D.2 and V.D.3.a *supra* (describing conduct of the Officer and AFD Defendants, respectively).

Plaintiffs argue, as alleged in the Complaint, that AFD Defendants deviated from MIEMSS protocols by maintaining Mr. Green in restraints while he was in a face-down position and his wrists were handcuffed and this positioning resulted in his death. Pl. Opp'n, ECF 13, at 39–40. As Judge Rubin found in the Prior Action, "Plaintiffs' allegation . . . that Defendants violated MIEMSS is insufficient to state a claim for gross negligence." *See Green*, 696 F. Supp. 3d at 174.

The instant case is similar to *McCoy v. Hatmaker*, where the Maryland Court of Special Appeals held that gross negligence was not established by a paramedic's failure to follow multiple medical protocols and made errors in medical judgment that resulted in a patient's death. 763 A.2d 1233, 1240–44 (Md. Ct. Spec. App. 2000). The court reasoned:

> [W]e cannot equate a well-intended error in medical judgment—
> even if it costs the patient's life—with wanton and reckless disregard
> for the life of that patient. Medical protocols seek to establish best
> practices for successfully treating certain conditions. Failure to
> follow such protocols might sometimes be deliberate, but more often
> than not, we believe, such failure to heed them during an emergency
> would be purely accidental and, therefore, at most simple
> negligence.

*Id.* at 1044, *quoted in Stracke v. Est. of Butler*, 214 A.3d 561, 570 (Md. 2019). Ultimately, the

plaintiff failed to show that the paramedic "made a deliberate choice not to give [the patient] a

chance to survive, and, at the end of the day, it is deliberateness that lies at the core of

the *Tatum* standard of willfulness and wantonness." *Id.* (citing *Tatum v. Gigliotti*, 565 A.2d 354

(Md. Ct. Spec. App. 1989), *aff'd*, 583 A.2d 1062 (Md. 1991)).

Similarly, in *Tatum*, the Court of Special Appeals affirmed the trial court's motion for

judgment in favor of the defendant paramedic where there was no evidence that he acted with "a

reckless disregard for [the patient's] life." *Tatum*, 565 A.2d at 358.[25] And "the failure to adhere

to protocols and policies does not itself establish a reckless disregard for human life or amount to

gross negligence." *Stracke*, 214 A.3d 561, 571 (citing *Tatum*, 565 A.2d at 359-60; and *McCoy*,

763 A.2d at 1241); *see also id.* at 572 ("The mere fact that Petitioners inaccurately diagnosed and

treated their patient does not elevate their conduct to gross negligence."); *Boyd v. Armstrong*, Civ.

No. ELH-17-2849, 2019 WL 1440876, at *25 (D. Md. Mar. 29, 2019) (granting summary

judgment in favor of defendant paramedic and EMT on the question of gross negligence because

"plaintiffs posit no facts to satisfy the 'tougher standard of wanton and reckless disregard for

---

[25] The evidence in *Tatum* was not sufficient to establish gross negligence, notwithstanding the plaintiff's argument "defendant knew of the possible fatal consequences of failure to act, knew that Tatum needed oxygen during an acute asthma attack, failed to transport him properly from the house, failed to administer oxygen to him in the back of the ambulance for a significant period of time, allowed him to remain face down on the floor of the ambulance, and finally, falsified the ambulance report." 565 A.2d at 358.

life[]'") (quoting *McCoy*, 763 A.3d at 1247); *id*. ("[P]laintiffs have failed to present facts from which a factfinder could infer that [defendant paramedic and EMT] acted with willful indifference to [patient's] wellbeing, or with gross negligence."). The instant case is no different than the foregoing cases.

In sum, setting aside its legal conclusions, the facts alleged in the Complaint and established by the BWC footage, viewed in the light most favorable to Plaintiffs, fail to establish a plausible claim that any Officer or AFD Defendant "intentional[ly] fail[ed] to perform a manifest duty in reckless disregard of the consequences" to Mr. Green, *Barbre*, 935 A.2d at 717, "made a deliberate choice not to give [Mr. Green] a chance to survive," *McCoy*, 763 A.2d at 1044, or acted "with willful indifference to [Mr. Green's] wellbeing, or with gross negligence[,]" *Boyd*, 2019 WL 1440876, at *25. Accordingly, Plaintiff's claims for gross negligence in Counts XV and XVI must be dismissed. *See Green*, 696 F. Supp. 3d at 174 (dismissing gross negligence claims in Prior Complaint).[26]

### F.  Counts XI and XII: Battery

In Counts XI and XII of the Complaint, Plaintiffs assert claims of battery under Maryland law against all Defendants. Compl. ¶¶ 214–25. Specifically, Plaintiffs allege that "Defendants assaulted and battered Mr. Green when they unlawfully restrained [him] . . . and unlawfully strapped him in a face-down position to two stretchers," and that "Defendants intentionally

---

[26] Plaintiffs allege that the City is vicariously liable for the "grossly negligent" conduct of the Officer and AFD Defendants "committed within the scope of their employment" with the City. Compl. ¶ 244. Defendants argue that the City is immune from Plaintiffs' gross negligence claims under the Local Government Tort Claims Act. Def. Mem. At 41 (citing Md. Code Ann., Cts. & Jud. Proc. § 5-303; and *Solis v. Prince George's Cnty*., 153 F. Supp. 2d 793, 805-06 (D. Md. 2001)). Plaintiffs do not respond to this argument. Any gross negligence claim that Plaintiffs intended to assert against the City is dismissed.

touched Mr. Green in a harmful or offensive manner when they strapped him in a face-down position" without permission. *Id.* ¶¶ 216, 218.

In Maryland, a "battery occurs when one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 735 A.2d 1096, 1099 (Md. 1999). "A battery may occur through a defendant's direct or indirect contact with the plaintiff." *Id.* "However, intent is required; mere accidental or inadvertent conduct that results in harmful contact with another does not rise to the level of assault or battery." *Wolfe v. Columbia Coll., Inc.*, Civ. No. GJH-20-1246, 2021 WL 2805952, *13 (D. Md. July 6, 2021) (citing *Nelson*, 735 A.2d at 1101).

First, Plaintiffs' battery claims against the Officer Defendants fail for the same reasons as their § 1983 excessive force claims. "An officer is not liable for battery for using a reasonable amount of force when effectuating a lawful detention or arrest." *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 383 (D. Md. 2018) (citing *Ashton v. Brown*, 339 Md. 70, 119 n.24 (Md. 1995)). It is well established that "th[e] jurisprudence [governing Fourth Amendment excessive force actions] also controls [a party's] actions for battery and gross negligence." *Njang v. Montgomery Cnty., Maryland*, 279 F. App'x 209, 216 (4th Cir. 2008) (quoting *Richardson*, 762 A.2d at 56); *Neal v. Caplan*, Civ. No. 22-1919-BAH, 2025 WL 608191, at *12 (D. Md. Feb. 25, 2025) ("Plaintiffs' common law state tort claims 'rise[] and fall' with Plaintiffs' Fourth Amendment claims.") (citation omitted); *Rovin v. State*, 488 Md. 144, 188, 321 A.3d 201, 227 (2024) (finding of objective reasonableness on a 42 U.S.C. § 1983 claim "would defeat the common law claims and constitutional claims arising from the same conduct as a matter of law"). Thus, Plaintiffs' battery claims against the Officer Defendants fail for the same reason as their excessive force claims. *See* Part V.A *supra*. In sum, Plaintiffs fail to state a plausible claim that any Officer Defendant acted unlawfully or used an unreasonable amount of force when taking protective custody of Mr. Green.

Accordingly, the battery claims in Counts XI and XII must be dismissed. *See Green*, 696 F. Supp. 3d at 169 (dismissing battery claims against Officer Defendants in Prior Complaint).

Second, the AFD Defendants are immune from Plaintiffs' battery claims under the Fire and Rescue Act. That statute provides: "Notwithstanding any other provision of law, except for any willful or grossly negligent act, a fire company or rescue company, and the personnel of a fire company or rescue company, are immune from civil liability for any act or omission in the course of performing their duties." Md. Code Ann., Cts. & Jud. Proc. § 5-604(a). This statute extends "broad immunity" to personnel of fire and rescue companies. *TransCare Maryland, Inc. v. Murray*, 64 A.3d 887, 888–89 (Md. 2013). Here, Plaintiffs allege that each AFD Defendant was a paramedic, emergency responder, or health care worker employed "within AFD's EMS Division[.]" Compl. ¶ 33. The statutory exception to immunity for "willful or grossly negligent act[s]" does not apply. As explained in Part V.E *supra*, setting aside legal conclusions drawn in the Complaint, Plaintiffs fail to present sufficient facts to state a plausible claim that any AFD Defendant acted willfully to injure Mr. Green or with gross negligence in causing injuries to Mr. Green. *See Green*, 696 F. Supp. 3d at 170 (dismissing battery claims against AFD Defendants in Prior Complaint).

Accordingly, Counts XI and XII must be dismissed.[27]

---

[27] The City is not listed as a defendant in the headers of Counts XIII and XIV. Plaintiffs allege, however, that the City is "vicariously liable for the AFD Defendants' and Officer Defendants' grossly negligent acts and omissions with respect to Mr. Green" because the individual Defendants were acting "within the scope of their employment" when the acts were committed. Compl. ¶ 220. Plaintiffs do not respond to Defendants' argument that this allegation should be stricken. The Court does not construe the instant Complaint as asserting battery claims against the City. *See* Def. Mem. at 39. Any battery claim that Plaintiffs intended to assert against the City is dismissed.

### G. Counts XIII and XIV: Negligence

In Counts XIII and XIV of the instant Complaint, Plaintiffs assert claims of negligence and negligence per se against the Officer Defendants. Compl. ¶¶ 226–38. "To plead negligence in Maryland, a plaintiff must 'allege with certainty and definiteness, facts and circumstances sufficient to set forth (a) a *duty* owed by the defendant to the plaintiff, (b) a *breach* of that duty and (c) injury *proximately* resulting from that breach.'" *Fletcher v. Md. Transit Admin.*, 741 F. App'x 146, 149 (4th Cir. 2018) (quoting *Pace v. State*, 38 A.3d 418, 423 (Md. 2012)). "Generally, under the public duty doctrine, when a statute or common law 'imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort.'" *Muthukumarana v. Montgomery County*, 805 A.2d 372, 395 (Md. 2002) (citation omitted). As relevant here, any duty owed by the Officer Defendants is an official duty to protect and serve the public—a duty that is generally not enforceable in tort. *See Ashburn v. Anne Arundel Cnty.*, 510 A.2d 1078, 1084 (Md. 1986). If, however, a plaintiff "alleges sufficient facts to show that the defendant policeman created a 'special relationship' with him[] upon which he relied, he may maintain his action in negligence." *Id.* at 1085. This "special duty rule," *id.*, "is applied only when a duty exists to control the conduct of a third person[,]" such as, when "a victim brings an action against a police officer for an injury caused by a third person[,]" *Gray v. Kern*, 124 F. Supp. 3d 600, 611 (D. Md. 2015), *aff'd in part, vacated in part on other grounds sub nom. Gray by Gray v. Kern*, 702 F. App'x 132 (4th Cir. 2017).

In the Prior Action, Judge Rubin found that the facts alleged therein did not support the special relationship between the Officer Defendants and Mr. Green necessary for Plaintiffs to pursue their negligence claims. *Green*, 696 F. Supp. 3d at 172–73. Judge Rubin reasoned as follows:

The Complaint fails to plausibly allege that any of the Doe or Officer Defendants[28] took affirmative steps – through conduct or words – to promise or assure Green that they would protect him from some harm; that they specifically or uniquely undertook to act for his benefit; or that they made a promise to induce (or which did induce) his reliance on same. *Ashburn*, 306 Md. at 631-32, 510 A.2d 1078. While responding officers and emergency responders surely address the needs of the specific citizen to whom duty may call them, and while surely those events may start off or become dangerous in the moment, that is the nature of the job. That is the essence – the starting point – of every officer or EMT relationship with every member of the public. By its natural extension, Plaintiffs' argument – that the Officer and Doe Defendants created a special relationship with Green by virtue of placing him in protective custody under physical restraint (even were it to an unconstitutional extent) – transforms the exception into the rule. That is not the law.

Moreover, importantly, the special relationship doctrine "is applied only when a duty exists to control the conduct of a third person." *Gray v. Kern*, 124 F. Supp. 3d 600, 611 (D. Md. 2015); *see Doe v. Montgomery Cnty. Bd. of Educ.*, 2021 WL 6072813, at *9, 2021 U.S. Dist. LEXIS 244900, at *29 (D. Md. Dec. 23, 2021) (explaining that the special relationship doctrine arises "when the state and the aggrieved individual have a special relationship whereby the state has an affirmative duty to protect the individual from harm inflicted by third parties"). Therefore, the special relationship exception "arises when a victim brings an action against a police officer for an injury caused by a third person." Gray, 124 F. Supp. 3d at 611.

Here, Plaintiffs allege that the Officer and Doe Defendants had an affirmative duty to protect Green from harm, specifically "to avoid causing foreseeable physical or mental injuries to him." (ECF No. 1 ¶ 211.)[29] Plaintiffs, however, allege that the Officer and Doe Defendants directly caused harm to Green – not by a failure to prevent harm at the hands of a third party. Therefore, even if a

---

[28] The Doe Defendants referenced in Judge Rubin's opinion are identified by name in the instant Complaint and referred to herein as AFD Defendants.

[29] The same fact is alleged in paragraph 228 of the instant Complaint.

special relationship were adequately pled, it would not result in a
cognizable negligence claim given the allegations of harm.

*Id.*

This Court finds the foregoing reasoning to be persuasive and fully applicable to the
negligence claims asserted in the instant Complaint. Accordingly, the negligence claims asserted
in Counts XIII and XIV must be dismissed.

Plaintiffs additionally asserts negligence per se claims against the Officer Defendants in
Counts XIII and XIV. Specifically, Plaintiffs allege that "Officer Defendants were . . . negligent
per se in that they violated the aforementioned prohibition against prone restraint in the MIEMSS
Protocols, which have the force of law." Compl. ¶ 233. Even if the protocols have the force of law,
as Plaintiffs contend, they do not plausibly allege that the MIEMSS protocols apply to create duties
for police officers or that they apply to anyone other than EMS providers. Thus, the Complaint
fails to state a claim for negligence per se against the Officer Defendants, and Counts XIII and
XIV are dismissed in their entirety.

### H.  Count XVII: Wrongful Death

In Count XVII of the instant Complaint, Plaintiffs assert a wrongful death claim against all
Defendants. Compl. ¶¶ 251–57. Specifically, Plaintiffs allege that Defendants "wrongfully killed
Mr. Green when they strapped him to two stretchers simultaneously in a face-down position in
violation of Mr. Green's clearly established constitutional rights on June 1, 2021." Compl. ¶ 253.

Maryland's Wrongful Death Act "allows the decedent's beneficiaries or relatives to
recover damages for loss of support or other benefits that would have been provided, had the
decedent not died as a result of another's ['wrongful act,' as defined by the statute]." *Spangler v.
McQuitty*, 141 A.3d 156, 168 (Md. 2016). The statute defines "wrongful act" as "an act, neglect,
or default including a felonious act which would have entitled the party injured to maintain an

46

action and recover damages if death had not ensued." Md. Code Ann., Cts. & Jud. Proc. § 3-902.

"To plead a wrongful death claim under Maryland law, a plaintiff must allege: (1) the victim's

death; (2) that the victim's death was proximately caused by the negligence [or other 'wrongful

act'] of the defendant; (3) that the victim's death resulted in injury to the plaintiff, who falls within

the category of beneficiaries defined by the statute; and (4) that the claim is brought within the

applicable statutory period." *Willey v. Bd. of Educ.*, 557 F. Supp. 3d 645, 670 (D. Md. 2021).

As explained in Parts V.A through V.G *supra*, the Court finds that the Complaint fails to

allege any plausible negligent act or other "wrongful act" on part of any Defendant. Furthermore,

as explained in Part V.F *supra*, the AFD Defendants are immune from suit under the Fire and

Rescue Act for "any act or omission in the course of performing their duties[,]" except "any willful

or grossly negligent act[.]" Md. Code Ann., Cts. & Jud. Proc. § 5-604(a). "One is grossly negligent

or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent

to the rights of others that he acts as if such rights did not exist." *McCoy*, 763 A.2d at 1240 (quoting

*Tatum,* 565 A.2d 354) (internal quotation marks omitted). As explained in Part V.E *supra*,

Plaintiffs do not plausibly allege any gross negligence or intent to injure on part of the AFD

Defendants. Therefore, Plaintiffs fail to state a plausible wrongful death claim, and Count XVII

must be dismissed as to all Defendants. *See Green*, 696 F. Supp. 3d at 175 (dismissing wrongful

death claims in Prior Complaint).

### I.    Count XVIII: Survival Action

Count XVIII of the instant Complaint asserts a "survival action" as a separate claim against

all Defendants. Compl. ¶¶ 258–64. Under Maryland law, a survival action allows a personal

representative to "prosecute, defend, or submit to arbitration actions, claims, or proceedings . . .

for the protection or benefit of the estate, including the commencement of a personal action which

the decedent might have commenced or prosecuted . . . . Md. Code Ann. Estates & Trusts § 7-401(y). The survival statute "does not provide a separate and distinct cause of action." *Minor v. Prince George's Cnty., Md.*, Civ. No. PWG-15-983, 2017 WL 633321, at *1 (D. Md. Feb. 15, 2017) (cleaned up); *see also Johnson v. Baltimore Police Dep't*, Civ. No. SAG-18-2375, 2021 WL 1610152, at *5 (D. Md. Apr. 23, 2021). A "survival action" is "merely the mechanism by which an estate brings a claim that the decedent could have asserted had he survived." *Mang v. City of Greenbelt, Md.*, Civ. No. A. DKC 11-1891, 2012 WL 115454, at *8 (D. Md. Jan. 13, 2012). A separate claim for "survival" set out in a separate count of a complaint is, therefore, unnecessary and improper. *Johnson*, 2021 WL 1610152, at *5.

Accordingly, Count XVIII is dismissed with prejudice. *See Green*, 696 F. Supp. 3d at 176 (dismissing "survival action" count in Prior Complaint).

## VI.    DISMISSAL WITHOUT PREJUDICE

In their Motion to Dismiss, Defendants request dismissal of this action with prejudice. "The determination whether to dismiss with or without prejudice under Rule 12(b)(6) is within the discretion of the district court." *Sharma v. Rushmore Loan Mgmt. Servs., LLC*, 611 F. Supp. 3d 63, 86–87 (D. Md. 2020) (quoting *Weigel v. Maryland*, 950 F. Supp. 2d 811, 825 (D. Md. 2013)). "[D]ismissal with prejudice is proper if there is no set of facts that plaintiff could present to support his claim[.]" *Id.* at 87 (quoting *Weigel*, 950 F. Supp. 2d at 826). Here, the Court notes that the instant Complaint is nearly identical to the Prior Complaint filed in the Prior Action, but there were substantive modifications that the Court finds were made upon reasonable grounds. The Court cannot find definitively that there is no set of facts Plaintiffs could present to support their claims. Accordingly, all claims are dismissed without prejudice, with the exception of their separate count for "survival action," which is dismissed with prejudice for reasons explained in Part V.*I supra*.

## VII.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED as to all counts.

Count XVIII is dismissed with prejudice, and all remaining claims are dismissed without prejudice.

A separate Amended Order shall issue.


  4/7/25
Date

_____
Matthew J. Maddox
United States District Judge